Electronically Filed
Unredacted Version Filed Under Seal

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
MITRE SPORTS INTERNATIONAL LIMITED,          :
                                                                          :
                                    Plaintiff,                      :   Case No.: 08 CIV 9117(GBD)
                                                                          :
                        -against-                                 :
                                                                          :
HOME BOX OFFICE, INC.,                              :
                                                                          :
                                    Defendant.                   :
                                                                          :
-------------------------------------------------------------------X


**MEMORANDUM OF LAW OF DEFENDANT HOME BOX OFFICE, INC.
IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**


HOGAN & HARTSON LLP
Slade R. Metcalf
Katherine M. Bolger
Rachel F. Strom
875 Third Avenue
New York, NY  10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100

Of Counsel:
Stephanie S. Abrutyn
Home Box Office, Inc.
1100 Avenue of the Americas
New York, NY 10036

*Attorneys for Defendant Home Box Office, Inc.*

Electronically Filed
Unredacted Version Filed Under Seal

## <u>TABLE OF CONTENTS</u>

<u>Page:</u>

TABLE OF AUTHORITIES ................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................... 1

FACTUAL BACKGROUND ..................................................................................................... 3

    A.    The Parties ............................................................................................................. 3

    B.    The Segment ........................................................................................................... 4

    C.    The Complaint ........................................................................................................ 5

    D.    Mitre's Use of Child Labor Makes International Headlines ........................................ 5

        1.    The 1995 Allegations of Child Labor and Mitre's Response ........................... 6

        2.    The *Life* Article and Foulball ........................................................................... 7

        3.    Mitre Enters the Fray and Signs the Atlanta Agreement in Atlanta ................................................................................................................ 8

        4.    Mitre's Role in the Child Labor Controversy Continues:  The Christian Aid Report and the SGFI .............................................................. 11

        5.    Mitre and the U.S. Department of Labor Report ........................................... 13

        6.    Child Labor in the Soccer Ball Industry Continues to Capture Worldwide Attention and Mitre Stays at the Center of the Dispute ....................................................................................................... 14

        7.    New Reports of Mitre's Use of Child Labor Continue ................................... 15

        8.    Mitre Advertises Its Prominence in the Child Labor Controversy ................................................................................................... 16

    E.    Mitre: A Leading Name In The Manufacture And Sales of Soccer Equipment ............................................................................................................ 19

        1.    Mitre and the United States Market ............................................................. 20

        2.    Mitre Becomes "The Leading Maker Of Soccer Shoes And Balls In The U.S." ...................................................................................... 21

Electronically Filed
Unredacted Version Filed Under Seal

3.     Mitre Becomes The First Official Ball of Major League
Soccer ...................................................................................................22

4.     Mitre Maintains Its High Profile....................................................23

5.     Mitre In The United States Today .................................................24

ARGUMENT .........................................................................................................25

MITRE IS A PUBLIC FIGURE .............................................................................25

A.     The Public Figure Standard .........................................................26

B.     Mitre Is A Public Figure ..............................................................28

1.     Mitre Injected Itself In The Controversy Surrounding The Use
Of Child Labor In The Manufacture Of Soccer Balls ....................28

2.     Mitre Is A Public Figure Because It Is Leading Manufacturer
Of Soccer Balls Sold In The United States.....................................33

CONCLUSION......................................................................................................38

\\\NY - 033845/000001 - 1156624 v1

Electronically Filed
Unredacted Version Filed Under Seal

# TABLE OF AUTHORITIES

Page:

Federal Cases

Carson v. Allied News Co.,
    529 F.2d 206 (7th Cir 1976) .................................................30

Celle v. Filipino Reporter Enters.,
    209 F.3d 163 (2d Cir. 2000).................................................28, 30, 31

Cerasani v. Sony,
    991 F. Supp. 343 (S.D.N.Y. 1998).................................................3

Church of Scientology Int'l v. Behar,
    238 F.3d 168 (2d Cir.),
    cert. denied, 534 U.S. 814 (2001).................................................26

Church of Scientology of California v. Siegelman,
    475 F. Supp. 950 (S.D.N.Y. 1979).................................................33, 34

Computer Aid, Inc. v. Hewlett-Packard Co.,
    56 F. Supp. 526 (E.D. Pa. 1999).................................................36

Contemporary Mission, Inc. v. New York Times Co.,
    842 F.2d 612 (2d Cir. 1988),
    cert. denied, 488 U.S. 856 (1988).................................................26, 28, 36

Curtis Publ'g Co. v. Butts,
    388 U.S. 130,
    reh'g. denied, 389 U.S. 889 (1967).................................................27

Dameron v. Washington Magazine, Inc.,
    779 F.2d 736 (D.C. Cir. 1985).................................................30

Franzon v. Massena Mem. Hosp.,
    89 F. Supp. 2d 270 (N.D.N.Y. 2000).................................................32

Gertz v. Robert Welch, Inc.,
    418 U.S. 323 (1974).................................................passim

Grass v. News Group Publ'ns, Inc.,
    570 F. Supp. 178 (S.D.N.Y. 1983).................................................31

\\\NY - 033845/000001 - 1156624 v1

Electronically Filed
Unredacted Version Filed Under Seal

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
  491 U.S. 657 (1989).........................................................................................27

*In re Saloman Analyst Winstar Litig.*,
  No. 02 Civ. 6171 (GEL), 2006 WL 510526 (S.D.N.Y. Feb. 28, 2006)....................................3

*Kroll v. City and County of Honolulu*,
  833 F. Supp. 802 (D. Hi. 1993).......................................................................36, 37

*Meeropol v. Nizer*,
  560 F.2d 1061 (2d Cir. 1977)...........................................................................35

*Millsap v. Journal/Sentinel, Inc.*,
  100 F.3d 1265 (7th Cir. 1996) ..........................................................................36

*Muller-Paisner v. TIAA, TIAA-CREF Enters., Inc.*,
  289 Fed. Appx. 461 (2d Cir. 2008).......................................................................3

*Nat'l Found. for Cancer Research, Inc. v.*
  *Counsil of Better Business Bureaus Inc.*,
  705 F.2d 98 (4th Cir. 1983) ............................................................................32

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964).....................................................................................26

*Partington v. Bugliosi*,
  56 F.3d 1147 (9th Cir. 1995) ...........................................................................36

*Perks v. Town of Huntington*,
  251 F. Supp. 2d 1143 (E.D.N.Y. 2003) ..................................................................32

*Quantum Elec. Corp. v. Consumers Union of United States, Inc.*,
  881 F. Supp. 753 (D. R. I. 1995)........................................................................32

*Reliance Ins. Co. v. Barron's*,
  442 F. Supp. 1341 (S.D.N.Y. 1977)......................................................................31

*Ren v. Gonzalez*,
  164 Fed. Appx. 33 (2d Cir. 2006)........................................................................3

*St. Amant v. Thompson*,
  390 U.S. 727 (1968).....................................................................................27

*Staehr v. Hartford Fin. Serv. Group, Inc.*,
  547 F.3d 406 (2d. Cir. 2008)............................................................................3

iv

Electronically Filed
Unredacted Version Filed Under Seal

*Steaks Unlimited, Inc. v. Deaner*,
     623 F.2d 264 (3d Cir 1980)...........................................................................................33

*Yiamouyiannis v. Consumers Union of the United States, Inc.*,
     619 F.2d 932 (2d Cir. 1980),
     *cert. denied*, 449 U.S. 839 (1980) .............................................................................31

<u>State Cases</u>

*Arrigoni v. Velella*,
     110 A.D.2d 601, 488 N.Y.S.2d 184 (1st Dep't 1985) .............................................34

*Capuano v. The Outlet Co.*,
     579 A.2d 469 (Sup. Ct. RI 1990) .............................................................................32

*Curry v. Roman*,
     217 A.D.2d 314, 635 N.Y.S.2d 391 (4th Dep't 1995) .............................................34

*Ithaca College v. Yale Daily News Publ'g Co.*,
     105 Misc.2d 793, 433 N.Y.S.2d 530 (Sup. Ct., Tompkins Co. 1980),
     *aff'd*, 85 A.D.2d 817, 445 N.Y.S.2d 621 (3d Dep't 1981).......................................34

*James v. Gannet Co.*,
     40 N.Y.2d 415, 386 N.Y.S.2d 871,
     *reh'g denied,* 40 N.Y.2d 990, 390 N.Y.S.2d 1027 (1976).........................................26, 27, 33

*Liu v. New York News, Inc.*,
     183 A.D.2d 443, 583 N.Y.S.2d 391 (1st Dep't 1992) ...........................................28, 34

*Maule v. NYM Corp.*,
     54 N.Y.2d 880, 444 N.Y.S.2d 909 (1981) ...........................................................27, 34

*Maule v. NYM Corp.*,
     76 A.D.2d 58, 429 N.Y.S.2d 891 (1st Dep't 1980),
     *rev'd*, 54 N.Y.2d 880, 444 N.Y.S.2d 909 (1981).................................................28

*Samuels v. Berger*,
     191 A.D.2d 627, 595 N.Y.S.2d 231 (2d Dep't 1993)............................................34

\\\NY - 033845/000001 - 1156624 v1

Electronically Filed
Unredacted Version Filed Under Seal

Defendant Home Box Office, Inc. ("HBO") submits this memorandum of law in support of its motion for partial summary judgment and asks that this Court to rule that Plaintiff Mitre Sports International Limited ("Mitre" or "Plaintiff") is a public figure.[1]

## PRELIMINARY STATEMENT

As a worldwide leader in the manufacture of soccer balls and sporting equipment, Mitre is unquestionably a public figure.  Mitre specifically plead facts sufficient to establish its public figure status when it described itself in its complaint as playing a "leading role in the international effort to eliminate child labor in the manufacture of soccer balls" and when Mitre's counsel asserted to this Court that Mitre is an "international hero" in the anti-child labor movement.  (Bolger Dec., Exs. A at Introduction, F at 69-70.)

Moreover, the record bears out Mitre's assessment of its status – ██████████████ ████████████████████████████████████, and since 1995 Mitre has routinely been the subject of newspaper articles and non-profit agency reports about its use of child labor in the manufacture of soccer balls in Pakistan and India.  Instead of remaining silent in the face of these revelations, Mitre has voluntarily and eagerly engaged in public discussion of these issues.  For example, in a clear effort to influence the direction of public discourse about soccer ball stitching, in 1997, Mitre voluntarily organized a syndicate of soccer ball manufacturers to enter into a highly-publicized agreement that sought to curtail child labor in Pakistan.  Mitre then publicly touted its credentials as a leader in the fight against child labor whenever the opportunity presented itself.  Despite these public statements, however, children continue to stitch Mitre branded soccer balls.  And each time this fact is disclosed to the public, Mitre follows the same pattern – it voluntarily comments on the allegations and attempts to influence

---

[1]      The facts necessary for a determination of this motion are set forth in the accompanying declaration of Katherine M. Bolger, sworn to the 28th day of August 2009 (the "Bolger Dec."), and the exhibits annexed thereto.

Electronically Filed
Unredacted Version Filed Under Seal

the debate by issuing press releases, conducting interviews and publicly describing its anti-child labor policies.  There can be no question, then, that Mitre is a public figure.

More generally, Mitre also is a public figure because it has taken affirmative steps to gain public attention in the United States and throughout the world.  In fact, Mitre's marketing manager proclaimed that Mitre has "become synonymous with [soccer] and [is] the number one manufacturer of [soccer balls] in the world . . . ."  (Bolger Dec., Ex. I-1.)  Amidst a swirl of publicity, Mitre became the sponsor of Major League Soccer, the United States' professional soccer league, providing the official soccer balls for the league from 1995 to 2000.  (*Id.*, Exs. I-2-4.)  Mitre also has publicly sponsored individual players and clubs throughout the United States since at least 1992.  (*Id.,* Exs. I-5, I-6.)  And Mitre branded soccer balls and sporting equipment are readily available throughout the United States and can be purchased by any one of the estimated 24 million Americans who play soccer (*id.*, Ex. H), at Wal-Mart, Kmart, Amazon.com and other retail outlets across the country (*id.,* Exs. M-R.)

Mitre has enjoyed sustained and unlimited access to the media to respond to reports of its use of child labor – access that Mitre's well-connected public relations department has routinely exploited by issuing press releases, granting interviews and responding to press inquiries.  Mitre also publicly touts its "Employment Standards Policy" and "Code of Employment Standards for Suppliers" (branded as "Mitre Making a Difference" through "Mitre's Ethical Responsibilities") and proudly claims that its efforts to combat child labor are equal to none.  It is a prominent player in the United States soccer industry and well known for its sponsorship of clubs and players, as well as a wide-range of soccer equipment.  From the perspective of United States consumers who purchase or consider purchasing soccer equipment, Mitre branded goods are ubiquitous.

2

Electronically Filed
Unredacted Version Filed Under Seal

In light of its overwhelming presence in the public discourse, there simply can be no good faith argument that Mitre is not a public figure.  Accordingly, HBO respectfully requests that its motion for partial summary judgment be granted and this Court hold that Mitre is a public figure.

## FACTUAL BACKGROUND

### A.    The Parties

Mitre is a "leading maker of soccer shoes and balls in the U.S. and the U.K."  (Bolger Dec., Ex. I-7.[2])  Founded in England in 1817, Mitre has been selling sporting equipment, including soccer balls, soccer shoes, soccer nets and baseball shoes in the United States since 1975.  (*Id.,* Ex. I-8.)  It has advertised itself as "America's Number 1 soccer shoe."  (*Id.*, Ex. G; *available at* http://www.youtube.com/watch?v=LbmRN7OvPac.)

Mitre also describes itself as an "international hero" in the soccer ball stitching community and claims to have "pulled together manufacturers from all around the world in an attempt to eliminate child labor."  (*Id.*, Ex. F at 69-70.)

HBO, among other things, owns and operates the premium pay television network HBO and distributes the Emmy-award winning program "Real Sports with Bryant Gumbel" ("Real

---

[2]    HBO respectfully requests that this Court take judicial notice of this and all other newspaper and magazine articles, television shows, websites, and/or government and non-government organization reports annexed to the Bolger Dec. at Exs. G-Q, T-BB.  *See Cerasani v. Sony*, 991 F. Supp. 343, 354-55 (S.D.N.Y. 1998) (taking judicial notice of the "widespread newspaper coverage" describing plaintiff's criminal conduct in determining that the plaintiff's reputation was libel-proof.); *Ren v. Gonzalez*, 164 Fed. Appx. 33, 35 n.2 (2d Cir. 2006) (taking judicial notice of a 2001 Department of State report on China's human rights practices); *see also Muller-Paisner v. TIAA, TIAA-CREF Enters., Inc.*, 289 Fed. Appx. 461, 466 n.5 (2d Cir. 2008) ("Judicial notice may be taken of the defendants' website for the fact of its publication.").  This Court may take judicial notice not just of the fact that these articles were published, but also that the information contained therein was, regardless of its truth or falsity, available to the general public.  *Staehr v. Hartford Fin. Serv. Group, Inc.*, 547 F.3d 406, 425 (2d. Cir. 2008) ("it is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents, in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice"); *see also In re Saloman Analyst Winstar Litig.*, No. 02 Civ. 6171 (GEL), 2006 WL 510526, at *4 n.6 (S.D.N.Y. Feb. 28, 2006) (taking judicial notice that certain articles were published and noting that "regardless of whether they were accurate, their evident purpose and immediate effect was to raise questions about objectivity and bias on Wall Street firms generally . . . .").

Electronically Filed
Unredacted Version Filed Under Seal

Sports") on that network.

B.      **The Segment**

On September 16, 2008, HBO telecast an episode of "Real Sports" that included a segment entitled "Children of Industry" (the "Segment").  (Bolger Dec., Ex. C.)[3]

The Segment reports on the use of child labor in the stitching of soccer balls in two areas in India.  (*Id.*)  The Segment begins with an interview between Bernard Goldberg ("Goldberg"), a "Real Sports" correspondent, and Kailash Satyarthi ("Satyarthi"), an internationally recognized children's rights advocate, who gives an overview of the use of child labor in the stitching of soccer balls in India.  (*Id.*)  The Segment goes on to report that, in the 1990s, after widespread child labor was uncovered in soccer ball manufacturing in Pakistan, Mitre called a summit of the world's major soccer manufacturers, who pledged to eradicate the use of child labor in the manufacture of soccer balls.  In particular, the Segment reports that Mitre and other companies pledged to adopt codes of conduct that prohibit the use of child labor, but that those codes of conduct have proven difficult to enforce.

The Segment then discusses two major, but distinct, child labor issues in India.  First, the Segment discusses the use of low-paid child labor in Jalandhar, India to stitch soccer balls.  (*Id.*)  It includes scenes of children under the age of fourteen stitching "Mitre Cobra" branded soccer balls in Jalandhar.  The Segment then discusses the economic reasons why children stitch soccer balls and features an interview with several children stitching Mitre branded soccer balls for low wages.  Thereafter, certain Mitre branded soccer balls are tracked – through the balls' UPC codes – from India, where child labor is used, to retail stores in the United States.  (*Id.*)

As a separate and second issue, the Segment discusses children who stitch soccer balls

---

[3]      The Segment premiered on September 16, 2008.  ███████████████████████
██████████████████

Electronically Filed
Unredacted Version Filed Under Seal

for no direct payment in Meerut, India.  In Meerut, the children are in "debt bondage," meaning they are working to pay off their parents' debts.  As Mitre acknowledges in the Complaint, the Segment "shows many other children both stitching and delivering finished soccer balls in Meerut, but never shows the brands of these balls nor mentions the names of these brands." (Bolger Dec., Ex. A. ¶ 23.)

In addition, during the Segment, Goldberg reports on the statement Mitre provided in response to HBO's requests for an interview:  "We wanted to talk to Mitre and Wal-Mart but they declined our request for on camera interviews.  But both did tell us that they regularly monitor their overseas suppliers to make sure that child labor is not being used, and that they wouldn't tolerate any lapses.  They also promised to investigate, as did the U.S. Department of Labor."  (*Id.*, Ex. C.)

## C.     The Complaint

On October 23, 2008, Mitre filed the complaint initiating this action against HBO (the "Complaint") and served the Complaint on October 29, 2008.  (Bolger Dec., ¶ 2, Ex. A.)

In the Complaint, Mitre alleges that the Segment is false and defamatory because, it claims, no Mitre branded soccer balls are stitched in India by children.  (*Id.,* Ex. A ¶ 44.)  In fact, the Complaint goes even further, alleging that no child labor is used in the manufacture of Mitre branded soccer balls.  (*See generally id.*)  Mitre also alleges that it plays "a leading role in the international effort to eliminate child labor in the manufacture of soccer balls."  (*Id.* at Introduction.)

## D.     Mitre's Use of Child Labor Makes International Headlines

In a recent interview, Nicola Lesirge, Mitre's marketing manager, proclaimed that Mitre has "become synonymous with football [soccer] and [is] the number one manufacturer of footballs [soccer balls] in the world . . . ." (Bolger Dec., Ex. I-1.)  But while Mitre has achieved

\\\NY - 033845/000001 - 1156624 v1

Electronically Filed
Unredacted Version Filed Under Seal

significant marketing and sales success – and brand recognition – in the United States and throughout the world, Mitre has also achieved international renown because child labor has repeatedly been found to have been used in the manufacture of its soccer balls.  In response, Mitre has stepped forward and repeatedly issued public statements in which Mitre purports to lead the fight to end child labor.

1.    The 1995 Allegations of Child Labor and Mitre's Response

The first time the use of child labor in the manufacture of Mitre branded soccer balls became public seems to be in 1995.  At that time, the United States had just hosted a successful soccer World Cup and "Soccer Fever" had gripped the nation.  (*Id.*, Ex. I-9 at 26.)  As American interest in soccer grew, so too did the interest of American non-profits, labor unions and media entities in the use of child labor in the manufacture of soccer balls.  (*See id.*, Ex. I-10 ("In the 1990s, child labour used in stitching footballs attracted the attention of US-based human rights NGOs and trade unions.").)  As a result of these growing concerns, on April 6, 1995, the CBS news program "Eye to Eye" aired a segment discussing the use of child labor in the manufacture of soccer balls in Pakistan.  (*Id.*, Ex. I-11.)  The next day, *USA Today* published an article entitled "CBS: Balls Made By Child Laborers" that reported on CBS' findings and noted that, "Virtually all of the USA's top suppliers of soccer equipment – including Adidas, Umbro and Mitre – import balls from Pakistan."  (*Id.*)

Just a few weeks later, on May 14, 1995, the *Sunday Times* of London wrote a lengthy article documenting the use of child labor in Pakistan and specifically reported that:

> An investigation by the Sunday Times discovered that balls made for Mitre, the British manufacturer of sports goods that supplies the Football Association and Premier League, are being stitched together by children in Pakistan.
>
> The children, often engaged in a modern form of slave labour, spend long hours in workshops around Sialkot, a Punjabi town near the border with India.

6

Electronically Filed
Unredacted Version Filed Under Seal

(Bolger Dec., Ex. I-12.)   Duncan Bembridge ("Bembridge"), the then marketing director for Mitre, was interviewed for the article and gave a statement promising to investigate the allegations and expressing "concern" that Mitre's suppliers in Pakistan would break their purported agreements with Mitre not to use child labor.   The article is available in the United States through the Lexis/Nexis database.   (*Id.*)

The next week, on May 21, 1995, in a clear effort to influence the public discussion of the *Times* article, Bembridge sent a letter to the editor responding to the allegations, which reads:

> Mitre Sports International do [sic] not condone in any form the use of child labour. Agreements with our factories in Pakistan clearly state our policy and we have written assurances that child labour is not being used to stitch Mitre balls.
>
> As a father and a director of a highly principled international company, I am totally committed to stamping out child slavery.

(*Id.*, Ex. I-13.)   But Bembridge's letter could do nothing to restrain the public's growing concerns over the use of child labor.   Reflecting public sentiment, for example, *The New York Times* reported that UNICEF pledged not to buy from suppliers that use child labor.   (*Id.*, Ex. I-14.)   Public concern over child labor only continued to grow in the wake of the May 1996 scandal surrounding the use of child labor in the manufacture of Kathie Lee Gifford-branded clothing.   (Bolger Dec., Ex. I-15.)   Not all of this attention was necessarily critical: public commentary often included discussion of whether child labor can be an essential part of life for families living in extreme poverty – and even a preferred alternative to child starvation or prostitution.   (*See, e.g., id.*, Exs. BB, I-14, I-16-20.)

2.      The *Life* Article and Foulball

In June 1996, *Life* magazine again brought soccer ball stitching to the attention of the American public, publishing an article entitled "Six Cents an Hour" that vividly recounted the danger to children from being forced to stitch soccer balls in Sialkot.   The article, for example,

Electronically Filed
Unredacted Version Filed Under Seal

discussed the story of Kfayat, who stitches Cobra soccer balls, and "who has never been to school and has been stitching in the same shed for three years. He is paid 30 cents for each synthetic leather ball he stitches." The article mentions Mitre by name as manufacturing balls in Pakistan. (*Id.*, Ex. I-21.)[4]

Shortly after the article was published, United States Secretary of Labor Robert B. Reich held a press conference to announce the creation of the "FoulBall Campaign". (Ex. J.) The campaign, sponsored by the International Labor Rights Fund (the "ILRF"), the International Labour Organization (the "ILO"), UNICEF, Save the Children, and the Sialkot (Pakistan) Chamber of Commerce was designed to end the use of child labor in the manufacture of soccer balls by putting pressure on the Fédération Internationale de Football Association ("FIFA"), the world governing body of soccer, to withhold its endorsement from any balls manufactured using child labor. (*Id.*, Ex. I-22.) In announcing the Foulball Campaign, Reich cited the astonishing statistic that a 1994 Labor Department survey found that 20 to 25% of the 35 million balls produced in Sialkot were produced by child laborers. (*Id.*) Reich (in words that were echoed by Satyarthi in the Segment) also called upon manufacturers to halt the use of child labor in part because "These children are robbed of their labor . . . but they are also robbed of their youth." (*Id.*, Ex. J.)

3.     <u>Mitre Enters the Fray and Signs the Atlanta Agreement in Atlanta</u>

The very next month, attempting to manage the public outcry against the soccer ball industry, Mitre stepped further into this public controversy to cast itself in the role of a crusader against child labor. Specifically, as described in a United Nations report, in July 1996, Mitre

---

[4]     The *Life* article also reported that, "[w]estern journalists have been threatened and assaulted for reporting on child labor in this still-feudal society, particularly in those industries where legions of small children toil for 60 cents a day to make products for export to the U.S. and other developed countries." (Bolger Dec., Ex. I-21.)

\\\NY - 033845/000001 - 1156624 v1

Electronically Filed
Unredacted Version Filed Under Seal

arranged a trip to Pakistan and invited Save the Children, a non-profit organization based in the U.K., to join them.  (*Id.*, Ex. I-9 at 28.)  The purpose of the trip, purportedly, was to lay the groundwork for a program to end child labor that would feature Save the Children as the entity responsible for monitoring the use of child labor in Pakistan.  (*Id*.)  Save the Children declined Mitre's request to monitor child labor and the program was not established.  (*Id.*)

Mitre's efforts to put a manufacturer-led monitoring system in place following the public outcry in the United States continued, particularly after FIFA, in conjunction with several labor organizations, imposed a code of conduct on soccer ball manufacturers in September 1996.  (*Id*.)  As a result, in November 1996, Stephen Rubin, chairman of Mitre called a conference of soccer ball manufacturers to discuss the problem further.  (*Id*.)  While the November 1996 meeting organized by Mitre did not immediately produce a formal agreement, it was the first step in developing a system to try to end the use of child labor in the manufacture of soccer balls in Pakistan.  (*See* Bolger Dec., Ex A ¶ 27; Ex. F.)

Ultimately, the end result of Mitre's efforts was an agreement between Mitre and many of the world's other soccer ball manufacturers in which the manufacturers pledged to end the use of child labor in Sialkot, Pakistan within 18 months of the date of the agreement.  The agreement, called the Partner's Agreement to Eliminate Child Labor in the Soccer Industry or the "Atlanta Agreement", was announced at the Manufacturers Association Super Show (the "Super Show") in Atlanta, Georgia, on February 14, 1997.  (Bolger Dec., Ex. I-23.)  In particular, the Atlanta Agreement called for an end to the practice of manufacturing soccer balls in people's homes – a practice that is widely believed to increase the use of child labor – and instead required contractors to register stitchers and work locations, thus making it easier to monitor.  In addition, the Atlanta Agreement set up a $1 million fund to aid in the efforts to end child labor.  (*Id.*, Ex. I-

Electronically Filed
Unredacted Version Filed Under Seal

24.)  Finally, the Atlanta Agreement established a hotline for American consumers to learn which brands had signed on to the Agreement.  The telephone number was 888-NO-1-CHILD. (*Id*.)

Not surprisingly, the Atlanta Agreement – and Mitre's involvement in bringing it about – was widely discussed throughout the United States and reports of the Agreement appeared in newspapers from New York to Miami to Dallas to Los Angeles.  (*Id.*, Exs. I-23-32.)  The response of some child advocates was described as "cautiously hopeful in their fight against child labor."  (*Id.*, Ex. I-27.)

The Atlanta Agreement also had its critics.  *The New York Times*, for example, described the Atlanta Agreement as merely a response to the public embarrassment occasioned by news reports publicizing the use of child labor.  (*Id.*, Ex. I-24.)  Other critics of the Atlanta Agreement were concerned with the negative effect that ending child labor in the soccer ball industry might have on the children stitching the balls.  And "[s]ome children's rights advocates wonder[ed] how far $1 million [would] go in helping the thousands of children who might lose their jobs." (*Id.*, Ex. I-24.)

Rubin, however, remained undeterred by such critics and moved forward, saying that "the soccer community has asked for reassurance that child labor has no place in producing the soccer balls used in neighborhood sandlots or national stadiums."  (Bolger Dec., Ex. I-33.)  He then pronounced, "For the first time ever – in any industry, in any part of the world – local manufacturers, global brands and internationally respected children's organizations have agreed to work together to address child labor in a responsible manner."  (*Id*.)  And, in the Complaint in this case and elsewhere, Mitre claims credit for initiating the process.  (*Id.*, Exs. A, V.)

Electronically Filed
Unredacted Version Filed Under Seal

4.      Mitre's Role in the Child Labor Controversy Continues:
        The Christian Aid Report and the SGFI

The Atlanta Agreement went into effect on February 14, 1997, but, despite all of the publicity surrounding the agreement and Mitre's efforts to tout its own role in ending child labor, less than four months later, the very practice Rubin had so publicly exclaimed had "no place in producing [] soccer balls" was again found in the manufacture of Mitre branded soccer balls.

Specifically, in May 1997, Christian Aid, an English charity, issued a report entitled "A Sporting Chance: Tackling Child Labour in India's Sports Goods Industry" that documented the use of child labor in the manufacture of soccer balls in India – a country that was not and, indeed, is not covered by the Atlanta Agreement.  The report, which extensively discusses Mitre and its contractor in India, Mayor & Co., contains the following passage:

> In Britain Eric Cantona is a hero to tens of thousands of youngsters: former footballer of the year and captain of Manchester United, the FA Premiership's richest and most successful club.[5] To Indian children like 11-year-old Sonia, however, he is just another brand name passing through their hands in the monotonous routine of stitching footballs for export.
>
> . . . .
>
> Families stitching footballs in Sonia's village work mainly for Mayor and Co., India's biggest sports-goods exporter and a key supplier of Mitre, Britain's leading football maker. Owned by the Pentland Group, Mitre commands 60 per cent of the UK's £40 million football market and is official supplier to every club in the English FA Premiership except Chelsea and Manchester United this season. Sonia herself has stitched the Mitre Cosmic, unaware that it sells in Oxford Street for £14.99. Her share of the retail price is a paltry 14 pence - less than 1 per cent.

(Bolger Dec., Ex. X.)

The Christian Aid report was discussed in reports issued by the United States Departments of Labor and Defense and in media publications throughout the world, many of which are available on-line in the United States.  (*Id.*, Exs. I-34-36.)  *See also* Peter Donnelly &

---

[5]      Manchester United, the current champion of the Premier League, is "the world's most popular team.  In any sport."  (Bolger Dec., Ex K.)  Manchester United is particularly popular in the United States, where it draws over 60,000 fans to each exhibition game.  (*Id.*)  The team is owned by an American, Malcolm Glazer, who also owns the National Football League's Tampa Bay Buccaneers.

Electronically Filed
Unredacted Version Filed Under Seal

Leanne Petherick, "Worker's Playtime? Child Labour at the Extremes of the Sporting Spectrum," in SPORT, CIVIL LIBERTIES AND HUMAN RIGHTS, 9-29 (David McArdle & Richard Giulianotti, Eds., Routledge 2006); Gardiner, *et al*., SPORTS LAW 3/E, 140 n.143, (Routledge Cavendish, 3d ed. Dec. 13, 2005).

Some media organizations even expanded on the report.  For example, on May 12, 1997, *The Independent* published an article entitled "Child labour shame for leisure industry", which is still available on the Independent website, www.independent.co.uk, accessible in the United States.  The article reported that:

> Families in [one child's] village work mainly for Mayor and Co., India's biggest sports-goods exporter, and a key supplier for Mitre, Britain's leading football maker and official supplier to all premiership clubs except Chelsea and Manchester United . . . .

(Bolger Dec., Ex. I-36.)

Mitre again went into damage control mode, publicly commenting on the allegations. The *Independent* article quotes a "Mitre spokeswoman" as saying that, while Mitre "disputed some details" of the Christian Aid report, it "welcomed the report for its 'balanced approach'" and is "happy to work with Christian Aid and other bodies, including a new committee in India, to tackle the problem."  (*Id.*)

Nonetheless, public disclosures that hinted at the use of child labor in the manufacture of Mitre branded equipment continued.  For example, Dan McCurry, of the U.S.-based Foulball Campaign, travelled to Pakistan and India to evaluate how far the signatories to the Atlanta Agreement had progressed in complying with its goals.  McCurry found that his ability to assess their progress was hamstrung by an unwillingness of the manufacturers to allow him access to the stitchers.  (Bolger Dec., Ex. I-41.)  While the body of the report does not name Mitre as one of the entities who obstructed McCurry, it calls on its readers to write to Mitre and the other

Electronically Filed
Unredacted Version Filed Under Seal

firms that "dominate the soccer ball industry . . . [to] express your concern about foot-dragging in the implementation of the February 1997 Partnership Agreement [the Atlanta Agreement] to address child labor in the industry."  (*Id.*, Exs. I-41, I-42.)

Stung by these new revelations, Mitre's agents again stepped forward in a clear effort to claim a place as leaders in the anti-child labor movement.  In 1998, at Mitre's urging, Mitre's agents in India joined other sports good manufacturers to form the Sports Good Foundation of India (the "SGFI").  (Bolger Dec., Ex. V.)  The SGFI's stated mission is to monitor the manufacture of soccer balls in India and uncover the use of child labor.  The SGFI, however, unlike the ILO, the ILRF, or Christian Aid, is not an independent monitoring organization – instead, it is funded solely by the manufacturers.  At the time of its formation, the manufacturer members of the SGFI contributed 0.25% of their earnings to the SGFI, although that number has since fallen to 0.10%.  (*Id.*, Exs. I-43, V.)  To this day, Mitre proudly notes that it has supported the SGFI for 11 years and, in this case, Mitre has identified SGFI as the *sole* body responsible for monitoring the use of child labor in the manufacture of Mitre branded products in India.  (*Id.*, Ex. V.)

5.    <u>Mitre and the U.S. Department of Labor Report</u>

Mitre also held itself out to the U.S. government as a leading opponent of child labor.  In June 1997, Pentland, Mitre's parent company, voluntarily contributed to a United States Department of Labor report called "By The Sweat & Toil of Children."  (Bolger Dec., Ex. Y.)  The report commented generally on the problem of child labor in Sialkot and more directly on the delay in implementing the monitoring program put in place by the Atlanta Agreement.  (*Id.* at 141.)  As part of that report, Pentland volunteered information about its child labor monitoring system including the manufacture of Mitre branded products, its written policies regarding the use of child labor, the method by which Mitre branded soccer balls were imported into the

Electronically Filed
Unredacted Version Filed Under Seal

United States, whether it had a labeling program to indicate that Mitre soccer balls were not made using child labor, whether its line of credit was dependent on its representations regarding the use of child labor and other specific details about its efforts to end child labor.  (*Id.* at 119-21, 123-24.)  Notably, Pentland, which is referred to by the DOL as "Pentland (Mitre)" told the Department of Labor that:

> Pentland's soccer ball product managers visit their production facilities about three times a year to monitor compliance with their child labor policy. Pentland noted, however, that it is difficult to monitor for child labor since children are seldom found in the factories, but stitch soccer balls in homes and small workshops in the rural areas.

(*Id.* at 124.)  All of this information was then published to the American public and is still available on the Department of Labor website.

      6.      Child Labor in the Soccer Ball Industry Continues to Capture Worldwide <u>Attention and Mitre Stays at the Center of the Dispute</u>

Over the next few years, the media's exposure of the on-going problem of child labor in the soccer ball industry continued.  Many articles mentioned Mitre and its role in the ratification of the Atlanta Agreement.  (*Id.*, Exs. I-44, I-45, I-10.)  The media's exposure of the problem caught the attention of the Premier League.  By September 1999, when Mitre's contract with the Premier League was coming to an end, the League announced that companies bidding for the new contract must provide evidence of their anti-child labor initiatives.  (*Id.*, Ex. I-46.)  Mitre was not awarded the new contract.  (*Id.*)

It was not long before new allegations against Mitre came to the fore.  In November 1999, the Clean Clothes Campaign in Belgium published an English language report entitled "Sialkot, Pakistan: The football industry From Child Labour to Worker's Rights."  (Bolger Dec., Ex. Z.)  The report purported to assess the success of the Atlanta Agreement and contained some disturbing information, including that, "In April 1999 . . . the ILO [the organization charged with

Electronically Filed
Unredacted Version Filed Under Seal

monitoring the implementation of the Atlanta Agreement] declared itself no longer satisfied with the information published by the manufacturers."  The report, which is still available in the United States, mentioned that Mitre was one of the manufacturers still operating in Sialkot.  (*Id.*)

Mitre, for its part, continued to insert itself into the public discussion.  On September 21, 1998, *Rubber & Plastic News*, an Ohio-based publication, wrote an article entitled "Soccer Industry Works To Stop Child Labor" that contains the following quote:

> "You don't want to just walk in with a knee-jerk reaction and take away someone's livelihood," said Tim Richardson, director of corporate communications for Pentland USA, a division of Pentland P.L.C.  Pentland is the parent company of Mitre Sports, which makes the official ball of Major League Soccer.

(*Id.*, Ex. I-45.)  Mitre elaborated further in an April 26, 2000, article in *The Independent (London)*, headlined "The Business World: Focus: The Big Business of Human Rights", which discussed, in part, the use of child labor in soccer ball stitching.  In that article, Mitre's representatives were quoted as claiming that "many children [in Sialkot, Pakistan] had stopped stitching footballs . . . Mitre hopes micro-credit and skills training schemes will create new sources of income."  (*Id.*, Ex. I-10.)

## 7.  New Reports of Mitre's Use of Child Labor Continue

Despite Mitre's efforts to control the public discussion regarding its use of child labor, Mitre faced new disclosures in 2000.  The India Committee of the Netherlands released a report entitled "The Dark Side of Football: Child and Adult Labor in India's Football Industry and the Role of FIFA," which focused on the use of child labor in the Punjab region of India (the "ICN Report"), where Jalandhar is located.  The report gave a history of the anti-child labor movement in India, mentioning that although the Atlanta Agreement went into effect in 1997 in Pakistan, no comparable organization addressed the child labor problems in India until 2000.  The report then assessed the success of the monitoring program in India and concluded:

Electronically Filed
Unredacted Version Filed Under Seal

> There is strong evidence that a few members of the SGFI are hiding a part of their production from the monitoring system, in particular the largest exporter Mayor & Co. This company is supplying balls to Adidas, Mitre and Mundo, as well as to other FIFA/ISL-licensed companies.
>
> There is strong evidence that at least some members of the SGFI are deliberately hiding a considerable part of their production from the monitoring system.  This implies that there is no check on child labour and working conditions in the area where this production is found: the district of Gurdaspur.  Especially India's largest sports goods exporter, Mayor & Co., seems to be involved in this.[6]

(*Id.*, Ex. AA.)  The ICN report achieved significant international attention and was discussed in

the media across the globe and in several books – all of which are accessible in the United States.

(*Id.*, Exs. I-47-50.)  *See* Noel Castree, et al., SPACES OF WORK: GLOBAL CAPITALISM AND THE

GEOGRAPHIES OF LABOR, 3 (Sage Publications Ltd. 2004), Andrew Clayon, "Child Labour in the

Third World," *in* UNDERSTANDING HOW ISSUES IN BUSINESS ETHICS DEVELOP, 90-117 (Ian Jones

& Michael G. Pollitt, eds., Palgrave Macmillan 2002).  And, at least in part as a result of the ICN

Report, UNICEF and FIFA jointly announced that FIFA would dedicate the 2002 Word Cup to

children. (Bolger Dec., Ex. I-51.)

        8.    Mitre Advertises Its Prominence in the Child Labor Controversy

        Despite, or perhaps because of, the repeated discovery of the use of child labor in the

manufacture of Mitre branded soccer balls, Mitre continues to publicly hold itself out as a leader

in the fight against the use of child labor.  Mitre posts its "ethical promise" on its website at

http://www.mitre.com/ethical-promise.html, where it features its "Code of employment standards

for suppliers."  There, Mitre specifically points out its requirement to its suppliers that "Child

labour is not used." (*Id.*, Ex. W.)  Just two pages later, however, the code makes provisions for

what to do when the use of child labor is discovered.  (*Id.*)  Similarly, in a document entitled

---

[6]        Mayor & Co. is still manufacturing Mire balls and SGFI remains Mitre's sole monitor responsible for preventing the use of child labor in the manufacture of Mitre branded soccer balls in India.  (Bolger Dec., Ex. A ¶ 25.)   Additionally, Mitre stated during discovery in this action that SGFI is responsible for obtaining the exhibits that Mitre annexed to the Complaint that purport to contain interviews with the children that appear in the Segment and their guardians.  (Bolger Dec. ¶ 8.)

Electronically Filed
Unredacted Version Filed Under Seal

"Mitre Making A Difference:  Addressing child labor in India," Mitre admits that "stitching involved in making footballs (soccer balls) is often sub-contracted out to homeworkers . . ." and that "children sometimes help out with this work in the home . . . ."  (*Id.*, Ex. V.)  Mitre then shifts its focus to the SGFI's efforts to rehabilitate these workers.

Electronically Filed
Unredacted Version Filed Under Seal



Lastly, in this litigation, Mitre's counsel stood before the Court and described Mitre as an "international hero" in the soccer ball stitching community that claims to have "pulled together manufacturers from all around the world in an attempt to eliminate child labor."  (*Id.*, Ex. F at 69-70.)[7]

Through these efforts, Mitre has injected itself in the middle of the public controversy about the use of child labor in the manufacture of consumer goods sold in the United States. Following its now well-established approach, when HBO informed Mitre that child labor was being used in the manufacture of Mitre balls in India, Mitre sent the following written comment to HBO:

> With the delay in receiving any information about this report and the limited information provided, we are unable to comment on the accuracy of the report.
>
> However, Mitre recognized that there have been instances in the industry where young people have been involved in stitching and we support the efforts of all the regulatory bodies to eliminate this: in particular in India, Mitre supports the efforts of the Sports Good Foundation of India (SGFI) to implement social and educational programmes designed to help the families of those involved in stitching balls.

---

[7] Despite all these pronouncements, as recently as July 22, 2007, the Sunday Mail, a Scottish publication, noted in an article available in the United States via Lexis/Nexis that Mitre has "been linked to child labor." (Bolger Dec., Ex. I-53.)

Electronically Filed
Unredacted Version Filed Under Seal

We take this report very seriously but believe the industry and our checks ensure that any such instance would be isolated and not widespread.  We are following up on the report and would welcome and further information you have so we can quickly take any positive action required to help the families involved.  We can then also review our checking procedures with our factories and SGFI and rectify any failings we might identify in the light of these investigations.

(Bolger Dec., Ex. LL.)

Mitre's pattern is clear – despite its public pledges to the contrary, child labor is routinely found by anyone who looks into the manufacture of Mitre branded soccer balls.  In an effort to stem the tide of bad publicity created by each discovery, Mitre steps forward to deny the use of child labor and tout its own behavior in combating child labor.

**E.**     **Mitre: A Leading Name In The Manufacture And Sales of Soccer Equipment**

Of course, Mitre's involvement in the sports goods industry is not limited to its use of child labor and/or its anti-child labor statements.  Instead, Mitre is a brand with worldwide name recognition.  At the consumer level, Mitre branded equipment is widely advertised and available throughout the world, including in the United States.  Mitre goods can be purchased at the largest United States retailers, such as Wal-Mart, Modell's Sporting Goods and Kmart, or on the Internet on ebay.com or amazon.com.  (*Id.*, Exs. N-S.) ██████████████████████ ███████████████████████████████████████████ A member of the American public looking to purchase a soccer ball very often will be presented with the opportunity to buy a Mitre ball.  Mitre's success in the United States and around the world is due in some measure to the large number of Mitre sponsorship agreements over the years.  In 1992, Mitre became the maker of the first official ball of the then fledgling Premier League, which rapidly became the world's most popular national football league, and Mitre remained its sponsor until 2000.  (*Id.*, Exs. I-54, I-55, U.)  Premier League games are currently broadcast in the United States on the Fox Soccer Channel and ESPN.  (Bolger Dec., Ex. K.)  Mitre also was

Electronically Filed
Unredacted Version Filed Under Seal

the first official sponsor of Major League Soccer, the professional soccer league in the United States in 1996.  (Bolger Dec., Ex. I-1-4.)

    1.   <u>Mitre and the United States Market</u>

    According to its website, Mitre was established in England in 1817 and "has been around since the dawn of professional sport."  (Bolger Dec., Ex. T.)  Mitre began selling soccer balls, shoes and accessories in the United States in 1975, and its profile in the United States rose immediately.  (*Id.*, Ex. I-8.)  In 1977, Mohammed Ali wore Mitre in his bout with Leon Spinks in New Orleans.  (*Id.*, Ex. T.)  According to Mitre's former president, the strength of its sales initially was due to the increase in popularity of the game of soccer in the United States.  (*Id.*, Ex. I-8.)  In 1989, Mitre undertook additional steps to raise its profile in the U.S., selling fixed-cleat baseball shoes, including one sponsored by Orel Hershiser, the then-current Cy Young Award winner, who endorsed the shoe at the annual Super Show in Atlanta in 1989.  (*Id.*, Exs. I-57, I-58.)  A 1989 *Sports Illustrated* article described Mitre's plans to make Mitre "a major player in the athletic-shoe game" in the United States.  (*Id.*, Ex. I-58.)  By January 7, 1991, Mitre's efforts were so successful that *The Seattle Times* described Mitre as one of "two giants in the soccer industry."  (Bolger Dec., Ex. I-59.)

    Later that year, in August 1991, Mitre "got people talking" and "rais[ed] a few eyebrows" by publishing a print ad for the University of Notre Dame's soccer team, which showed the team beneath the university's famous golden dome, with a caption that read "Equipped by Mitre. Recruited by God."  (*Id.*, Exs. I-60, I-61.)  Mitre continued to undertake deliberate steps towards becoming a leading name in American soccer in May 1991 when it signed an endorsement deal with America's most famous soccer player, the goalie of the United States national team, Tony Meola, to produce a line of soccer cleats called the "Mitre Meola".  (*Id.*, Exs. I-62, I-63.)

    In 1992, Genesco, Inc. bought Mitre and, shortly thereafter, moved Mitre's base of

Electronically Filed
Unredacted Version Filed Under Seal

operations to Nashville, Tennessee.  (*Id.*, Exs. I-64-66.)

    2.    <u>Mitre Becomes "The Leading Maker Of Soccer Shoes And Balls In The U.S."</u>

Following its move to Nashville, Mitre stepped up its marketing and sponsorship efforts in the United States.  Indeed, the National Sporting Goods Association's Expo '92 included a panel entitled "How to Merchandise Soccer," and Dan Morgan, the vice-president of sales for Mitre, was one of the participants.  (Bolger Dec., Ex. I-64.)  In addition, Mitre was an active participant in the 1994 Super Show in Atlanta, Georgia.  An Associated Press wire story from February 7, 1994, discussing the event reads:

> "I think the impact of the World Cup is going to be tremendous," said Joe Fields, marketing vice president of Nashville-based Mitre Sports International Ltd., a leading make of soccer shoes, balls and apparel.

(*Id.*, Exs. I-65, I-66.)  Fields' prediction proved correct.

By June, several American media outlets were reporting that soccer clothing was the summer's great fashion craze.  *See* "Fashion Gets a Kick From Soccer" (*Id.*, Exs. I-67. I-68) Mitre was described as a "must-have brand" (*id.*) and the *South Florida Sun Sentinel* reported that "serious soccer-esque dressers go for brands like Umbro, Mitre and Adidas".  (*Id.*, Ex. I-69.) Similarly, the *Fresno Bee*, reported on June 17, 1994, that "strong fan interest in World Cup 1994" had resulted in "Mitre soccer balls . . . stacked high in a display window at the All America Sports Fan in Manchester Mall" in Fresno, California.  (*Id.*, Ex. I-70.)

Mitre furthered its efforts to increase its profile by sponsoring soccer leagues throughout the United States.  In 1992, Mitre signed a contract with the Fort Lauderdale Strikers, a team in the now-defunct American Professional Soccer League.  (Bolger Dec., Ex. I-71.)  As part of their deal with the Strikers, Mitre engaged in promotions that served to spread the Mitre name to the soccer-going public. (*Id.,* Ex. I-72.)  Mitre also sponsored the Fort Lauderdale Strikers' soccer camp for boys and girls ages 6 to 18, at which all participants received a free leather Mitre ball

Electronically Filed
Unredacted Version Filed Under Seal

and T-shirt.  (*Id.*, Exs. I-73, I-109.)

In addition, in 1993, Mitre signed an agreement to provide the official ball for the United States Interregional Soccer League, a semi-pro soccer league that began in Dallas, Texas, but by April 21, 1993, had 43 teams "from California to Connecticut to Florida."  (*Id.*, Exs. I-74, I-75.) Mitre also sponsored an under-17 men's team from Tennessee called the Mitre Express, (*id.*, Ex. I-5), the Mitre Cup, "one of the premier U.S. indoor soccer club tournaments," (*id.*, Ex. I-76) and the Mitre Classic soccer tournament for college men's teams.  (*Id.*, Ex. I-77.)  Further, Mitre and Pepsi-Cola were "reportedly conducting a soccer-themed cross-promotion" during the World Cup.  (*Id.*, Ex. I-78.)

All of these activities were successful:  on April 26, 1993, *Forbes* magazine called Mitre the "leading maker of soccer shoes and balls in the U.S."  (Bolger Dec., Ex. I-7.)  Mitre touts itself in similar terms, claiming that, by 1995, it had "massive brand exposure in the fast expanding US market."  (*Id.*, Ex. U.)

3.   Mitre Becomes The First Official Ball of Major League Soccer

After the successful appearance of the United States men's soccer team in the 1994 World Cup, Major League Soccer (the "MLS"), a professional men's soccer league, was formed in the United States.  (*Id.*, Ex. I-3.)  And, in 1994, more than a year before the MLS played it first game, Mitre became one of the MLS's first sponsors, agreeing to provide the league balls.  (*Id.*) The Mitre sponsorship of the MLS was covered in almost every major newspaper in the United States from *USA Today* to the *New York Times*, to the *Atlanta Journal-Constitution*, to the *L.A. Times*, to the *Columbus Dispatch*.  (*Id.*, Exs. I-2-4, I-79-85.)   As part of the sponsorship arrangement, Mitre received advertising time to promote its products during the 35 league games that were nationally televised on either ESPN or ESPN2 and during the MLS title match, which aired on the ABC television network throughout the United States.  (*Id.*, Ex. I-86.)  Mitre also

received on-field signage and incorporation into all of the league's youth programs.  (*Id.*)  Mitre remained the official soccer ball of the MLS until 2000 (*id.*, Exs. I-87, I-88) and today remains so much a part of the lore surrounding the creation of the league that it was mentioned in a 2005 article reflecting on the tenth season of the MLS.  (*See id.*, Ex. I-89 ("The league has endured its share of tough patches since San Jose and D.C. United dribbled the first Mitre ball in the inaugural MLS match.").

    4.    <u>Mitre Maintains Its High Profile</u>

In August 1995, Pentland Group PLC, the current owner, bought Mitre and returned its base of operations to the United Kingdom.  (*Id.*, Ex. I-90.)  Nonetheless, Mitre remains committed to expanding its brand in the United States.  It heavily promotes its products in the United States, issuing press releases to the American media when it releases new products, from its new Street Ball in 1996 (*id.*, Ex. I-91) to its new line of fashion street shoes in 2006 (*id.*, Ex. I-92.) ██████████████████████████████████████████████████

████████████████████████████████████████

In addition to promoting the release of its products, Mitre remains committed to sponsoring other American-based soccer events, including the Mitre National Indoor Tournament (Bolger Dec., Exs. I-93-97), which took place at various locations across the United States, and the Mitre Classic soccer tournament.  (*Id.*, Ex. I-98.)  Mitre also took part in the Soccer Celebration hosted by MLS' Tampa Bay Mutiny on April 7, 1997, hosting a game called the Mitre Power shot (*id.*, Ex. I-99), and co-sponsored the "Ultimate Soccer Challenge" at the *Milwaukee Journal Sentinel*'s Get You Moving health and fitness expo in May 1998.  (*Id.*, Ex. 110.)  Similarly, on June 21, 2000, the *Las Vegas Review – Journal* advertised a soccer camp from July 17-21 at which each player would receive "A Mitre shirt, a Mitre ball."  (*Id.*, Ex. I-100.)

Electronically Filed
Unredacted Version Filed Under Seal

Mitre also expands its reach through new promotional efforts.  In 2002, Mitre balls were featured prominently in the film and trailer for the wildly successful film *Bend it Like Beckham*. (*See* Bolger Dec., Ex. I-111, *available at* http://www.youtube.com/watch?v=At5opsDNqbw.) For its contribution to the film, Mitre received an "Additional Thanks" in the film's credits. (Bolger Dec., Ex. I-101.)  *Bend It Like Beckham* grossed $32.5 million in box office receipts in the United States and was nominated for numerous awards, including the Golden Globe for Best Picture (Musical or Comedy). (Bolger Dec., Ex. L.)

Mitre has consistently pursued marketing efforts in the United States and continues to do so today, routinely issuing press releases about its new products and new developments in the soccer community.  On May 31, 2005, for example, Mitre announced that David Beckham would make his first-ever American appearance with the England national team in Giants' Stadium. The press release emphasized that the England national team will "use the new Official England National Team game ball, the Mitre Pro 100T".  (*Id.*, Ex. I-102.)  Mitre has also hired a public relations firm, Pitch PR, to market its products in the United States and around the world.  (*Id.*, Ex. I-103.)

5.      Mitre In The United States Today

Mitre has maintained its high profile in the United States.  Indeed, its shoes, cleats and other sporting equipment are currently available to American consumers at some of the largest retailers in the country, including Kmart, Modell's, Amazon.com, and the company the *New York Times* described as "the world's largest retailer," Wal-Mart.  (*Id.*, Exs. I-108, N-R.)  In preparing for this motion, a summer clerk in defendant's counsel's office visited two stores in Manhattan to see what Mitre products were available for purchase. At Kmart, she found and photographed Mitre soccer balls and shin guards for sale.  At Modell's sporting goods store, she found and photographed several varieties of Mitre soccer balls and cleats.  (Bolger Dec., Exs. Q,

24

Electronically Filed
Unredacted Version Filed Under Seal

R)  Defendant's counsel also found Mitre goods for sale on-line at Wal-Mart, including soccer balls, cleats and soccer nets, and on Amazon.com.  (*Id.*, Ex. N.)  Mitre soccer balls also are available for sale to the American consumer on other websites, from huge consumer websites like eBay to small, family owned businesses like Pittsburgh Soccer & Sports.  (*Id.*, Exs. O, P, Q.)  Whether a consumer in the United States is looking to purchase a soccer ball or is just walking down the aisle in a retail store or browsing online, he or she will be faced with the Mitre name and Mitre branded products.

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████

In short, by its own design, Mitre is present wherever soccer is played throughout the United States and wherever customers in the United States might go to purchase soccer equipment.

## ARGUMENT

## MITRE IS A PUBLIC FIGURE

This Court should grant HBO's motion for partial summary judgment because Mitre is unquestionably a public figure.  Indeed, there can be no clearer example of a limited purpose public figure as defined by the United States Supreme Court in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974).  Mitre has responded publicly to all discoveries of the use of child labor in the manufacture of Mitre branded soccer balls and held itself out as an "international hero" that seeks to combat child labor.  In doing so, Mitre has voluntarily injected itself into the public controversy surrounding the use of child labor in the manufacture of soccer balls, a controversy

Electronically Filed
Unredacted Version Filed Under Seal

still on-going today.  Further, Mitre also is a public figure as defined by the New York State

Court of Appeals in *James v. Gannet Co.*, 40 N.Y.2d 415, 421, 386 N.Y.S.2d 871, 875-76,

*reargument denied,* 40 N.Y.2d 990, 390 N.Y.S.2d 1027 (1976), because it has taken affirmative

steps to attract attention and strived to achieve a measure of public acclaim.  Finally, Mitre is a

public figure because it was and is, as *Forbes* magazine wrote in 1993, "the leading maker of

soccer shoes and balls in the U.S. and the U.K."  (Bolger Dec., Ex. I-7.)

## A.      The Public Figure Standard

In a defamation action, a plaintiff's status as a public or private figure determines the

standard of fault that it must establish to succeed on its claims.  *Church of Scientology Int'l v.

Behar*, 238 F.3d 168, 173 (2d Cir.), *cert. denied*, 534 U.S. 814 (2001); *Contemporary Mission,

Inc. v. New York Times Co.,* 842 F.2d 612 (2d Cir. 1988), *cert. denied,* 488 U.S. 856 (1988).

This rule arises from the landmark decision *New York Times Co. v. Sullivan*, 376 U.S. 254

(1964), in which the United States Supreme Court rejected the common law idea that falsity and

defamatory meaning were the only necessary elements of a libel claim, holding instead that the

common law regime was inconsistent with the:

> profound national commitment to the principle that debate on public issues should
> be uninhibited, robust, and wide-open, and that it may well include vehement,
> caustic, and sometimes unpleasantly sharp attacks on government and public
> officials.

*Id.* at 270.  Accordingly, the Supreme Court held that "libel can claim no talismanic immunity

from constitutional limitations.  It must be measured by standards that satisfy the First

Amendment."  *Id.* at 269.  The Court then announced that the First Amendment required a public

official plaintiff to prove, by clear and convincing evidence, that an allegedly defamatory

statement was published with "actual malice."  "Actual malice" was defined not as ill will or

spite, but as knowledge of falsity or reckless disregard for the truth.  *Id.* at 279-80.  The Court

Electronically Filed
Unredacted Version Filed Under Seal

later gave meaning to the phrase "reckless disregard of the truth" by stating that it rests solely on the subjective state of mind of the defendant. "There must be sufficient evidence to permit the conclusion that the defendant in fact 'entertained serious doubts as to the truth of [the] publication,'" *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968), or had a "high degree of awareness of . . . probable falsity." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989).

In 1967, the Supreme Court expanded this constitutional privilege to apply to all libel cases in which the plaintiff is a "public figure." *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, *reh'g. denied*, 389 U.S. 889 (1967). And, in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344-45 (1974), the term "public figure" was further clarified when the Supreme Court identified two classes of persons who are "public figures" for purposes of defamation law. One class of persons consists of those who "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes." *Id.* at 345. The other class of public figures, limited purpose public figures, consists of those persons who have taken affirmative steps to attract public attention *or* who have "thrust themselves into the forefront of a particular controversy" in an attempt to influence the outcome. *Id.*

After the Supreme Court laid the foundation in *Gertz,* the New York State Court of Appeals in *James v. Gannett Co.* further extended the category of public figures under New York law, holding that:

> [t]he essential element underlying the category of public figures is that *the publicized person has taken an affirmative step to attract public attention.* Of course, not all persons reported upon in the media have sought the publicity. However, there are individuals who, for a variety of reasons, have strived to achieve a measure of public acclaim.

40 N.Y.2d at 422-23, 386 N.Y.S.2d at 876 (emphasis added). *See, also, Maule v. NYM Corp.*, 54 N.Y.2d 880, 882, 444 N.Y.S.2d 909, 910 (1981) (holding that a writer of 28 sports books was a

Electronically Filed
Unredacted Version Filed Under Seal

public figure and noting that "critical consideration" in assessing public figure status is "whether the evidence demonstrates that plaintiff had taken affirmative steps to attract personal attention or had strived to achieve a measure of public acclaim"); *Liu v. New York News, Inc.*, 183 A.D.2d 443, 443, 583 N.Y.S.2d 391, 392 (1st Dep't 1992) (neighborhood leader "attempting to project his power by using the media to thrust himself into the forefront of events" is a public figure). Significantly, the *James* test defines public figure more broadly than does the test articulated in *Gertz*.  *See Maule v. NYM Corp.,* 76 A.D.2d 58, 61, 429 N.Y.S.2d 891, 893 (1st Dep't 1980) (dissenting), *rev'd,* 54 N.Y.2d 880, 444 N.Y.S.2d 909 (1981).  Under each of these formulations, it is beyond cavil that Mitre is a public figure.

**B.**      **Mitre Is A Public Figure**

First, Mitre is unquestionably a limited purpose public figure within the meaning of the *Gertz* test. "Whether a plaintiff is a public figure is a question of law for the court".  *Celle v. Filipino Reporter Enters.,* 209 F.3d 163 (2d Cir. 2000).  Looking at Mitre's actions with respect to child labor, it is impossible to imagine a more appropriate example than Mitre of a limited purpose public figure that has injected itself into a preexisting controversy.   In determining whether an entity or person is a public figure under the *Gertz* test, "[t]he key inquiry [is] the nature and extent of [the] individual's participation in the particular controversy giving rise to the defamation."  *Contemporary Mission, Inc.*, 842 F.2d at 617 (citing *Gertz*, 418 U.S. at 352).

1.      Mitre Injected Itself In The Controversy Surrounding The Use Of Child Labor In The Manufacture Of Soccer Balls

Here, as a preliminary matter, Mitre has essentially pled that it is a public figure by alleging that it stepped into the controversy surrounding the use of child labor in the manufacture of soccer balls.  For example, in its Complaint, Mitre describes itself as  playing "a leading role in the international effort to eliminate child labor in the manufacture of soccer balls."  (Bolger

\\\NY - 033845/000001 - 1156624 v1

Electronically Filed
Unredacted Version Filed Under Seal

Dec., Ex. A at Introduction.)   Moreover, at a conference in this action, counsel for Mitre, in

delivering a speech to the Court about the purported defamatory sting of the Segment, told the

Court that Mitre "led this international conference in 1997" and "came up with" the Atlanta

Agreement.   Mitre's counsel also proclaimed that "Mitre became an international hero by pulling

together manufacturers from all around the world in an attempt to eliminate child labor."   (*Id.*,

Ex. F at 69-70.   In short, Mitre has affirmatively alleged that it voluntarily thrust itself into the

controversy surrounding the use of child labor in the manufacture of soccer balls and, in doing so,

has effectively conceded its public figure status.   For this reason alone, this Court should hold

that Mitre is a public figure.

　　　　Further, even if Mitre had not essentially pled its way to public figure status in this action,

the facts as set forth in the public record establish that Mitre has voluntarily thrust itself into the

controversy surrounding the use of child labor in the manufacture of soccer balls.   In 1995, when

allegations of the use of child labor in Sialkot first became public, Mitre immediately

commented and, more importantly, issued a press release in which Mitre's marketing director

touted Mitre's ethical policies in an effort to diffuse the allegations.   (Bolger Dec., Exs. I-12, I-

13.)   Thereafter, Mitre followed the same pattern – whenever the media or a non-profit

organization reported on the use of child labor to manufacture of Mitre branded goods, Mitre

immediately commented or issued a press release.   (*See, e.g., id.*, Exs. I-19 at 28, I-33, I-36, V.)

　　　　In 1997, for example, after Christian Aid published its first report that child labor was

being used to stitch Mitre soccer balls in India, Mitre immediately spoke to the media,

emphasizing its willingness to  work with Christian Aid to solve the problem.   (*Id.*, Ex. I-36.)

Mitre gave voluntary statements to the press at other times, as well – including in 1998 when its

president voluntarily discussed the complexities of stopping child labor, suggesting that bringing

Electronically Filed
Unredacted Version Filed Under Seal

it to an immediate end might do more harm than good to child stitchers. (*Id.*, Ex. I-45.)  In 1997, Mitre, through its parent company, voluntarily submitted information about its use of child labor and the problems it had encountered in trying to combat it, to the United States Department of Labor for use in a public report. (*Id.*, Ex. Y.)

Mitre continues to this day to inject itself into the public controversy.  Documents produced in this litigation reflect the Mitre is still greeting each allegation of its own wrongdoing with rhetoric about its role as a leader in the anti-child labor movement. (*Id.*, Ex. V.)  Clearly, Mitre has stepped into the controversy surrounding child labor.[8]  (*See, e.g.,* Bolger Dec., Exs. I-19 at 28, I-33, I-36, V.)

If the Supreme Court's holding in *Gertz* means anything, it must mean that Mitre is a public figure.  One of the central rationales for the distinction between public and private figures is that because public figures have access to channels of communication, they have the capacity to engage in self-help to respond to allegedly false and defamatory statements. *Gertz*, 418 U.S. at 344 ("Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements then private individuals normally enjoy.").  *See also Celle*, 209 F.3d at 177. Here, there is no question that Mitre had and has access to channels of communication and, in fact, uses those channels to advance its goals.  Public accusations that child labor is used in the manufacture of Mitre soccer balls have surfaced repeatedly since 1995.  Each and every time, Mitre steps forward and makes public statements denying or, in some cases, conceding the truth of those reports and then offers some explanation of its role in the formation of the Atlanta

---

[8]    Even if Mitre's involvement in the controversy surrounding the manufacture of soccer balls was involuntary, Mite would still be a public figure by virtue of being inexplicably intertwined in the controversy. *See Carson v. Allied News Co.*, 529 F.2d 206, 210 (7th Cir 1976) (Joanna Carson an involuntary public figure); *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736 (D.C. Cir. 1985) (plaintiff an involuntary public figure).

\\\NY - 033845/000001 - 1156624 v1

Electronically Filed
Unredacted Version Filed Under Seal

Agreement and its related plan to end child labor.  Mitre provided similar comments to HBO, which were included in the Segment.  (Bolger Dec., Ex. C.)  As such, it is clear that Mitre has used and continues to use its access to channels of communications to engage in self-help.  Mitre is, as a matter of federal constitutional law, a public figure.

Mitre's behavior also is consistent with other defamation plaintiffs who have been found to be public figures.  In *Yiamouyiannis v. Consumers Union of the United States, Inc.*, 619 F.2d 932 (2d Cir. 1980), *cert. denied,* 449 U.S. 839 (1980), for example, the United States Court of Appeals for the Second Circuit affirmed a decision finding a doctor who was a vocal opponent of the fluoridation of water to be a public figure.  In so holding, the Second Circuit relied heavily on the doctor's own statements regarding his prominence in the controversy – statements that are remarkably like those made by Mitre in this action.  Dr. Yiamouyiannis, for example, claimed to be the "recognized expert on the biological effects of fluoride" (*id.* at 939); Mitre claims to have "a leading role in the international effort to eliminate child labor in the manufacture of soccer balls."   Dr. Yiamouyiannis testified in Congress about his views on fluoridation; Mitre voluntarily submitted a report to the Department of Labor.  And Dr. Yiamouyiannis claimed to have been an "active and vociferous opponent of" fluoridation in much the same way that Mitre claims to be an "international hero" in the fight against child labor.  As such, Mitre, like Dr. Yiamouyiannis, is unquestionably a public figure.  *See also Celle,* 209 F.3d at 176 ("Those who have voluntarily sought and attained influence or prominence in matters of social concern are generally considered public figures."); *Grass v. News Group Publ'ns, Inc.*, 570 F. Supp. 178 (S.D.N.Y. 1983) (brother-in-law of political candidate who writes to newspapers to "correct" inaccuracies in press coverage of candidate is a public figure); *Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341, 1349 (S.D.N.Y. 1977) (insurance company injected itself into public

Electronically Filed
Unredacted Version Filed Under Seal

controversy by making the "voluntary decision to make a stock offering"); *Perks v. Town of Huntington*, 251 F. Supp. 2d 1143, 1168 (E.D.N.Y. 2003) (plaintiff is a public figure because he made "voluntary and repeated contact with the media" so that he could present "his side of the story"); *Franzon v. Massena Mem. Hosp.*, 89 F. Supp. 2d 270, 278-80 (N.D.N.Y. 2000) (plaintiff doctor is a public figure because he injected himself into the controversy).

Similarly, Mitre's behavior is consistent with corporations in other jurisdictions who have all been found to be public figures under the *Gertz* test.  In *Nat'l Found. for Cancer Research, Inc. v. Counsil of Better Business Bureaus Inc.*, 705 F.2d 98, 101 (4th Cir. 1983) ("*NFCR*"), for example, the United States Court of Appeals for the Fourth Circuit held that a non-profit organization is a public figure because

> the Foundation had thrust itself into the public eye, not only through its massive solicitation efforts (almost 68 million pieces of direct mail solicitation in the past three years), but also through the claims and comments it made in many of these solicitations where it extolled its judicious use of donated funds in finding a cure for cancer, where it declared its objective to make "NFCR a household word," and where it asserted the need "to present [NFCR's] case to the jury of the American people.

*See also Capuano v. The Outlet Co.*, 579 A.2d 469, 473 (Sup. Ct. RI 1990) (finding waste disposal company to be a public figure because company was frequent subject of newspaper articles about its purported organized crime connections and "on occasion" one or more of plaintiffs have consented to be interviewed or made statements to members of the media about their businesses as they relate to this controversy"); *Quantum Elec. Corp. v. Consumers Union of United States, Inc.*, 881 F. Supp. 753, 765 (D. R. I. 1995) (plaintiff is a public figure because it "actively participated in a public controversy about the safety and efficacy of ozone generating air purifiers.")  Mitre, like the Foundation in *NFCR,* has used its access to channels of communication to extol its purported efforts to end child labor in the manufacture of soccer balls, commenting to the press every time child labor is found and training its marketing and client

Electronically Filed
Unredacted Version Filed Under Seal

outreach teams to react to every consumer question with an answer that highlights Mitre's purported efforts to create a child-free workplace.  As such, Mitre is unquestionably a public figure.

In addition, Mitre's extensive advertising, marketing and promotional efforts also merit finding it to be a limited purpose public figure.  In *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 273 (3d Cir 1980), for example, the Third Circuit affirmed a finding that a meat producer is a public figure on the grounds that "Steaks launched an intensive campaign over local radio stations, through local newspapers, by large signs displayed at the sales location and by handbills."  *See also Church of Scientology of California v. Siegelman*, 475 F. Supp. 950, 953 (S.D.N.Y. 1979) (Church is a public figure because it has "taken affirmative steps to attract public attention, and actively seek new members and financial contributions from the general public."). Here, Mitre has made substantial efforts to market itself and promote its brand through commercials and promotions during the World Cup (Bolger Dec., Ex. I-78), MLS games (*id.*, Exs. I-3, I-86), and at other times throwing free balls and shirts to fans, and retaining a public relations firm.  (*Id.,* Exs. G; I-60-64, I-72, I-73, I-109.)  These efforts have resulted in prominent placement of Mitre branded products in United States' retail stores and substantial sales. Mitre's advertising and promotional efforts, therefore, support the finding that it is a limited purpose public figure.

      2.      Mitre Is A Public Figure Because It Is Leading Manufacturer Of Soccer Balls
                   Sold In The United States

Next, Mitre also is a public figure under New York law.  The New York Court of Appeals has held that "[t]he essential element underlying the category of public figures is that *the publicized person has taken an affirmative step to attract public attention.*"  *James*, 40 N.Y.2d at 422-23, 386 N.Y.S.2d at 876.  As a consequence, a broad variety of individuals and

Electronically Filed
Unredacted Version Filed Under Seal

corporations are considered public figures under New York law.  *See, e.g., Maule v. NYM Corp.*, 54 N.Y.2d at 882, 444 N.Y.S.2d at 910 (writer of sports books is a public figure); *Liu*, 183 A.D.2d at 443, 583 N.Y.S.2d at 392 (neighborhood leader "attempting to project his power by using the media to thrust himself into the forefront of events" is a public figure); *Siegelman*, 475 F. Supp. at 954 (church that took affirmative steps to attract public attention is a public figure); *Arrigoni v. Velella*, 110 A.D.2d 601, 603-04, 488 N.Y.S.2d 184, 187 (1st Dep't 1985) (bus company that operated a transit system of more than 300 buses with multi-million dollar annual revenues is a public figure); *Samuels v. Berger*, 191 A.D.2d 627, 630, 595 N.Y.S.2d 231, 233 (2d Dep't 1993) (marine contracting company that purchased advertisements and otherwise attracted publicity is a public figure); *Curry v. Roman*, 217 A.D.2d 314, 319, 635 N.Y.S.2d 391, 395 (4th Dep't 1995) (auction company that voluntarily sought media attention is a public figure); *Ithaca College v. Yale Daily News Publ'g Co.*, 105 Misc.2d 793, 796-98, 433 N.Y.S.2d 530, 533 (Sup. Ct., Tompkins Co. 1980), *aff'd*, 85 A.D.2d 817, 445 N.Y.S.2d 621 (3d Dep't 1981) (private college is a public figure because it is like a corporation).

Mitre clearly fits within this definition.  Mitre has taken affirmative steps to attract public attention – Mitre has sponsored soccer leagues the world over, including the English Premiere League, Major League Soccer and other American soccer leagues and tournaments  Mitre has aired commercials billing itself as producing America's Number 1 Soccer shoe. (Bolger Dec., Ex. G.)  It had a featured role in the movie *Bend It Like Beckham.* (*Id.*, Ex. I-111)  Mitre issues press releases, pays for advertisements, hires PR firms and gives away free merchandise to increase its visibility.  (*Id.*, Exs. G, I-60-64, I-72, I-73, I-78, I-109.)  And Mitre repeatedly touts itself, in this litigation and beyond, as an "international hero" in the fight to end child labor in the manufacture of soccer balls.  (*Id.*, Ex. F at 69-70.)  Mitre has not just taken affirmative steps to attract public

34

Electronically Filed
Unredacted Version Filed Under Seal

attention, it also has been successful in obtaining that attention.   Accordingly, Mitre is unquestionably a public figure under New York law.

Finally, Mitre is an all-purpose public figure as defined by *Gertz*.   The Supreme Court defined all purpose public figures as those who have "roles of especial prominence in the affairs of society."   *Gertz*, at 324.   All purpose public figures need not be household names – they merely must be entities who "assume special prominence in the resolution of public questions." *Gertz*, 418 U.S. at 351, 1066, *cited by Meeropol v. Nizer*, 560 F.2d 1061, 1066 (2d Cir. 1977) (finding that the children of Julius and Ethel Rosenberg were public figures despite the passage of time and their change in name because they were "cast in the limelight" during their parents' trial), *cert. denied,* 434 U.S. 1013 (1978).

Mitre has, by its own admission in the Complaint, assumed special prominence in its self-described role as "international hero" in the fight against child labor.   In addition, it also has achieved special prominence through  its widespread retail presence and its extensive advertising and sales campaign throughout the United States.   From being the "must have" brand of soccer clothes during the World Cup (Bolger Dec., Exs. I-67, I-68), to sponsoring indoor and college level soccer tournaments throughout the United States (*id.*, Exs. I-76, I-77, I-93-98), to being the sponsor of the MLS, Mitre was a prominent part of the rise of soccer in the United States.   And Mitre's prominence continues. ████████████████████████████ and its products are available at major retailers like Wal-Mart, Kmart and Amazon.com. (*Id.*, Exs. JJ, II.)  Clearly, if you know soccer in the United States, you know Mitre.  (*Id.*; *see also id.,* Exs. N-S.)

Accordingly, under any standard, Mitre is unquestionably a public figure.

In the face of this clear precedent, it is difficult to understand what good faith basis Mitre

Electronically Filed
Unredacted Version Filed Under Seal

had for denying that it is a public figure.  In fact, counsel for Mitre telegraphed the lack of legal precedent in supporting its position at the June 2 Conference.[9]  First, Mitre suggested that it would rely on two cases that found Hewlett-Packard and Kroll & Associates to be private figures. But even if a decision from a Pennsylvania or Hawaii district court could trump the United States Supreme Court or Second Circuit authorities discussed above, a cursory reading of those cases reveals that they have no relevance to the issues here.  First, in *Computer Aid, Inc. v. Hewlett-Packard Co.*, 56 F. Supp. 526 (E.D. Pa. 1999), unlike this case, there was no public controversy into which Hewlett-Packard voluntarily thrust itself or became involved to any significant degree. There was no question of child labor or other issue of public importance– it was just a commercial dispute.  For that reason, the court rejected the argument that Hewlett-Packard was a public figure.

Similarly, in *Kroll v. City and County of Honolulu*, 833 F. Supp. 802 (D. Hi. 1993), the Court rejected the argument that Kroll & Associates was a public figure for the purposes of an article about a government investigation.  In so holding, the court emphasized that Kroll did nothing more than receive federal funds to undertake an investigation.  That is, Kroll did not speak to the media, or try to influence the public disclosure.  The court concluded Kroll's participation in the controversy surrounding the investigation was involuntary.[10]  Both of these

---

[9]    In addition, to the extent that Mitre argues that it is no longer a public figure because Mitre believes it was more famous in the 1990s than it is today, this argument is incorrect.  The Second Circuit has expressly held that an individual's "limited purpose public figure status has not dissolved with the passage of time." *Contemporary Mission*, 842 F.2d at 620.  *See also Millsap v. Journal/Sentinel, Inc.*, 100 F.3d 1265, 1270 (7th Cir. 1996) ("A person who injects himself into public controversy assumes the risk of negative public comment on his role in the controversy, both contemporaneously and in the future."); *Partington v. Bugliosi*, 56 F.3d 1147, 1152 n.8 (9th Cir. 1995) ("[I]t appears that every court of appeals that has specifically decided this question has concluded that the passage of time does not alter an individual's status as a limited purpose public figure.").

[10]    The Court also was influenced by the fact that none of the newspapers that discussed Kroll were widely circulated in Hawaii.  *Kroll*, 833 F. Supp. at 806   Today, the near universal availability of newspapers and other publications on the Internet, regardless of the location of the hard copy circulation, renders *Kroll*'s reasoning obsolete.

Electronically Filed
Unredacted Version Filed Under Seal

cases are plainly inapposite.

Next, Mitre's counsel suggested that Mitre is not a public figure because it has only attained notoriety in countries other than the United States.  This argument is simply baffling given Mitre's widespread business, marketing and sales in the United States.  Mitre has sold its goods in the United States since 1975 (*id.*, Ex. I-8) and sales went up from 2007 to 2008.  Mitre has sponsored several soccer teams and leagues and was the first sponsor of MLS.  (*Id.*, Exs. I-8, I-74, I-75, I-3.)  Mitre describes itself in advertisements as "America's Number 1 soccer shoe," (Ex. G.)  Rather than choosing to announce its plans to end child labor from its headquarters in the United Kingdom, Mitre's representatives traveled to the Super Show in Atlanta, Georgia, to announce the creation of the Atlanta Agreement.  Mitre then voluntarily provided information to the United States Department of Labor about its plans to end child labor.  (*Id.,* Ex. Y.)  Mitre's efforts to combat negative publicity about its use of child labor have been targeted at the United States.

Mitre is the paradigmatic example of a public figure who has thrust itself into a public controversy in an attempt to influence its outcome.  In addition, Mitre has exploited the American sporting goods market and affirmatively reached out to American consumers for more than thirty years.  There can be no question that it is a public figure.

Electronically Filed
Unredacted Version Filed Under Seal

## <u>CONCLUSION</u>

For all of the foregoing reasons, Defendant Home Box Office, Inc. respectfully requests that this Court grant its motion for partial summary judgment and hold that Mitre is a public figure, and grant such other and further relief, together with costs, as this Court deems appropriate.

Dated:  August 28, 2009             Respectfully submitted,

                                    HOGAN & HARTSON LLP


                                    By:  /s/  Katherine M. Bolger
                                    Slade R. Metcalf (SM 8360)
                                    Katherine M. Bolger (KB 6206)
                                    Rachel F. Strom (RS 9666)
                                    HOGAN & HARTSON LLP
                                    875 Third Avenue
                                    New York, NY 10022
                                    Tel: (212) 918-3000

                                    Of Counsel:
                                    Stephanie S. Abrutyn
                                    Home Box Office, Inc.
                                    1100 Avenue of the Americas
                                    New York, NY 10036

                                    *Attorneys for Defendant Home Box Office, Inc.*

38