Filed Under Seal

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

MITRE SPORTS INTERNATIONAL LIMITED,  :
              :
    Plaintiff,      : Case No.: 08 CIV 9117(GBD)(HBP)
              :
   -against-       :
              :
HOME BOX OFFICE, INC.,     :
              :
    Defendant.     :
              :

-------------------------------------------------------------------X

## MEMORANDUM OF LAW OF DEFENDANT HOME BOX OFFICE, INC. IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Slade R. Metcalf
Katherine M. Bolger
R. Brian Black
Rachel F. Strom
Collin J. Peng-Sue
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100

Of Counsel:
Stephanie S. Abrutyn
Home Box Office, Inc.
1100 Avenue of the Americas
New York, NY 10036

*Attorneys for Defendant Home Box Office, Inc.*

Filed Under Seal

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ........................................................................................................................3

    A.    The Parties ..............................................................................................................3

    B.    The Segment ...........................................................................................................4

        1.    Initial Research for the Segment.................................................................4

        2.    April 2007 Trip to India ...............................................................................6

        3.    Additional Research......................................................................................6

        4.    2008 Trip to India ........................................................................................8

        5.    Interview with Kailash Satyarthi .................................................................9

        6.    Interview with Charlotte Ponticelli ...........................................................10

        7.    Efforts to Contact Mitre ............................................................................11

        8.    Editing.........................................................................................................13

        9.    Mitre's Last-Minute Call To HBO ............................................................14

        10.    Distribution of the Segment ......................................................................16

    C.    Mitre's Claim Letter and Complaint.....................................................................17

    D.    Additional Facts Revealed In Discovery ..............................................................17

    E.    Public Figure.........................................................................................................19

        1.    The Public Controversy and Mitre's Involvement....................................19

        2.    Mitre Has Sought, and Achieved, Public Acclaim ...................................20

ARGUMENT.............................................................................................................................21

I.    SUMMARY JUDGMENT STANDARD IN LIBEL CASES...........................................22

II.    THE SEGMENT IS SUBSTANTIALLY TRUE ............................................................23

    A.    The Segment Is True.............................................................................................24

    B.    Mitre's Unreasonable Interpretations of the Segment Cannot Save
        Its Claim...............................................................................................................26

i

III.   MITRE, A PUBLIC FIGURE, CANNOT ESTABLISH THAT HBO ACTED
       WITH CONSTITUTIONAL MALICE ............................................................................27

       A.   Mitre Is A Public Figure ....................................................................................28

            1.   Mitre Is a Public Figure Under the Standard Set Forth In
                 *James* ......................................................................................................29

            2.   Mitre Is a Federal Limited Purpose Public Figure ....................................32

            3.   Mitre Is A General Purpose Public Figure ................................................35

       B.   HBO Did Not Act With Constitutional Malice ....................................................37

            1.   HBO Did Not Doubt The Truth Of The Segment ......................................39

            2.   HBO Did Not Intend to Imply Any Of Mitre's
                 Unreasonable Interpretations of the Segment ............................................41

IV.    IN THE ALTERNATIVE, HBO IS ENTITLED TO SUMMARY JUDGMENT
       BECAUSE HBO WAS NOT GROSSLY IRRESPONSIBLE ..........................................42

V.     IN THE ALTERNATIVE, HBO IS ENTITLED TO SUMMARY JUDGMENT
       LIMITING RECOVERY TO NOMINAL DAMAGES ....................................................45

       A.   Mitre Is Not Entitled to Presumed Or Punitive Damages .....................................45

       B.   Mitre Has No Evidence of Recoverable Economic Damages ...............................45

       C.   Mitre Is Not Entitled to Non-Economic Damages ...............................................47

       D.   Mitre Did Not Comply With its Discovery Obligations .......................................48

CONCLUSION ......................................................................................................................49

## TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*24/7 Records, Inc. v. Sony Music Entm't, Inc.*,
   566 F. Supp. 2d 305 (S.D.N.Y. 2008)................................................................47

*3Com Corp. v. Banco do Brasil, S.A.*,
   171 F.3d 739 (2d Cir. 1999)..............................................................................22

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)...........................................................................................37

*Bose Corp. v. Consumers Union of U.S., Inc.*,
   466 U.S. 485,
   *reh'g denied*, 467 U.S. 1267 (1984) .................................................................37

*Carr v. Forbes, Inc.*,
   259 F.3d 273 (4th Cir. 2001) .............................................................................32

*Celle v. Filipino Reporter Enters.*,
   209 F.3d 163 (2d Cir. 2000)..................................................................29, 33, 36

*Chaiken v. VV Pub. Corp.*,
   119 F.3d 1018 (2d Cir. 1997).............................................................................44

*Chandok v. Klessig*,
   632 F.3d 803 (2d Cir. 2011)...............................................................................22

*Chapin v. Knight-Ridder*,
   993 F.2d 1087 (4th Cir. 1993) ...........................................................................41

*Chapman v. Journal Concepts, Inc.*,
   528 F. Supp. 2d 1081 (D. Haw. 2007)...............................................................36

*Church of Scientology Int'l v. Behar*,
   238 F.3d 168 (2d Cir. 2001)...............................................................................38

*Church of Scientology Int'l v. Eli Lilly & Co.*,
   778 F. Supp. 661 (S.D.N.Y. 1991) ....................................................................33

*CMI, Inc. v. Intoximeters, Inc.*,
   918 F. Supp. 1068 (W.D. Ky. 1995)..................................................................48

*Cobb v. Time, Inc.*,
   No. 3:94-0836, 1995 WL 861518 (M.D. Tenn. Aug. 30, 1995)........................25

*Coliniatis v. Dimas,*
  965 F. Supp. 511 (S.D.N.Y. 1997) ................................................................38

*Compuware Corp. v. Moody's Investors Servs., Inc.,*
  499 F.3d 520 (6th Cir 2007) ......................................................................41

*Contemporary Mission, Inc. v. New York Times Co.,*
  842 F.2d 612 (2d Cir. 1988)........................................................27, 32, 38

*County Vanlines Inc. v. Experian Info. Solutions,*
  317 F. Supp. 2d 383 (S.D.N.Y. 2004),
  *aff'd,* No. 04-2982-CV, 2005 WL 3117211 (2d Cir. Nov. 22, 2005)....................................38

*Croton Watch Co. v. Nat'l Jeweler Magazine, Inc.,*
  No. 06 CV 662 (GBD), 2006 WL 2254818 (S.D.N.Y. Aug. 7, 2006) ...................................23

*Cummins v. Suntrust Capital Markets, Inc.,*
  649 F. Supp. 2d 224 (S.D.N.Y. 2009)................................................................29

*Curtis Publ'g Co. v. Butts,*
  388 U.S. 130,
  *reh'g. denied,* 389 U.S. 889 (1967) ......................................................27, 37

*D.A.R.E. Am. v. Rolling Stone,*
  101 F. Supp. 2d 1270 (C.D. Ca. 2000) ................................................................40

*Design Strategy, Inc. v. Davis,*
  469 F.3d 284 (2d Cir. 2006)........................................................................47

*DiBella v. Hopkins,*
  403 F.3d 102 (2d Cir. 2005)................................................................23, 36

*Dodds v. Am. Broad. Co.,*
  145 F.3d 1053 (9th Cir. 1998) ......................................................................41

*F.C.C. v. AT&T Inc.,*
  131 S. Ct. 1177 (2011)........................................................................48

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,*
  314 F.3d 48 (2d Cir. 2002)..............................................................46, 47

*Gertz v. Robert Welch, Inc.,*
  418 U.S. 323 (1974)........................................................................ *passim*

*Guccione v. Hustler Magazine, Inc.,*
  800 F.2d 298 (2d Cir. 1986)........................................................................23

*Harris v. Quadracci*,
    48 F.3d 247 (7th Cir.1995) ......................................................................................29

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989)..........................................................................................28, 37

*Hatfill v. New York Times Co.*,
    488 F. Supp. 2d 522 (E.D. Va. 2007) ....................................................................23

*Hickey v. St. Martin's Press, Inc.*,
    978 F. Supp. 230 (D. Md. 1997)............................................................................22

*Hoodho v. Holder*,
    558 F.3d 184 (2d Cir. 2009)...................................................................................33

*Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*,
    844 F.2d 955 (2d Cir. 1988)............................................................................26, 27

*Lluberes v. Uncommon Prods., LLC*,
    Civil Action No. 07-11623-DPW, 2010 WL 3245283 (D. Mass. Aug. 16, 2010) ...........34, 35

*McFarlane v. Esquire Magazine*,
    74 F.3d 1296 (D.C. Cir. 1996) ...............................................................................40

*McNally v. Yarnall*,
    764 F. Supp. 838 (S.D.N.Y. 1991) ........................................................................40

*Meeropol v. Nizer*,
    560 F.2d 1061 (2d Cir. 1977).................................................................................36

*Milsap v. Journal/Sentinel, Inc.*,
    100 F.3d 1265 (7th Cir. 1996) ...............................................................................28

*MVM Inc. v. Rodriguez*,
    568 F. Supp. 2d 158 (D.P.R. 2008)........................................................................48

*Naantaanbuu v. Abernathy*,
    816 F. Supp. 218 (S.D.N.Y. 1993) ..................................................................43, 44

*Nelson v. Globe Int'l, Inc.*,
    626 F. Supp. 969 (S.D.N.Y. 1986) ........................................................................44

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964)................................................................................................27

*Newton v. Nat'l Broad. Co.*,
    930 F.2d 662 (9th Cir. 1991) .................................................................................41

*Nichols v. Moore*,
   396 F. Supp. 2d 783 (E.D. Mich. 2005)................................................................25

*Pavlica v. Behr*,
   No. 03 Civ. 9628(DC), 04 Civ. 8152(DC), 2006 WL 1596763 (S.D.N.Y. June 12,
   2006) ....................................................................................................................26

*Perks v. Town of Huntington*,
   251 F. Supp. 2d 1143 (E.D.N.Y. 2003) ................................................................35

*Philadelphia Newspapers, Inc. v. Hepps*,
   475 U.S. 767 (1986)...........................................................................................23, 24

*Phillips v. Ingram County*,
   371 F. Supp. 2d 918 (W.D. Mich. 2005) ..............................................................25

*Price v. Viking Penguin, Inc.*,
   881 F.2d 1426 (8th Cir. 1989) .............................................................................40

*Reliance Ins. Co. v. Barron's*,
   442 F. Supp. 1341 (S.D.N.Y. 1977)...................................................................35, 36

*Secord v. Cockburn*,
   747 F. Supp. 779 (D.D.C. 1990) ..........................................................................37

*St. Amant v. Thompson*,
   390 U.S. 727 (1968).................................................................................28, 38, 39

*Street v. Nat'l Broad. Co.*,
   645 F.2d 1227 (6th Cir. 1981),
   *cert. granted*, 454 U.S. 815,
   *cert. dismissed*, 454 U.S. 1095 (1981) ................................................................28

*Synygy, Inc. v. Scott-Levin, Inc.*,
   51 F. Supp. 2d 570 (E.D. Pa. 1999),
   *aff'd*, 229 F.3d 1139 (3d Cir. 2000) ....................................................................48

*Tavoulareas v. Piro*,
   817 F.2d 762 (D.C. Cir. 1987) (en banc) .............................................................32

*Tilton v. Capital Cities/ABC, Inc.*,
   938 F. Supp. 751 (N.D. Okla. 1995).....................................................................38

*Toltec Fabrics, Inc. v. August Inc.*,
   29 F.3d 778 (2d Cir. 1994)....................................................................................47

*Trotter v. Jack Anderson Enters., Inc.*,
   818 F.2d 431 (5th Cir. 1987) ...............................................................................32

*Tzougrakis v. Cyveillance, Inc.*,
    145 F. Supp. 2d 325 (S.D.N.Y. 2001)............................................................................42

*Vinas v. Chubb Corp.*,
    499 F. Supp. 2d 427 (S.D.N.Y. 2007)............................................................................41

*White v. Fraternal Order of Police*,
    909 F.2d 512 (D.C. Cir. 1990)......................................................................................42

*World Boxing Council v. Cosell*,
    715 F. Supp. 1259 (S.D.N.Y. 1989)..............................................................................38

*Yiamouyiannis v. Consumers Union of the United States, Inc.*,
    619 F.2d 932 (2d Cir. 1980)..................................................................................33, 35

**STATE CASES**

*Biskupic v. Cicero*,
    313 Wis.2d 225, 756 N.W.2d 649 (Wisc. App. 2008)....................................................36

*Chapadeau v. Utica Observer-Dispatch, Inc.*,
    38 N.Y.2d 196, 379 N.Y.S.2d 61 (1975) ........................................................21, 42, 44

*Curry v. Roman*,
    217 A.D.2d 314, 635 N.Y.S.2d 391 (4th Dep't 1995)....................................................31

*Gaeta v. New York News, Inc.*,
    62 N.Y.2d 340, 477 N.Y.S.2d 82 (1984) ......................................................................43

*Geraci v. Probst*,
    15 N.Y.3d 336, 912 N.Y.S.2d 484 (2010) ....................................................................47

*Gist v. Macon County Sheriff's Dep't*,
    284 Ill. App. 3d 367, 671 N.E.2d 1154 (1996) ............................................................25

*Immuno A.G. v. Moor-Jankowski*,
    77 N.Y.2d 235, 566 N.Y.S.2d 906 (1991) ..............................................................22, 29

*James v. Gannett Co.*,
    40 N.Y.2d 415, 386 N.Y.S.2d 871 (1976) ............................................................. *passim*

*Jones v. New Haven Register, Inc.*,
    No. 393657, 2000 WL 157704 (Conn. Super. Jan 31, 2000) ......................................28

*Karaduman v. Newsday, Inc.*,
    51 N.Y.2d 531, 435 N.Y.S.2d 556 (1980) ....................................................................43

*Khan v. New York Times Co.*,
    269 A.D.2d 74, 710 N.Y.S.2d 41 (1st Dep't 2000) ................................................22, 38

*Kipper v. NYP Holdings, Inc.*,
    12 N.Y.3d 348, 884 N.Y.S.2d 194 (2009) ...................................................................31, 37

*Kuan Sing Enters., Inc. v. T.W. Wang, Inc.*,
    86 A.D.2d 549, 446 N.Y.S.2d 76 (1st Dep't)
    *aff'd*, 58 N.Y.2d 708, 458 N.Y.S.2d 544 (1982).............................................................43

*Lakeshore Community Hosp., Inc. v. Perry*,
    212 Mich. App. 396, 538 N.W.2d 24 (1995) ..................................................................36

*Lee v. Rochester*,
    254 A.D.2d 790, 677 N.Y.S.2d 848 (4th Dep't 1998) ......................................................43

*Materia v. Huff*,
    394 Mass. 328, 475 N.E.2d 1212 (1985) .......................................................................36

*Maule v. NYM Corp.*,
    54 N.Y.2d 880, 444 N.Y.S.2d 909 (1981) ..................................................................28, 29

*Ortiz v. Valdescastilla*,
    102 A.D.2d 513, 478 N.Y.S.2d 895 (1st Dep't 1984) ......................................................44

*Robare v. Plattsburg Publ'g Co.*,
    257 A.D.2d 892, 685 N.Y.S.2d 129 (3d Dep't 1999) ......................................................43

*Sheridan v. Carter*,
    48 A.D.3d 447, 851 N.Y.S.2d 252 (2d Dep't 2008) ........................................................42

*Simonsen v. Malone Evening Telegram*,
    98 A.D.2d 905, 470 N.Y.S.2d 898 (3d Dep't 1983) ........................................................43

*Steere v. Cupp*,
    226 Kan. 566, 602 P.2d 1267 (1979) ...........................................................................36

*Suckenik v. Levitt*,
    177 A.D.2d 416, 576 N.Y.S.2d 258 (1st Dep't 1991) ......................................................47

*Sweeney v. Prisoners' Legal Services of New York, Inc.*,
    84 N.Y.2d 786, 622 N.Y.S.2d 896 (1995) ....................................................................43

*Tellier-Wolfe v. Viacom Broad. Inc.*,
    134 A.D.2d 860, 521 N.Y.S.2d 597 (4th Dep't 1987) ......................................................26

*Weiner v. Doubleday & Co.*,
    74 N.Y.2d 586, 550 N.Y.S.2d 251 (1989) ....................................................................43

*Wilsey v. Saratoga Harness Racing, Inc.*,
    140 A.D.2d 857, 528 N.Y.S.2d 688 (3d Dep't 1988) ......................................................31

*Wolf St. Supermarkets, Inc. v. McPartland*,
    108 A.D.2d 25, 487 N.Y.S.2d 442 (4th Dep't 1985) .......................................................47, 48

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26(a) ...................................................................................................................45, 47

Fed. R. Civ. P. 37(c)(1) ......................................................................................................................48

Fed. R. Civ. P. 56 ................................................................................................................................1

Robert D. Sack, Sack on Defamation, Libel, Slander and Related Problems, § 5:5.2[D]
    (4th ed. 2010) ..............................................................................................................................38

Filed Under Seal

Defendant Home Box Office, Inc. ("HBO") submits this memorandum of law in support of its Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure for an order dismissing the complaint of Mitre Sports International Limited ("Mitre") in its entirety.[1]   In the alternative, because Mitre has not set forth any cognizable damages in this action, HBO seeks summary judgment on such claims, and an order limiting Mitre's recovery (if it establishes a triable issue of fact as to liability) to nominal damages.

## PRELIMINARY STATEMENT

HBO owns and operates the United States premium pay television network also known as HBO, which features, among other things, the monthly news magazine program *Real Sports with Bryant Gumbel* ("Real Sports").  The first segment in the September 16, 2008 episode of Real Sports reported on the use of child labor in the manufacture of soccer balls in India (the "Segment").  The Segment reported, in substance, that children in India are involved in the manufacture of soccer balls, including soccer balls bearing the brand of plaintiff Mitre.  In October 2008, Mitre filed this lawsuit against HBO, claiming that Mitre has been defamed because, it alleged, no children stitch Mitre-branded balls in India.

Now, after over two and a half years of discovery, including more than 70 depositions in four countries and hundreds of thousands of documents exchanged, the central fact cannot be disputed:  children in India stitch Mitre-branded soccer balls.

This fact endures despite Mitre's opposition to child labor and its publicly expressed efforts to root out the problem.  Where the balls are precisely stitched in India, how the children

---

[1] The material facts in support of this motion are indisputable and are set forth in HBO's Rule 56.1 Statement ("56.1 Statement") and the accompanying declarations of Richard Bernstein ("Bernstein Dec."), R. Brian Black ("Black Dec."), Kirby Bradley ("Bradley Dec."), Ezra Edelman ("Edelman Dec."), Bernard Goldberg ("Goldberg Dec."), Ross Greenburg ("Greenburg Dec."), Bruce Grivetti ("Grivetti Dec."), Bryant Gumbel ("Gumbel Dec."), Gul-e-Zehra Mamdani ("Mamdani Dec."), Slade R. Metcalf ("Metcalf Dec."), Joseph Perskie ("Perskie Dec.") and Peter Rienecker ("Rienecker Dec."), and the exhibits annexed thereto.

receive the raw materials to stitch, how much the children are paid (or not paid), and whether some children are relieved of their burden and sent to school, all are beside the point. The Managing Director of Mitre has acknowledged that he was aware that children were occasionally found stitching Mitre-branded soccer balls in India prior to the first telecast of the Segment. A month later, the head of security for Mitre's parent company was sent to India to investigate, and was handed a list by a soccer manufacturers' self-regulatory group confirming that children had indeed been found stitching Mitre balls in 2007 and 2008.

This case should have ended then and there. Instead, Mitre spent the next two-and-a-half years vigorously pursuing its claims through a series of constantly evolving theories that changed each time discovery revealed facts that undermined its position. Mitre's "throw everything against the wall and see what sticks" approach cannot mask the fact that, at bottom, this is a very simple case. HBO reported that children in India stitch soccer balls, and Mitre is one of the brands that children were found stitching. That fact is indisputably true. As such, there is no falsity here and thus there can be no viable claim for libel.

In addition, Mitre, as a public figure under New York law and federal constitutional law, cannot provide sufficient evidence to support a finding by clear and convincing evidence that HBO acted with knowledge of falsity or entertained serious doubts about the truth of any statements contained in the Segment it produced. On the contrary, not only was the Segment free from falsity, but HBO also was exceptionally fair to Mitre. HBO reached out to Mitre, not once, but numerous times, for its point of view. HBO not only included a statement from Mitre in the Segment after Mitre declined to appear for an on-camera interview, but the correspondent also specifically stated that Mitre might not even be aware that children in India were stitching Mitre-branded soccer balls. The blame was placed squarely on the Indian subcontractors. Mitre

\\NY - 033845/000001 - 2316353 v3

is complaining about what it considers negative publicity, but the HBO journalists were thorough, professional, and fair, and the Segment was an accurate report about a significant issue of public concern.  In sum, Mitre's claim simply fails.

A careful review of the record in this case, as summarized in this Memorandum of Law, can only lead one conclusion:  that HBO is entitled to summary judgment.  The Background, *see* pages 3 - 21, summarizes facts showing that the Segment was prepared in a thorough and professional way, involving extensive research, two trips to India by HBO employees, interviews with multiple and knowledgeable sources, and persistent efforts to obtain Mitre's point of view, *see* pages 3 - 17; that in the course of discovery, the consistent testimony from Mitre employees and other witnesses confirms that the core of the Segment - that child labor can be found in the supply chain for Mitre-branded soccer balls - is true, *see* pages 17 - 19; and that the undisputed, overwhelming evidence establishes that Mitre is a public figure, *see* pages 19 - 21.  Applying the law to these facts reveals that HBO is entitled to summary judgment because (1) the Segment is substantially true, *see* Section II; (2) Mitre is a limited purpose public figure under both the more expansive view required under New York law and under federal law, as well as a general purpose public figure, and as such it cannot meet its heavy burden of establishing by clear and convincing evidence that any HBO employee acted with knowledge of falsity, *see* Section III; (3) even if Mitre were a private figure, there is no evidence that HBO was grossly irresponsible, *see* Section IV; and (4) in any event, there is not a shred of evidence that Mitre has suffered any damage and therefore HBO is entitled to summary judgment on those claims, *see* Section V.

## BACKGROUND

### A.      The Parties

Mitre, described by *Forbes* as the "leading maker of soccer shoes and balls in the U.S. and the U.K," has advertised itself as "America's Number 1 soccer shoe," and claims to be "the

number one manufacturer of [soccer balls] in the world." Metcalf Dec. Ex. 36 at 167-68 and its Ex. 24; Ex. 88-6; Ex. 107; *available at* http://www.youtube.com/watch?v=LbmRN7OvPac. Founded in England in 1817, Mitre now sells sporting equipment, including soccer balls, soccer shoes, soccer nets and baseball shoes throughout the world, including in the United States.

Mitre, as it claims in its Complaint, also "has played a leading role in the international effort to eliminate child labor in the manufacture of soccer balls." Metcalf Dec. Ex. 1. It also describes itself as an "international hero" in the soccer ball stitching community and claims to have "pulled together manufacturers from all around the world in an attempt to eliminate child labor." Metcalf Dec. Ex. 3 at 69-70.

HBO owns and operates the premium pay television network HBO and produces and distributes the monthly news magazine program Real Sports. Greenburg Dec. ¶ 2; Bradley Dec. ¶ 2; Rienecker Dec. ¶ 2.

## B.    **The Segment**

On September 16, 2008, Episode #138 (the "Episode") of Real Sports premiered. Rienecker Dec. ¶¶ 2-5, Ex. A. Included in the Episode was the Segment entitled "Children of Industry," which discussed the use of child labor to stitch soccer balls in India. Perskie Dec. Ex. 1. See the Bernstein, Bradley, Edelman, Goldberg, Greenburg, Gumbel, Mamdani and Perskie Declarations for a detailed description of the production process.

### 1.    Initial Research for the Segment

Joseph Perskie ("Perskie"), a coordinating producer at Real Sports and a veteran journalist with over fifteen years of experience, originally thought of the idea for the Segment during the 2002 World Cup. Perskie Dec. ¶¶ 1, 16, 70. In 2006, Perskie remained interested and asked Gul-e-Zehra Mamdani ("Mamdani"), a Real Sports PA who was the associate producer for the Segment, to work with him, in part because Mamdani is fluent in Hindi, one of the primary

languages spoken in India.  *Id.* ¶¶ 19-20; Mamdani Dec. ¶ 7.

From the summer of 2006 through the spring of 2007, Mamdani and Perskie conducted extensive research into the use of child labor in the soccer ball industry in India.  Mamdani Dec. ¶¶ 8-9, 26-27, Exs. 10, 11; Perskie Dec. ¶ 17; Exs. 2-13.  They also reviewed information about and from Bachpan Bachao Andolan ("BBA"), a well-respected non-governmental organization ("NGO") in India that works on child labor issues.  Perskie Dec. ¶¶ 21-22.  Perskie and Mamdani came across Kailash Satyarthi ("Satyarthi"), one of the foremost experts on the issue of child labor, who has been nominated for the Nobel Peace Prize, has spoken at the World Economic Forum in Davos and is the recipient of numerous reputable human rights awards.  Mamdani Dec. ¶ 16.  He is based in India and founded BBA and related NGOs.  Mamdani and Perskie also reached out to journalists and individuals at other NGOs seeking information about child labor in the soccer ball industry.  *Id.* ¶¶ 20-23, Ex. 7.

Through their research, Perskie and Mamdani learned that India's soccer ball production primarily exists in two areas: Meerut and Jalandhar.  Perskie Dec. ¶ 22.  They also learned that, in some cases, children stitching soccer balls in India were paid far below minimum wage.  *Id.*  In other cases, the children were paid nothing at all and were instead stitching to pay off loans that soccer ball contractors had made to their families.  *Id.*  One of the BBA representatives referred to the latter practice as "debt bondage."  *Id.*  At least two different BBA representatives also informed Perskie and Mamdani that "bonded labor" referred to either debt bondage or being paid below-minimum wage.  *Id.*

Perskie and Mamdani reviewed import records and learned that manufacturers in both Meerut and Jalandhar ship sporting goods, including soccer equipment and balls, to the United States.  The records also revealed the names of the companies in the United States that were

ordering soccer balls from India.  Perskie Dec. ¶ 27, Exs. 30-61.[2]

2.    April 2007 Trip to India

In April 2007, Perskie and Mamdani traveled to India on a "scouting" trip, where they spent time with Yatish Yadav ("Yatish"), a freelance journalist and award-winning documentary filmmaker based in India, and Rakesh Senger of BBA.  Mamdani Dec. ¶¶ 21, 33, 35; Perskie Dec. ¶ 30.  Rakesh and Yatish took Mamdani and Perskie around several villages in the Meerut area, where Perskie and Mamdani personally saw and spoke to a number of children stitching soccer balls to pay off their families' debts.  Mamdani Dec. ¶ 36.

While in Meerut, Perskie and Mamdani also met a man who showed them panels from a Mitre-branded soccer ball that they believe he was subcontracted to stitch.  Mamdani Dec. ¶ 38.  The man told Perskie and Mamdani that he used to stitch soccer balls in Jalandhar, and that while he had not received an order to stitch Mitre-branded balls in the past few weeks, he thought he might receive another order after the harvest season was over.  *Id.*, Exs. 14, 15.

By the end of their trip to Meerut, Perskie was convinced that children in India were still stitching soccer balls.  Even though they had been told that some recognizable brands were being produced in Meerut, they also learned that the manufacture of brands that might be available for sale in the U.S. is centered in Jalandhar.  Perskie Dec. ¶ 33.

3.    Additional Research

After they returned to the United States, HBO retained a highly recommended researcher in Jalandhar, Veena Sharma ("Veena").  *Id.* ¶ 37.  From November 2007 through early 2008, Mamdani and Veena spoke on an almost daily basis.  Mamdani's contemporaneous notes of their

---

[2] It was through these import records that HBO learned that Regent Sports Corporation ("Regent"), Mitre's exclusive licensee in the United States for the wholesale distribution of soccer balls, imported balls from two manufacturers in Jalandhar, India – Soccer International and Mayor & Company ("Mayor").  Perskie Dec. ¶¶ 28, 57; Exs. 30-33.

conversations list dozens of children found stitching name-brand soccer balls in the Jalandhar area, including Mitre-branded balls.  Mamdani Dec. ¶¶ 44-49; Exs. 14, 17, 18.  Perskie and Mamdani then contacted Sumit Khanna ("Sumit"), a local, freelance journalist who also works as a staff reporter in Jalandhar for an Indian television station.  Perskie Dec. ¶ 40.  After talking to Sumit, Perskie retained Sumit to shoot some footage in and around Jalandhar.  *Id.*

In or around February or March of 2008, Sumit sent Perskie and Mamdani a number of "screen grabs," or still images, from footage of the children and soccer balls.  Mamdani Dec. ¶ 54, Ex. 19.  Sumit then sent Mamdani and Perskie a copy of the footage he had taped for HBO. *Id.* ¶ 54, Ex. 20; Metcalf Dec. Ex. 45.  Included in the video was footage of two girls, Preeti and Savita, stitching Mitre-branded soccer balls.  Mamdani Dec. Ex. 20.

In light of the research, Kirby Bradley, senior producer for Real Sports, and Perskie decided to move forward with a segment on child labor in India's soccer ball industry.  Ezra Edelman ("Edelman"), another HBO Sports producer who had extensive production experience overseas, and Mamdani went to India to gather additional information and shoot footage for the segment.  Perskie Dec. ¶ 43.  Yatish, who was no longer available to help, recommended that HBO use Manpreet Kaur ("Manpreet") as a stringer.  Mamdani Dec. ¶ 57.  Manpreet had an accomplished resume that reflected both academic studies in journalism as well as experience working for various journalistic outlets.  Perskie Dec. Ex. 72.  Perskie and Mamdani retained Manpreet to do some preliminary scouting work in and around Meerut.

HBO also retained Vijay Bedi ("Vijay"), an experienced, award-winning cameraman and director of photography, who had worked extensively with internationally respected media organizations such as the BBC and CNN International.  *Id.* ¶ 45.  Perskie and Mamdani arranged for Vijay and Manpreet to conduct a preliminary shoot in Meerut in April 2008 as a test run to

assess their reliability and competence.  Mamdani Dec. ¶ 61.  The shoot went very well.  *Id.*

4.  2008 Trip to India

On Saturday, May 10, 2008, Mamdani and Edelman arrived in Delhi.  *Id.* ¶ 63.  On May 12, Manpreet, Rakesh, Mamdani and Edelman met Vijay and his audio technician, Ramesh, and they drove to Meerut where they were joined by Mukesh Kumar, who worked, at times, for BBA.  *Id.* ¶ 65.  They stayed in Meerut for the better part of a week, scouting and shooting video.

In Meerut, they met with a number of the families whom Manpreet had previously identified before Mamdani and Edelman arrived in India.  Mamdani Dec. ¶ 67.  Manpreet's information proved to be accurate, including the names of the families who had children who stitched soccer balls, their locations and the ages of the children.  *Id.*  After leaving Meerut, Mamdani, Edelman, Vijay and Ramesh traveled back to Delhi, and then on to Jalandhar. Mamdani Dec. ¶¶ 73-76.  Mamdani, with Sumit, started by scouting in three villages where Mamdani personally witnessed more than four children stitching Mitre-branded soccer balls, one child stitching a MacGregor soccer ball, and one child stitching a ball with a McDonald's logo on it.  Mamdani Dec. ¶¶ 78-80; Ex. 22 at HBO008773.

A day or so later, Mamdani called Manpreet to see if she would assist them in Jalandhar. *Id.*  Mamdani also connected with Harinder Singh ("Harinder"), a bureau chief for Total TV News, a Hindi news channel.  *Id.* ¶ 84.

Thereafter, Mamdani went out to scout in Jalandhar with Manpreet.  *Id.* ¶ 86.  Mamdani saw one girl stitching a Mitre-branded ball.  Although she looked quite young to Mamdani, she said she was 15 or 16 years old.  *Id.*  They also saw a family that had Mitre panels ready to be stitched.  They were told that the younger children in the family were at school, but they would stitch the Mitre panels after school.  *Id.*  Vijay, Manpreet and Mamdani also went to a village where Harinder told Mamdani that he had been advised that numerous children stitch soccer

balls. *Id.* ¶ 87.  They saw and talked with three young boys who Mamdani saw stitching balls. One boy, who was 11 years old, was stitching a Mitre-branded net ball, and the other two boys were stitching Cosco-branded balls. *Id.*  Vijay taped the children stitching. *Id.*; Ex. 23.

Because Edelman and Mamdani were going to leave India, Perskie decided that Manpreet and Vijay, who had proven themselves to be competent and reliable, should return to Jalandhar at a later date to locate and tape more children stitching soccer balls.  Perskie Dec. ¶ 52. Subsequently, Vijay sent Perskie and Mamdani additional tape, which contains footage of a child named Manjit, who was 12 years old and stitched Mitre-branded soccer balls, two boys named Deepu and Aman, ages 12 and 9, who stitched Mitre-branded soccer balls, and a stitching center where children were stitching Mitre-branded soccer balls.  Perskie Dec. Exs. 74-76.  After reviewing the footage, Mamdani and Perskie fully believed that the footage was accurate.  Not only did they trust Vijay and Manpreet, but the children on the video appeared to be very skilled. *Id.* ¶ 90(b); Mamdani Dec. ¶ 96.  In addition, at Perskie's request, Vijay and Manpreet obtained and sent to Perskie one of the balls Manjit was stitching and one of the balls Deepu and Aman were stitching.  Perskie Dec. ¶ 53; Mamdani Dec. ¶ 95.

5.    Interview with Kailash Satyarthi

Bernard Goldberg ("Goldberg"), an award winning journalist with over forty years of experience in television news, was the correspondent on the Segment.  Goldberg Dec. ¶ 2.  He spoke with Perskie about the research Perskie and Mamdani had done, the footage that had been obtained and what Mamdani and Perskie had seen during their trips to India.  Perskie Dec. ¶ 63. In July 2008, Goldberg interviewed Satyarthi.  Goldberg Dec. ¶ 13.  Because Satyarthi is one of the foremost experts on child labor in India, Perskie (and Mamdani and Goldberg) believe he was a reliable and knowledgeable source of information. *Id.* ¶ 16; Mamdani Dec. ¶ 100; Perskie Dec. ¶ 16.

During that interview, Goldberg and Satyarthi discussed a wide range of topics, including the use of debt bondage (which Satyarthi referred to as "slavery"), policies of major companies against the use of child labor, the irony of children stitching balls with panels imprinted with the phrase "no child labor," the policies of major companies against purchasing goods made with child labor, the wages children in India earn stitching soccer balls, and parents being compelled to allow their children to stitch soccer balls because they can not find jobs themselves.  Perskie Dec. Exs. 84-91.  Satyarthi also expressed his opinion that those who directly engage children, and those who are directly benefiting from the use of child labor, such as contractors and companies, have to be blamed first for child labor in the soccer ball industry.  *Id.*

6.     Interview with Charlotte Ponticelli

Perskie also thought it was important for the Segment to include an interview with a representative of the United States government to explain why the United States government regards the use of child labor in the manufacture of soccer balls as deeply problematic, to help the viewer in the United States connect with the story.  Perskie Dec. ¶ 67. He scheduled an interview with Charlotte Ponticelli ("Ponticelli"), the Department of Labor's Deputy Undersecretary for International Affairs, and the person in charge of the Bureau of International Labor Affairs ("ILAB"), the branch of the DOL responsible for investigating the use of child labor in the manufacture of goods imported into the United States.  *Id.* ¶ 68.

After the interview, Perskie believed that Ponticelli had confirmed what HBO's earlier research indicated:  the United States government viewed child labor and forced labor as a problem that still existed in India, and that forced labor includes instances of child labor in which the children are too young to give meaningful consent, and/or work in a hazardous industry, and/or work in such a way that it interferes with their education, and/or are effectively forced into working, whether by their parents or their impoverished circumstances or some other outside

factor.  The interview also confirmed that the United States government was still concerned about forced and child labor in India, and had a policy against importing goods made with such labor.  Perskie Dec. ¶ 69.  In addition, when Goldberg asked Ponticelli for her thoughts on companies, like Mitre, who have policies against child labor but may not be aware of child labor in their supply chains, Ponticelli told Goldberg that "the source of the problem is that the parent company, no matter how well intentioned, may not be doing due diligence in making sure that their subcontractors down the line are doing the best they can to make sure this exploitation is not occurring."  Goldberg Dec. ¶ 18; Perskie Dec. Exs. 92-97.

7.   Efforts to Contact Mitre

After Perskie reviewed all of the footage that had been taken in India, he felt comfortable including Mitre in the part of the Segment that discusses children stitching international brands of soccer balls in Jalandhar.  Perskie ¶ 55.  Perskie was confident that Mitre-branded balls were, in fact, being stitched by children in Jalandhar.  He had first-hand accounts from Mamdani and from stringers in India, as well as video footage shot months apart from both Sumit and Vijay.  *Id.*  Mitre had also been associated by NGOs with child labor in the past.  *Id.*  In addition, Perskie felt that American viewers would be familiar with the Mitre brand.  *Id.* ¶ 56.  He knew that Mitre had been the official ball of both Major League Soccer ("MLS") in the United States and the Premier League in England.  *Id.*

Perskie also believed that he had done the necessary due diligence to establish that the Mitre-branded balls that the children were taped stitching in Jalandhar were not counterfeit, having obtained two of these balls and compared them closely with known, genuine Mitre balls of the same make, model, size, and color.  Perskie Dec. ¶ 57; Metcalf Dec. Ex. 120.  In addition, he believed he had sufficient information to determine that American retailers may have been carrying balls made by child labor.  Perskie Dec. ¶ 57.  Perskie and Mamdani learned from

Regent, Mitre's exclusive licensee for the wholesale distribution of soccer balls in the United States, that all Mitre balls that Regent imports for sale have a certain UPC code prefix and that some Mitre Cobra balls had been distributed by Regent to Walmart in Austin, Texas. Inspection of balls purchased from Walmart showed that their color, style, and size were identical to those of some of the balls shown on the videotape being stitched by children—as was the UPC code. *Id.* They also had been told by Manpreet that all of the children stitching Mitre-branded balls that were videotaped by Vijay were working for Soccer International, which import records showed was one of the companies that produced and delivered soccer balls to Regent. Mamdani Dec. ¶ 109(d).

It also made sense to include Mitre in the Jalandhar part of the Segment because, according to HBO's research, Mitre had held itself out as an industry leader in combating child labor in the manufacture of soccer balls. Perskie Dec. ¶ 58. Perskie understood that Mitre had played a central role in organizing the conference that led to the implementation of the Atlanta Agreement, a landmark agreement designed to end the use of child labor in the manufacture of soccer balls in Pakistan. *Id.*

Finally, as a practical matter, Perskie and Mamdani had more footage of children stitching Mitre-branded balls than any other well-known soccer brand, which made including Mitre in the Segment a reasonable choice. Perskie Dec. ¶ 60.[3]

Perskie wanted an interview with Mitre to give it an opportunity to respond and to equip him, as the producer, to include Mitre's point of view in the Segment. *Id.* ¶ 70. Starting on August 15, 2008, more than a month before the Segment premiered, Perskie reached out to Mitre

---

[3] Perskie ruled out specifically identifying other brands of balls they had footage of children stitching for a variety of reasons, including because he could not find those balls for sale in the U.S., he did not believe consumers in the U.S. would be familiar with the brand, he did not have sufficient information to determine if the balls were counterfeit and, in the case of Pepsi, it is known as a soft drink maker, not a sporting goods company. Perskie Dec. ¶ 62.

multiple times, requesting an on-camera interview with a Mitre representative. *Id.* ¶¶ 71-74. At the end of August, Perskie was drafting a script for the Segment, collaborating with Goldberg. Perskie and Goldberg agreed they should reach out to Mitre again so that in the absence of a face-to-face interview, Mitre still would have the chance to be heard. *Id.* ¶¶ 75-76. On September 8, 2008, Perskie wrote to Mitre once again, attaching to his email several still frames of the footage of children stitching Mitre-branded soccer balls in Jalandhar. *Id.* ¶ 77.

On September 11, 2008, Mitre sent Perskie written statements from both Mitre and the Sports Goods Foundation of India ("SGFI"). Perskie Dec. ¶ 78; Ex. 106. Mitre's statement acknowledged that children were sometimes involved in stitching, and stated that Mitre would "review [its] checking procedures with [its] factories and SGFI and rectify any failings [it] may identify in the light of these investigations." *Id.* ¶ 79. Most importantly, neither the email nor the statements denied in any way that children in India were stitching Mitre-branded soccer balls. Mitre also did not indicate in any way that the Mitre-branded balls in the pictures Perskie had sent were or could be counterfeit. *Id.*

8.   Editing

Around the same time Perskie was soliciting additional comment from Mitre, the editing process began. Perskie Dec. ¶ 80. On September 11, Perskie gave a rough cut[4] to Bryant Gumbel ("Gumbel"), the host of Real Sports and an internationally renowned journalist with over thirty-five years of experience, so that Gumbel would be prepared for the "cross talk" exchange at the end of the Segment – where Gumbel and the correspondent discuss the segment. Gumbel Dec.; Perskie Dec. ¶ 83. Perskie gave a rough cut to Bradley as well as to Ross Greenburg ("Greenburg"), one of the executive producers of Real Sports. *Id.* Mamdani and Edelman also reviewed the rough cut and believed it to be accurate, based on everything they

---

[4] A rough cut is essentially a draft of a segment, in video form. Bradley Dec. ¶ 11.

had seen in India, the information they had received, and the research Mamdani had done.

Mamdani Dec. ¶ 104; Edelman Dec. ¶ 28.

> On September 15, 2008, Goldberg and Gumbel taped the cross-talk.  They stated:
>
> Goldberg:  . . .  Are we supposed to believe that Mitre, for instance, which is just one of many companies that, that are involved in this – are we supposed to believe that Mitre, an international company based in London is going to know what's happening on a side street in Jalandhar, India?  It's hard.  It's very hard.
>
> Gumbel:  I understand that, but when they say they investigated it, are they just lousy investigators, or are they lying?
>
> Goldberg:  Well, let, let me answer it this way.  I, I don't believe they're lying.  I honestly believe – and I don't think I'm naive – I honestly believe that Mitre and all the other companies would like this to be wiped out once and for all.  Having said that, we're a television program.  We don't have subpoena powers.  We don't have guns.  We don't have badges.  We can't walk in and tell everybody to get their hands up on a wall.  But we found it.  We found it.
>
> Gumbel:  That's what I said.  How, how good can their investigation be?  How hard can they be trying?
>
> Goldberg:  I, I don't believe Mitre wants it to happen, but the subcontractors are a different story altogether.  The subcontractors don't want to hire those kids' parents.  By the way, there are over fifty million unemployed adults in India.  They could hire those – every single one of those kids working could be thrown out of work today and hired by a parent.  They don't want to do that, because the kids are making a nickel an hour. The kids aren't yelling to organize.  The parents aren't going to tolerate a nickel an hour and may want to organize.

Perskie Dec. Ex. 1.

> 9.    Mitre's Last-Minute Call To HBO

On September 16, 2008, the day the Segment was scheduled to premiere, counsel for Mitre called HBO.  Metcalf Dec. Ex. 38 at 150-61, 198-200 and its Ex. 15; Metcalf Dec. Ex. 39 at 86-89; Ex. 41 at 58-60; Ex. 54 at 112-50; Ex. 55 at 32-34.  During the sequence of calls that afternoon (evening in the U.K.), Mitre's counsel told HBO's counsel that they understood that the Segment was set to premiere later that day and would state that children in India manufacture Mitre-branded products, which they stated they did not believe to be the case.  Metcalf Dec. Ex.

54 at 118-21.

Mitre provided a link to a video clip that had been posted on YouTube (the "Clip"). The edited and subtitled Clip contains footage of two girls, Preeti and Savita Singh ("Preeti and Savita") — the same two girls that Sumit had taped stitching Mitre-branded balls — and their mother stating that Preeti and Savita do not stitch soccer balls, that they both go to school and that someone "forcibly clicked their picture with ball in their hands." *Id.* at 118-50, Exs. 4, 5; Metcalf Dec. Ex. 119. Mitre's representatives stated that the SGFI, the manufacturers' trade association that Mitre relies on to monitor the use of child labor in the manufacture of Mitre-branded products in Jalandhar, uploaded the Clip. Metcalf Dec. Ex. 54 at 129-30.

During the sequence of telephone calls, Mitre's representatives were unable to provide any facts regarding where, how or who specifically filmed or edited the Clip. They also said they could not make the raw footage available because they did not have it. Thereafter, HBO's counsel explained in detail why HBO did not find the Clip credible. Metcalf Dec. Ex. 55 at 35-39. As they explained, the Clip was clearly heavily produced – even including subtitles at the bottom of the screen that were not a verbatim translation of what the girls and their mother were saying in the Clip. Metcalf Dec. Ex. 54 at 153-55. In contrast to the Clip, which stated that Preeti and Savita had *never* stitched soccer balls before, HBO had raw footage of Preeti and Savita stitching soccer balls in a fairly skillful manner, making it highly improbable that the girls were telling the truth in the Clip. Metcalf Dec. Ex. 55 at 35-37; Perskie Dec. ¶ 87. In response to HBO's statement that the Clip lacked credibility because of the overly-produced nature of the Clip, Mitre's representatives offered only that the production "was typical of Bollywood." Metcalf Dec. Ex. 55. at 35-39.

After the calls with Mitre, HBO's counsel and Perskie met with Bruce Grivetti ("Grivetti"), Executive Vice President of Business Affairs, and discussed the matter. Metcalf Dec. Ex. 51 at 40, 58-72, 220-30. Grivetti decided not to include footage of Preeti and Savita in the final Segment. *Id.* at 66-70, 224-26. Although the Clip "absolutely" did not cast any doubt on the credibility of the footage of Preeti and Savita that was in the rough cut Grivetti reviewed, "in an attempt to possibly avoid a frivolous objection," HBO decided to take out the footage of Preeti and Savita from the final Segment. *Id.* at 70-72; Grivetti Dec. ¶ 9.

The decision was made only out of an abundance of caution, as no one at HBO believed the Clip was credible and, in any event, nothing in the Clip called into question what Mamdani had seen with her own eyes – numerous children in India stitching Mitre-branded soccer balls.

10.     Distribution of the Segment

After the Segment premiered on September 16, 2008, it was distributed in September and October 2008 by HBO on HBO's United States premium pay television service on the channels branded HBO, HBO2, and HBO Latino and on HBO On Demand. Rienecker Dec. ¶¶ 5, 10, Ex. A. HBO did not authorize any other distribution of the Segment, and, in particular, did not authorize distribution on the Internet or in the United Kingdom. *Id.* ¶¶12-13. *See* point V, *infra*.

The nearly 22-minute Segment reports on the use of child labor in the manufacture of soccer balls in India, generally, and specifically addresses two different situations in India. Perskie Dec. Ex. 1. It discusses the use of low-paid child labor in Jalandhar, India, to stitch soccer balls, including the economic reasons why children stitch soccer balls. *Id.* It shows children under the age of 14 stitching Mitre "Cobra" branded soccer balls in Jalandhar, and features interviews with several children stitching Mitre-branded soccer balls for low wages. A certain type of Mitre-branded soccer ball also is tracked – through the ball's UPC code – from India, where child labor is used, to a retail store in the United States. *Id.*

The Segment also discusses Meerut, India, where children are working for no money to pay off their parents' debts.  As Mitre acknowledges in the Complaint, the Segment "shows many other children both stitching and delivering finished soccer balls in Meerut, but never shows the brands of these balls nor mentions the names of these brands."  Metcalf Dec. Ex. 1 ¶ 23.  The Segment also discusses the statement Mitre provided and concludes with the cross-talk, during which Goldberg comments that Mitre may not know what was happening in India, and that Mitre and all of the other companies would like to eliminate child labor, but that the subcontractors "are a different story altogether."  Perskie Dec. Ex. 1.

C.   **Mitre's Claim Letter and Complaint**

On or about October 1, 2008, Mitre's counsel sent HBO a letter requesting that HBO cease dissemination of the Segment.  Metcalf Dec. Ex. 1 at E (the "October 1 Letter").  On October 6, 2008, HBO responded to the October 1 Letter by noting, among other things, that "[t]o date, HBO has not received any credible evidence that the Segment is false."  *Id.* at E, J.

On October 23, 2008, Mitre filed the Complaint initiating this action against HBO. Metcalf Dec. Ex. 1.  In the Complaint, Mitre alleges that it plays "a leading role in the international effort to eliminate child labor in the manufacture of soccer balls."  *Id.* at Introduction.  In the core allegation, Mitre claims that the Segment is false and defamatory because, Mitre claims, child labor is not used to manufacture Mitre-branded soccer balls in India. *Id.* ¶¶ 32, 44, Ex. E.

D.   **Additional Facts Revealed In Discovery**

Discovery has conclusively established what HBO already knew – Mitre-branded soccer balls were sometimes stitched by children in India.  In depositions, Mitre admitted that it has long been aware of the child labor found in its supply chain.  Metcalf Dec. Ex. 38 at 113-14.  For example, Mitre's Managing Director, Gary Hibbert, testified that at the time of his first viewing

of the Segment, he already knew that from time to time children had been found stitching Mitre-branded soccer balls in India. *Id.* at 204-05.

In November 2008 and January 2009, representatives of Mitre traveled to Jalandhar, India, as part of Mitre's investigation into HBO's Segment and were told that the SGFI had documented numerous instances in 2007 and 2008 when children were found stitching Mitre-branded balls. Specifically, during the 2008 trip, the head of security for Mitre's parent company ("Boocock") listened to Ravi Purewal ("Purewal") at the SGFI discuss the SGFI's findings of children stitching Mitre-branded balls and received a copy of the "Monthly Child Found Stitching Detail" report. Metcalf Dec. Ex. 32 at 184-86, 221-227, 324-25 and its Exs. 16-17. *See also* Metcalf Dec. Ex. 44 at 273-76, 286-87, 310-21 and its Ex. 17A; Metcalf Dec. Ex. 33 at 127-29, 138, 161-69, 221-26. Boocock specifically testified that the "Monthly Child Found Stitching Detail" showed that several children had been discovered stitching Mitre-branded soccer balls in 2007 and 2008. Metcalf Dec. Ex. 32 at 221-227. He also testified that he made a follow-up trip to Jalandhar in January 2009 for the purpose of clarifying the number of children who had been found stitching Mitre-branded soccer balls in Jalandhar in 2008. *Id.* at 265-69, 282-85 ("There was more children involved in Mitre than I originally thought"), 327-28. Based on the charts provided by Purewal, both Mitre representatives in the room understood that children in India were, in fact, stitching Mitre-branded soccer balls. *Id.* at 220-25, 282-85; Metcalf Dec. Ex. 33 at 127-129, 138, 161-169, 221-226.[5]

One former SGFI monitor testified to personally witnessing at least one child under the age of fourteen stitching a Mitre-branded ball. Metcalf Dec. Ex. 47 at 83-86. Navdeep Singh, a

---

[5] Mitre's counsel has conceded that these children were stitching genuine Mitre-branded balls. Metcalf Dec. Ex. 78 at 5. That concession is supported by Purewal's testimony, which discusses in great detail how the SGFI uses particular ID Codes to confirm that the balls are genuine. Metcalf Dec. Ex. 44 at 98-99, 171-72, 314-20.

former employee of a Mitre contractor (Mayor), admitted that monitors for the SGFI found children under the age of 14 stitching Mitre-branded soccer balls from Mayor in 2007 and 2008. Metcalf Dec. Ex. 46 at 267-69.  Two other Mayor employees testified that they could never say that there is no child labor used in the manufacture of Mitre-branded products.  Metcalf Dec. Ex. 49 at 10, 70; Ex. 42 at 27, 112-13.  This testimony – from Mitre's representatives, contractors and the entity Mitre relies on for monitoring – is consistent with what HBO employees and stringers saw.  There is, therefore, no material fact in dispute on this point.

**E.    Public Figure**

In a recent interview, Mitre's marketing manager proclaimed that Mitre has "become synonymous with [soccer] and [is] the number one manufacturer of [soccer balls] in the world." Metcalf Dec. Ex. 36 at 168 and its Ex. 24.  But while Mitre has achieved significant marketing and sales success – and brand recognition – in the United States and throughout the world, Mitre also has achieved international renown because child labor has previously been found to have been used in the manufacture of its soccer balls.  In response, Mitre has stepped forward and repeatedly issued public statements in which Mitre purports to lead the fight to end child labor. The extensive record supporting Mitre's public figure status is set forth in the 56.1 Statement at ¶¶ 118-281.

1.    The Public Controversy and Mitre's Involvement

After extensive media coverage focused on the use of child labor in the soccer ball industry – including in the manufacture of Mitre-branded soccer balls –  Mitre was quoted in the media time and time again promising that it takes the issue seriously.  Metcalf Dec. Exs. 77, 88-10, 88-11, 88-27; 97, 98.  Mitre did more than just comment, however.  It chose to became a member of an industry task force charged with investigating allegations of child labor in the soccer ball industry, Metcalf Dec. 72 at Ex. J; it called two international conferences "which

resulted in the elimination of child labor in the soccer ball industry in Sialkot, Pakistan," and marked "the beginning of a corporate social responsibility movement," Metcalf Dec. Ex. 1 at Ex. E; Ex. 3 at 43, Ex. 57 at 52, 54, 89 and its Ex. 3; Ex. 34 at 88, 181-92 and its Ex. 5; Ex. 102 at 27-28; and it became a "major player" and "used its influence whenever possible" to implement the Atlanta Agreement – an agreement "between the industry, International Labor Organization [("ILO")], and UNICEF to remove children from the soccer ball industry, provide them with educational opportunities and create internal and external monitoring systems," Metcalf Dec. Ex. 101 at 95 n.3; Ex. 35 at 173-7; Ex. 34 at 91-94.

Mitre goes to great lengths to promote these and other efforts it has undertaken to try to eradicate child labor from the soccer ball industry. Metcalf Dec. Exs. 10, 11, 57 at 73-83 and its Ex. 6; 72 at its Exs. A, E, F, G; Ex. 77 ¶ 12, Ex. 101 at 115 n. 118, 119-23, 212, Ex. 34 at its Exs. 17, 18 and 26 ; Ex. 36 at 76-77, 101-14, 132 and its Ex. 12. Mitre's self promotion has worked – its efforts to prevent child labor have been discussed in newspapers across the United States and in reports from the United Nations and the United States Department of Labor. Metcalf Dec. Exs. 88-14 – 88-23, 101, 102, 104, 105.

2.    Mitre Has Sought, and Achieved, Public Acclaim

Mitre also is a leading brand with worldwide name recognition and Mitre has pursued a calculated world-wide marketing strategy over many years to maintain its visibility to consumers throughout the world, including in the United States.

Mitre was one of the two initial sponsors of Major League Soccer ("MLS") and it paid over a million dollars to MLS to have the official Mitre-branded MLS ball used at every one of the over 100 MLS games played each year from 1996 through 1999 – games which were often nationally televised on ESPN, ESPN2 and ABC. Metcalf Dec. Ex. 65 ¶¶ 10-13, and its Exs. 1 at MLS1346, 12 at MLS0144 and 83; Ex. 74; Ex. 76 at its Exs. 1-28. Mitre's logo and goods

(including the ubiquitous MLS Mitre Official Ball) were visible to millions of MLS fans on sideline on-field advertising boards, on on-site kiosks and banners, and in page advertising in MLS Official Programs and Media Guides for each regular season, playoff, and all star game, as well as on trading cards and other memorabilia.  Metcalf Dec. Ex. 65 at its Exs. 1, 11-79, 81; Exs. 66-68, Ex. 69 ¶ 10 and its Exs. 1 and 2.  Its sponsorship of MLS was reported in major newspapers across the United States.  Exs. 88-2 – 88-4, 88-57 – 88-63.

Mitre also sponsors individual soccer ball players and leagues, and from 1992-2000 was the official ball of the Premier League, the world's most popular league.  Metcalf Dec. Ex. 36 at 161-174; Ex. 58 at 119-23; Ex. 61 at 230-34 and its Ex 24; Ex. 62 at 10 and its Ex. 1.  Through its internal marketing department, external press relations companies and the marketing efforts of its U.S.-based licensees, Mitre has engaged in large-scale promotional campaigns, sponsored trade shows, had its brand featured in national magazines, and even was featured prominently in the film and trailer for the successful film *Bend it Like Beckham.*  Metcalf Dec. Ex. 36 at 29-30, 85-86 and its Ex. 13; Ex. 60 and at its Exs. 4-9; Ex. 63 and at its Exs. 1-9; Ex. 71 ¶¶ 6-14 and at its Exs. 1-4, 6; Ex. 118.  Through these efforts Mitre has made sure its brand name stays in the spotlight.

## ARGUMENT

This Court should dismiss the Complaint because Mitre cannot set forth sufficient evidence to create an issue of material fact to defeat summary judgment.  Under New York law, to prevail on its defamation claim, Mitre must prove that there was (1) a materially false and (2) defamatory statement (3) published about plaintiff without privilege or authorization to a third party, (4) with the requisite level of fault that (5) caused damage.  *See, e.g., Chapadeau v. Utica*

*Observer-Dispatch, Inc.*, 38 N.Y.2d 196, 198-99, 379 N.Y.S.2d 61, 63-64 (1975); *Chandok v. Klessig*, 632 F.3d 803, 814 (2d Cir. 2011).[6]

Here, Mitre cannot come forward with any proof supporting two key elements of its defamation claim. First, Mitre cannot establish falsity as a matter of law because the statements relating to Mitre in the Segment are substantially true. Second, Mitre cannot establish that HBO acted with the requisite level of fault. Mitre, one of the most well-known soccer brands in the world, is without question a public figure. Consequently it must show, by clear and convincing evidence, that HBO acted with actual malice, *i.e.* had knowledge of falsity or in fact entertained serious doubts about the truth. There is no evidence – much less clear and convincing evidence – that HBO did so. However, even if this Court were to determine that Mitre is not a public figure as a matter of law, there is no evidence that HBO acted in a grossly irresponsible manner.

Finally, there is no evidence whatsoever that Mitre has sustained any damage as a result of HBO's conduct, and therefore Mitre is at most entitled to seek nominal damages.

## I.
## SUMMARY JUDGMENT STANDARD IN LIBEL CASES

New York and federal courts have repeatedly extolled the virtue of resolving defamation cases through summary judgment: "It is particularly important in a libel case involving First Amendment rights that a court carefully scrutinize the record to determine if a defendant is entitled to summary judgment." *Hickey v. St. Martin's Press, Inc.*, 978 F. Supp. 230, 234 (D. Md. 1997). *See also Immuno A.G. v. Moor-Jankowski*, 77 N.Y.2d 235, 256, 566 N.Y.S.2d 906, 918, *cert. denied*, 500 U.S. 954 (1991); *Khan v. New York Times Co.*, 269 A.D.2d 74, 77-78, 710 N.Y.S.2d 41, 44 (1st Dep't 2000).

---

[6] New York state law applies to Mitre's libel claim. Both parties have relied exclusively on New York law in briefing throughout this litigation. This approach is deemed consent to the application of New York law and "concludes the choice of law inquiry." *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 743 (2d Cir. 1999).

## II.
## <u>THE SEGMENT IS SUBSTANTIALLY TRUE</u>

First and foremost, Mitre cannot prevail on its defamation claim because the gist or thrust

of the Segment as it pertains to Mitre – that children in India are involved in the manufacture of

soccer balls, including Mitre-branded soccer balls – is substantially true.

A defamation plaintiff in the United States bears the burden of proving that an allegedly

defamatory publication is false. *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776

(1986), *cert. denied*, 475 U.S. 1134 (1986); *accord Hatfill v. New York Times Co.*, 488 F. Supp.

2d 522, 532 (E.D. Va. 2007).[7]

Because of this constitutionally mandated burden of proof, "[i]t's not necessary of course

that a statement be literally true." *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 301 (2d

Cir. 1986). Rather, "[i]t is only necessary that the gist or substance of the challenged statements

be true." *Croton Watch Co. v. Nat'l Jeweler Magazine, Inc.*, No. 06 CV 662 (GBD), 2006 WL

2254818, at *5 (S.D.N.Y. Aug. 7, 2006) (citation omitted). It naturally follows that if the

statements complained of are substantially true, a defamation claim fails as a matter of law.

*Guccione*, 800 F.2d at 301; *Croton Watch Co.*, 2006 WL 2254818, at *5 (a statement is not

actionable "if the published statement could have produced no worse an effect on the mind of a

reader than the truth pertinent to the allegation") (citation omitted).

In this case, the "gist" of the Segment, as it relates to Mitre, is that children in India are

involved in the manufacture of soccer balls, including Mitre-branded soccer balls. As a result,

---

[7] As a public figure, Mitre must prove falsity by clear and convincing evidence. *DiBella v. Hopkins*, 403 F.3d 102, 111-15 (2d Cir.), *cert. denied*, 546 U.S. 939 (2005). If the Court determines that Mitre is not a public figure, it still should be required to prove material falsity by clear and convincing evidence. *See id.* (noting that some courts still require private figure plaintiffs to establish material falsity by clear and convincing evidence). For the purposes of this motion, however, the legal question is beside the point because Mitre (if deemed a private figure) also cannot on the record of this case prove by a preponderance of the evidence that the gist of the Segment is false.

under New York and constitutional law, if children in India have been found stitching Mitre-branded soccer balls, Mitre can not meet its burden of establishing that the Segment is materially false and HBO is entitled to summary judgment.

## A.      **The Segment Is True**

As a preliminary matter, Mitre can never meet *its* heavy burden of establishing that the Segment is materially false because the head of corporate responsibility for Mitre's parent company testified "that no one could say that there is no child labor in the production of our product." Metcalf Dec. Ex. 34 at 41, 56-58, 186[8]. It would be impossible, she stated, to claim that "child labor is not used in the manufacture of Mitre branded soccer balls in India." *Id.* at 201-02, 126.   On this point, the parties agree, and this undisputed fact leads to only one conclusion – Mitre cannot meet its burden of proving material falsity and summary judgment must be granted to HBO. *See Hepps*, 475 U.S. at 776.

Equally important, Mitre's claim fails because Mitre has long known (and was again advised after the premiere of the Segment) that children in India have been found stitching Mitre-branded products. *See* pg. 17-18, *supra*.  In fact, during its investigation into the Segment, Mitre learned that the SGFI, the entity Mitre relies on to monitor the use of child labor in the manufacture of Mitre-branded products in India, found a number of children in 2007 and 2008 (including a young child named Dimple on the very day the Segment premiered) stitching Mitre-

---

[8] HBO served six 30(b)(6) Notices of Deposition on Mitre, calling for the testimony on key subjects directly relevant to this case.  Mitre produced a 30(b)(6) witness in response to the one notice requesting information on Mitre's alleged damages.  Metcalf Dec. ¶ 82.  However, Mitre refused to identify any 30(b)(6) witnesses in response to the remaining five notices and instead offered to selectively adopt deposition testimony of various individuals at Mitre and related companies as its 30(b)(6) testimony.  *Id.*  After Judge Pitman ordered Mitre to "identify the testimony it will adopt as 30(b)(6) testimony," Mitre provided the testimony it would designate in response to the five notices.  *Id.*, Ex. 9.  Because the designations were incomplete, HBO renewed its request with Judge Pitman that it be entitled to take 30(b)(6) testimony from Mitre.  Judge Pitman has not ruled on HBO's request.  *Id.*, Ex. 80.

branded products.  Metcalf Dec. Ex. 32 at its Ex. 17; Ex. 33 at 221-222; Ex. 44 at its Ex. 17a.

Further, Mamdani personally witnessed children stitching Mitre-branded balls in India. Mamdani Dec. ¶¶ 78-80, Ex. 22 at HBO008773.  Mitre has not, and cannot, present any evidence that contradicts Mamdani's direct, personal observations.  For the purposes of this motion, this Court need not decide if the children who appeared in the Segment actually stitched Mitre-branded soccer balls, as they appear to be doing skillfully, or whether the children's subsequent claims (which were made to a manufacturer that is important to the Jalandhar economy) that they have *never* stitched a soccer ball in their life are credible.  Rather, the Court need only assess whether the allegedly defamatory thrust of the Segment – that children in India stitch soccer balls, including Mitre-branded soccer balls – is true.

As a matter of law, it is substantially true and non-actionable to state that a plaintiff was suspended from boxing because a post-fight drug test showed he had used cocaine where he only tested positive for marijuana, *Cobb v. Time, Inc.*, No. 3:94-0836, 1995 WL 861518, at *6 (M.D. Tenn. Aug. 30, 1995); and a crime stoppers poster that stated plaintiff "might possibly be armed," "should be considered dangerous" and was a "most wanted" fugitive is substantially true because he was wanted on an arrest warrant for burglary of a motor vehicle, *Gist v. Macon County Sheriff's Dep't*, 284 Ill. App. 3d 367, 671 N.E.2d 1154 (1996).  *See also Phillips v. Ingram County*, 371 F. Supp. 2d 918 (W.D. Mich. 2005) (statement that an assistant prosecutor's actions, in lying to get a cat back from a shelter, were criminal is substantially true because the conduct was *similar* to larceny); *Nichols v. Moore*, 396 F. Supp. 2d 783 (E.D. Mich. 2005) (statement that plaintiff was arrested "in connection" with the Oklahoma City bombing is substantially true).  Applying these principles here, because it is indisputable that children in

Jalandhar in 2007 and 2008 stitched Mitre-branded soccer balls, the Segment is substantially true and Mitre's defamation claim therefore fails as a matter of law.

**B.      Mitre's Unreasonable Interpretations of the Segment Cannot Save Its Claim**

Mitre brought this action claiming that the Segment is false because, Mitre claims, child labor is not used in the manufacture of Mitre-branded balls in India.    Metcalf Dec. Ex. 1 ¶¶ 32, 44, 45, Ex. E.  Apparently realizing this statement is completely refuted by its own documents and testimony from its own representatives, which establish – without a doubt – that child labor is sometimes used in the manufacture of Mitre-branded products in India, Mitre began to argue that the Segment implies a variety of different things it does not say.[9]   In making these arguments, however, Mitre is unreasonably straining the plain meaning of the Segment in a way that cannot be supported under New York law.

Reviewing the allegedly defamatory publication as a whole, "it is for the court in the first instance to determine whether the [spoken] words are susceptible to the particular defamatory meaning ascribed to them by plaintiff."  *Tellier-Wolfe v. Viacom Broad. Inc.*, 134 A.D.2d 860, 860, 521 N.Y.S.2d 597, 598 (4th Dep't 1987).  In addition, as the Second Circuit has held, "[t]he accuracy of the report should be assessed on the publication as a whole, *not isolated portions of it.*"  *Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*, 844 F.2d 955, 959 (2d Cir. 1988) (emphasis added); *see also James v. Gannett Co.*, 40 N.Y.2d 415, 419-20, 386 N.Y.S.2d 871, 874, 875 (1976).  *See also Pavlica v. Behr*, No. 03 Civ. 9628(DC), 04 Civ. 8152(DC), 2006 WL 1596763, at *7 (S.D.N.Y. June 12, 2006).

---

[9] As this litigation progressed, Mitre's claims as to what the Segment states became more and more attenuated.  By the end of discovery, in response to an interrogatory, Mitre claimed that the Segment contained 77 false and defamatory statements about Mitre.  Metcalf Dec. Ex. 84.  As the chart annexed to the Metcalf Dec. as Ex. 85 establishes, the majority of the statements simply do not exist in the Segment because they cannot be supported by the plain meaning of the Segment.  Others are non-actionable for other reasons, as set forth in the chart.

Mitre's approach, in contrast, ignores the plain meaning of the Segment as a whole and cherry-picks certain statements. It then argues that those portions – divorced from the meaning of the Segment as a whole – are false. Perhaps recognizing that the news media otherwise could never report on a large, multi-faceted problem without fear that someone might manipulate the meaning, the Second Circuit has explicitly rejected this tactic. *See Law Firm of Daniel P. Foster, P.C.*, 844 F.2d at 959.

Setting aside Mitre's tortured interpretations leads to only one conclusion: HBO is entitled to summary judgment because it is undisputed that in 2007 and 2008 some children did stitch Mitre-branded soccer balls.

## III.
## MITRE, A PUBLIC FIGURE, CANNOT ESTABLISH THAT HBO ACTED WITH CONSTITUTIONAL MALICE

This Court also should grant HBO's motion for summary judgment because Mitre cannot establish a basic element of its libel claim – that HBO acted with "constitutional malice." In the landmark decision *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), the Supreme Court announced that the First Amendment requires a public official plaintiff to prove, by clear and convincing evidence, that an allegedly defamatory statement is published with "actual malice" (or, alternatively, "constitutional malice").[10] In 1967, the Supreme Court expanded this constitutional requirement to all libel cases in which the plaintiff is a "public figure." *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, *reh'g. denied*, 389 U.S. 889 (1967); *Gertz v. Robert Welch*,

---

[10] With permission from Judge Daniels, on August 28, 2009, HBO filed a motion for partial summary judgment asking this Court to find that Mitre is a public figure. Metcalf Dec. ¶ 10. On March 15, 2010, this Court denied as premature HBO's motion and Mitre's cross motion "regarding whether Mitre Sports International Limited is a public figure," holding that the parties could file motions on Mitre's public figure status *after* the conclusion of discovery (the "March 15 Order"). *Id.* Ex. 8. Although Magistrate Judge Pitman has not ruled on HBO's application to take a 30(b)(6) deposition of Mitre on that issue and refused to allow HBO to take any discovery of Mitre's public figure status prior to 1997 (a decision HBO believes was erroneous), existing evidence establishes – without a doubt – that Mitre is a public figure.

*Inc.*, 418 U.S. 323, 344-45 (1974).[11]

"Actual malice" is defined not as ill will or spite, but as knowledge of falsity or reckless disregard for the truth. *Id.* at 279-80. The Court later gave meaning to the phrase "reckless disregard of the truth" by stating that it rests solely on the subjective state of mind of the defendant. "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [the] publication," *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968), or had a "high degree of awareness of . . . probable falsity," *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) (citation omitted).

## A.   **Mitre Is A Public Figure**

In *Gertz*, the Supreme Court held that there are two types of public figures under federal law: a limited purpose public figure and a general purpose public figure. After the Supreme Court laid the foundation, the New York Court of Appeals in *James v. Gannett Co.* essentially created a third category of public figure under New York law, holding that:

> [t]he essential element underlying the category of public figures is that *the publicized person has taken an affirmative step to attract public attention*. Of course, not all persons reported upon in the media have sought the publicity. However, there are individuals who, for a variety of reasons, have strived to achieve a measure of public acclaim.

40 N.Y.2d at 422-23, 386 N.Y.S.2d at 876 (emphasis added). *See also Maule v. NYM Corp.*, 54 N.Y.2d 880, 882, 444 N.Y.S.2d 909, 910 (1981). Mitre qualifies as a public figure under all three tests.

---

[11] A plaintiff's public figure status does not dissolve over time. *See, e.g. Contemporary Mission, Inc. v. New York Times Co.*, 842 F.2d 612, 619-20 (2d Cir. 1988) (finding that the plaintiff's public figure status "has not dissolved with the passage of time" even though, in the intervening years, the plaintiff had not sought *any* publicity "with respect to this or any other matter"). *See also Jones v. New Haven Register, Inc.*, No. 393657, 2000 WL 157704, at *5 (Conn. Super. Jan 31, 2000); *Milsap v. Journal/Sentinel, Inc.*, 100 F.3d 1265, 1269-70 (7th Cir. 1996); *Street v. Nat'l Broad. Co.*, 645 F.2d 1227, 1235-36 (6th Cir. 1981), *cert. granted*, 454 U.S. 815, *cert. dismissed*, 454 U.S. 1095 (1981).

1.     Mitre Is a Public Figure Under the Standard Set Forth In *James*

First, Mitre is a public figure under New York law according to the standard articulated in *James*. "Whether a plaintiff is a public figure is a question of law for the court." *Celle v. Filipino Reporter Enters.,* 209 F.3d 163, 176 (2d Cir. 2000). Importantly, "although whether a person is a public figure 'is a question of federal constitutional law and Supreme Court rulings are controlling,' in a diversity action, 'resort to the applicable state case law is appropriate' because 'states are entitled to provide a broader, though no more constricted, meaning to public figures' than federal law provides." *Cummins v. Suntrust Capital Markets, Inc.*, 649 F. Supp. 2d 224, 240 (S.D.N.Y. 2009) (quoting *Harris v. Quadracci*, 48 F.3d 247, 250 n.5 (7th Cir.1995)). New York's highest court has emphasized that the "'protection afforded by the guarantees of free press and speech in the New York Constitution *is* often broader than the minimum required by' the Federal Constitution." *Immuno A.G.*, 77 N.Y.2d at 256, 566 N.Y.S.2d at 918 (citation omitted), and, as a result, the *James* test defines public figure more broadly than does federal jurisprudence. *See Maule v. NYM Corp.,* 76 A.D.2d 58, 61, 429 N.Y.S.2d 891, 893 (1st Dep't 1980) (dissenting), *rev'd,* 54 N.Y.2d 880, 444 N.Y.S.2d 909 (1981).

The breadth of the *James* definition is no accident. In *Maule*, the New York Court of Appeals, applying the *James* test, found a sports columnist to be a public figure. The Court held that the "critical consideration" in assessing public figure status is "whether the evidence demonstrates that plaintiff had taken affirmative steps to attract personal attention or had strived to achieve a measure of public acclaim." *Maule,* 54 N.Y.2d at 882, 444 N.Y.S.2d at 910. The Court then proceeded to discuss aspects of plaintiff's career that convinced it that he should be deemed a public figure under the *James* standard:

> The product of plaintiff's craft – his books, articles and personal appearances – were obviously designed to project his name and personality before millions of readers of nationally distributed magazines and millions of television's viewers

> and to establish his reputation as a leading authority on professional football.  In
> short, plaintiff not only welcomed but actively sought publicity for his views and
> professional writing and by his own purposeful activities thrust himself into the
> public eye.  He had become a public personality.

*Id.*  In so concluding, the New York Court of Appeals chose to uphold New York's decision to

define public figure more broadly than *Gertz.*[12]

Here, as in *James*, Mitre is a public figure because it has projected its name before a

national audience of television viewers and magazine readers to establish its reputation as a

leading soccer ball brand.  It cannot be disputed that Mitre-branded balls have been prominently

displayed in the hands of superstar athletes and celebrities in advertisements, and that Mitre paid

over one million dollars as a sponsor of MLS to ensure that Mitre-branded balls, and only Mitre-

branded balls, were used at each one of the over 100 MLS games played every year and that its

logo would be shown on the side of the field at each of those games.  Mitre sponsored a

television promotion, which ensured its logo was shown throughout the ESPN, ESPN2, and ABC

national telecasts of MLS games; and through its licensee, in 2006 Mitre engaged in an elaborate

marketing campaign involving a large, double-decker bus wrapped in billboard-sized Mitre logos

seen by hundreds of thousands of attendees at three music festivals and featured in print media

and on television.  Metcalf Dec. Ex.60 and at its Exs. 4, 6, 7 and  9; Ex. 65 ¶ 14 and its Exs. 2 , 3,

91; Ex. 71 at its Ex. 6 at F4M0050 and 0079; Ex. 76 at its Exs. 19-22; Exs. 108-112.  Mitre also

was prominently featured in the film and trailer for the successful film *Bend it Like Beckham*.

Metcalf Dec. Ex. 118, http://www.youtube.com/watch?v=LbmRN7OvPac.

Mitre has an internal marketing department and, for many years, hired a press relations

---

[12]  The distinction between the two definitions was highlighted by Justice Sandler in the Appellate Division in his dissent when he wrote, "I doubt that the plaintiff was a public figure within the definition set forth in *Gertz* with regard to the article at issue here. . .  However, the concept was given what seems to me a somewhat more expansive interpretation by the Court of Appeals in *James v. Gannett Co*." 76 A.D.2d at 58, 429 N.Y.S.2d at 891.

company to increase the visibility of the brand.  Metcalf Dec. Ex. 36 at 21-27; Metcalf Dec. Ex. 63 at 1-9.  Through the marketing department, PR company and Mitre's licensees, Mitre has been able to advertise or cultivate mention of the Mitre brand in numerous print publications. Metcalf Dec. Ex.36 at 29-3; Ex. 63 at 14-20 and its Exs. 1-4, 6; Ex. 71 at its Exs. 1, 3 and 6; Exs. 108-112.  Mitre maintains a consistent presence on-line, through its routine posting of videos on "YouTube" and issuing of "tweets" and status updates on the social networking sites Twitter ("follow Mitre Sports on Twitter @MitreSports") and Facebook about its new products and new developments in the soccer community.  Metcalf Dec. Ex. 107; Ex. 36 at 148-49, 168-69 and its Ex. 23; Ex. 63 at 22-25, 32-33 and its Ex. 5; Ex. 61 at 269.  Mitre also has gone to great lengths to promote its efforts to eliminate child labor – on its website, to the United States government, and, through the Sporting Goods Manufacturers Association, on postcards and advertisements sent throughout the United States.  Metcalf Dec. Ex 34 at its Exs. 17 and 18; Ex. 72 ¶ 3(e)-(f) and at its Exs. E, F; Ex. 101 at 115 n. 118-23, 212.

Mitre has ensured that it is featured in popular movies, on television, on the Internet, and in print media and, thus, has certainly achieved a measure of public acclaim.  It is, therefore, a public figure under the standard set forth in *James*.  *See Kipper v. NYP Holdings, Inc.*, 12 N.Y.3d 348, 353 n.3, 884 N.Y.S.2d 194, 196 n.3 (2009) (doctor who had a medical practice that was written about in the media and who appeared as a doctor in movies and as a medical expert on television is "unquestionably a public figure"); *Wilsey v. Saratoga Harness Racing, Inc.*, 140 A.D.2d 857, 858, 528 N.Y.S.2d 688, 690 (3d Dep't 1988) (licensed harness track driver is a public figure due to his decision to cultivate press coverage); *Curry v. Roman*, 217 A.D.2d 314, 635 N.Y.S.2d 391 (4th Dep't 1995) (auctioneer who made television appearances on three local stations and gave interviews to print media is a public figure).

2.    Mitre Is a Federal Limited Purpose Public Figure

Mitre also meets the more narrow definition of limited purpose public figure in *Gertz*. Under *Gertz*, "an individual [who] voluntarily injects himself or is drawn into a particular public controversy . . . thereby becomes a public figure for a limited range of issues." *Gertz*, 418 U.S. at 351. Beginning with the allegations set forth in its Complaint, Mitre essentially has conceded in this litigation that it is a public figure for purposes of the controversy surrounding the use of child labor in the manufacture of soccer balls.

The federal courts of appeals have looked to different factors when evaluating whether a plaintiff is a limited purpose public figure. Generally, there must be a controversy in which the plaintiff either had "more than a trivial or tangential role" (*Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431, 433 (5th Cir. 1987) (citing *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987) (en banc)), or in which the plaintiff voluntarily injected himself and assumed prominence (*Contemporary Mission, Inc.*, 842 F.2d at 612-21; *Carr v. Forbes, Inc.*, 259 F.3d 273, 280 (4th Cir. 2001)). Under any of these rationales, Mitre is as a matter of law a public figure.

First, Mitre cannot reasonably dispute that, at the time the Segment was distributed, there had been an ongoing international controversy over the use of child labor in the manufacture of consumer products generally, and in the soccer ball industry, in particular. In this respect, this case is very much like *Trotter*, in which the Fifth Circuit found there to be a controversy surrounding "[t]he labor violence at [a Coca-Cola bottling company in Guatemala]" because it "captured the attention of a diverse and broadly-based audience, including the media, political leaders, human-rights organizations, labor unions, and Coca-Cola shareholders." *Id.*, 818 F.2d at 434. Here too the controversy surrounding child labor in the soccer ball industry also has captured the attention of a broad audience including the media, human rights organizations, the United States government and the United Nations. *See, e.g.*, Metcalf Dec. Exs. 64 at its Ex. 1, 77

and at its Ex. 1, 88-8 – 88-26, 100-102.

Far from having a trivial role in this existing public controversy, by its own admission, Mitre assumed a position of prominence.   This Court need look no further than Mitre's Complaint, where Mitre describes itself as playing "a leading role in the international effort to eliminate child labor in the manufacture of soccer balls," to find that it qualifies as a public figure under *Gertz*.[13]  Metcalf Dec. Ex. 1 at Introduction.   Similarly, Mitre claims in a letter from Mitre's counsel to HBO, which is part of the Complaint, that, "Mitre and the World Federation of the Sporting Goods Industry convened the first international conference on this effort on November 3, 1995, which resulted in the elimination of child labor in the soccer ball industry in Sialkot, Pakistan." *Id.*, Ex. E.  Moreover, at a court conference in this action, counsel for Mitre, while discussing the Segment, told the Court that Mitre "led this international conference in 1997" and "came up with" the Atlanta Agreement.   Metcalf Dec. Ex. 3 at 69-70.[14]   Mitre's counsel also stated that "Mitre became an international hero by pulling together manufacturers from all around the world in an attempt to eliminate child labor."  *Id.*   In short, Mitre has affirmatively alleged that it voluntarily thrust itself into – and in fact took the lead publicly in – the controversy surrounding the use of child labor in the manufacture of soccer balls.   In so doing, Mitre has conceded its public figure status.

---

[13] Courts in the Second Circuit regularly have relied on allegations in a plaintiff's complaint as the basis for finding it to be a public figure. *See Yiamouyiannis v. Consumers Union of the United States, Inc.*, 619 F.2d 932, 938 (2d Cir. 1980); *Celle*, 209 F.3d at 177; *Church of Scientology Int'l v. Eli Lilly & Co.*, 778 F. Supp. 661, 666 n.3 (S.D.N.Y. 1991) (public figure based on allegations in complaint).   Similarly, in this Circuit "a litigant is bound by the representations of his attorney." *Hoodho v. Holder*, 558 F.3d 184, 186-87 (2d Cir. 2009).

[14] Mitre's 30(b)(6) witness on corporate responsibility reiterated the significant role played by Mitre, describing it as a *major player in establishing the Atlanta Agreement*" that "worked with [its] partners in Pakistan to develop the programme in the decade since the agreement was signed" and was "*instrumental* in bringing" the major parties to the Atlanta Agreement "to the table."  Metcalf Dec. Ex. 34 at 91-94 and its Ex. 6 (emphasis added); Ex. 82.

Finally, Mitre has proven that it has access "to the channels of effective communication." Not only has Mitre publicly responded to allegations about the use of child labor consistently from 1995 to the present (Metcalf Dec. Exs. 77 ¶ 12, 88-10, 88-11, 88-27; 97, 98; Ex. 34 at its Ex. 18; Perskie Dec. Ex. 106), but Mitre also has affirmatively taken strides to publicize its work on the Atlanta Agreement and its other attempts to eradicate child labor in the soccer ball industry.  Metcalf Dec. Exs. 10, 11; Ex 34 at its Exs. 17 and 18; Ex. 36 at 76-86 and its Exs. 12, 13; Ex. 57 at 83-83 and its Ex. 6; Ex. 72 ¶ 3(e)-(f) at E, F; Ex. 101 at 115 n. 118-23, 212.

Mitre's actions since at least 1995 – by publicly and proudly stepping forward in an attempt to eradicate child labor – meet the very definition of a limited purpose public figure.  In one recent case, for example, the United States District Court in Massachusetts found that sugar plantation owners are limited purpose public figures in relation to claims they brought over a 2007 documentary entitled the "Price of Sugar," which focused on the treatment of Haitian laborers by Dominican sugar producers. *Lluberes v. Uncommon Prods., LLC,* Civil Action No. 07-11623-DPW, 2010 WL 3245283 (D. Mass. Aug. 16, 2010).   The facts in *Lluberes* are uncannily parallel to those here.

After discussing the existence of a controversy, the court in *Lluberes* found that the plaintiffs had thrust themselves into the controversy merely by (1) assuming important roles in a business that had "garnered international attention for its working conditions since the 1970s," (2) hiring "a social worker to identify general areas that should be dealt with," (3) privately meeting with critics of their business as well as Peace Corps volunteers and United States diplomats, (4) preparing "a fact sheet on their sugar operations, which they distributed to members of the United States Congress," and (5) issuing one advertisement in response to criticism about the labor conditions on their plantation. *Lluberes*, 2010 WL 3245283, at *8.

Here, Mitre's involvement in the controversy over child labor in the soccer ball industry is much more extensive than the plaintiffs' actions in *Lluberes.* Unlike the plaintiffs in *Lluberes* who kept their efforts to address labor conditions mainly private, Mitre has continuously issued public statements in response to allegations that child labor is used in the manufacture of its products and chosen to publicize how, in its own words, it became a "major player" in the soccer ball industry's efforts to eradicate child labor from the production of soccer balls. *See supra,* pages 20, 32-33. Similarly, Mitre hired Lesley Roberts "in 1996 especially for work with the [soccer] brand (Mitre) to deal with the issue of child labor in Sialkot, Pakistan." Metcalf Dec. Ex. 34 at 41-42. If the plaintiffs in *Lluberes* are considered public figures by virtue of their mainly limited and private response to labor conditions on their plantation, there can be no doubt that Mitre is a public figure by virtue of its consistent and often very public involvement in the controversy over the use of child labor. *See also Yiamouyiannis*, 619 F.2d at 932 (doctor who was a vocal opponent of the fluoridation of water is a public figure based on his claim to be a "recognized expert on the biological effects of fluoride" and his testimony before Congress about his views on fluoridation); *Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341, 1349 (S.D.N.Y. 1977) (insurance company injected itself into public controversy by making the "voluntary decision to make a public stock offering"); *Perks v. Town of Huntington*, 251 F. Supp. 2d 1143, 1168 (E.D.N.Y. 2003) (plaintiff is a public figure because he made "voluntary and repeated contact with the media" to present "his side of the story").

3.      Mitre Is A General Purpose Public Figure

Finally, Mitre, simply by virtue of being one of the largest sporting goods companies in the world and one of the leading soccer ball brands in the United States, where millions of children reportedly play soccer and millions of adults watch soccer on television (Metcalf Dec.

Ex. 65 ¶ 39, at Exs. 88-6, 88-42, 88-45), is a public figure.[15]  It is not necessary to be a celebrity or a "household" name to be a general purpose public figure.  *See Reliance Ins. Co.*, 442 F. Supp. at 1349 (plaintiff "argues that it is not a 'household word' and that a majority of jurors would not recognize its name.  The 'household word' standard is not determinative in any event"); *see also, e.g., Celle*, 209 F.3d at 176-77; *Meeropol v. Nizer*, 560 F.2d 1061, 1063-64, 66 (2d Cir. 1977); *Biskupic v. Cicero*, 313 Wis.2d 225, 232-40, 756 N.W.2d 649, 652-56 (Wisc. App. 2008); *Steere v. Cupp*, 226 Kan. 566, 602 P.2d 1267 (1979).  Rather, a plaintiff is considered a general purpose public figure when it seeks and obtains the public's attention.  *See, e.g. DiBella* 403 F.3d at 110 (plaintiff is a public figure based on the "success with which he sought and obtained the public's attention by organizing and promoting boxing bouts"); *Celle*, 209 F.3d at 176-77; *Lakeshore Community Hosp., Inc.  v. Perry*, 212 Mich. App. 396, 403, 538 N.W.2d 24 (1995).  Mitre fits this general purpose public figure standard to a tee.

In the media, Mitre has at various times proclaimed that it has become "synonymous with [soccer] and [is] the number one manufacturer of [soccer balls] in the world" and that Mitre is "America's Number 1 Soccer Shoe." (Metcalf Dec. Ex. 36 at 168 and its Ex. 24; Ex. 107).  One of Mitre's licensees boasts on its website that Mitre's contract with MLS gave "the brand massive exposure in the fast expanding US market."  Metcalf Dec. Ex. 88-87.  It also was described by *Forbes* as "the leading maker of soccer shoes and balls in the U.S." (*id.* Ex. 88-6), by *USA today* as a "top supplier[] of soccer equipment" (*id.* Ex. 88-9), by *The Seattle Times* as one of "two giants in the soccer industry" (*id.* Ex. 88-37) and by the *Orlando Sentinel* as one of

---

[15] The Second Circuit follows the general rule that a plaintiff need only be a public figure to the community to which the publisher distributes the allegedly defamatory statement.  *See, e.g., Celle*, 209 F.3d at 177; *Chapman v. Journal Concepts, Inc.*, 528 F. Supp. 2d 1081 (D. Ha. 2007); *Materia v. Huff*, 394 Mass. 328, 331-32, 475 N.E.2d 1212, 1215 (1985).  Thus, in this case, the relevant community for the public figure analysis is people who watch sports and sports programming such as Real Sports.

the "must-have brands" (*id.* Ex. 88-45). Mitre is well known as the supplier of the first official

ball for MLS.  Because of its decision to purchase this sponsorship, Mitre's official MLS ball

was seen everywhere from the playing field to in the hands of Jay Leno; on ESPN, ABC and

official trading cards; and in media guides and on other memorabilia.  (Metcalf Dec. Ex. 65

¶¶ 35-40 and its Ex.12 at MLS0299, MLS0144 and its Exs. 81, 83, 86-90; Exs. 66-68; Ex. 69 at

its Ex. 1).  At the consumer level, Mitre-branded goods are available at major retail outlets across

the United States, including, most notably, at Walmart.  Metcalf Dec. Ex. 52 at 11-13, 141.

Accordingly, it is clear that under any standard, Mitre is indisputably a public figure.

**B.**     **HBO Did Not Act With Constitutional Malice**

Once this Court concludes that Mitre is a public figure, it must grant summary judgment

to HBO because Mitre cannot possibly carry its burden to show that a trier of fact *could find by*

*clear and convincing evidence* that HBO acted with constitutional malice in publishing the

Segment.  *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 524, n. 30, *reh'g denied*,

467 U.S. 1267 (1984).  The "clear and convincing" evidence standard sets the bar very high and

in a libel case must be applied at the summary judgment stage.  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247-48 (1986).   Where the plaintiff is a public figure, "[t]he moving parties'

burden in a motion for summary judgment is simply showing – pointing out to this Court – that

there is an absence of evidence to support the element of actual malice in the plaintiff's libel

case."  *Secord v. Cockburn*, 747 F. Supp. 779, 787 (D.D.C. 1990) (citation omitted).  *See also*

*Kipper*, 12 N.Y.3d at 354, 884 N.Y.S.2d at 197.

On the other hand, to overcome summary judgment, Mitre must produce evidence of

either a deliberate falsification by HBO or a publication "despite the publisher's awareness of

probable falsity." *Curtis Publ'g Co.*, 388 U.S. at 153.  Significantly, HBO's "conduct is not

measured by whether a reasonably prudent man would have published, or would have

investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant *in fact* entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (emphasis added). *See also Harte-Hanks Commc'ns., Inc.*, 491 U.S. at 664; *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173-74 (2d Cir.), *cert. denied*, 535 U.S. 814 (2001). Because a plaintiff must prove that a defendant in fact had such doubts, and not whether it should have had them under some objective standard, as a matter of law, the making of a simple error is not constitutional malice. *County Vanlines Inc. v. Experian Info. Solutions*, 317 F. Supp. 2d 383, 392 (S.D.N.Y. 2004), *aff'd*, No. 04-2982-CV, 2005 WL 3117211 (2d Cir. Nov. 22, 2005), *cert. denied*, 549 U.S. 826 (2006).[16]

Notably, courts have consistently held that evidence that a plaintiff presented the defendant with a denial prior to publication does not constitute constitutional malice. "Empathetic denials are part of the landscape of journalism, and a decision to print a story in the face of such a denial, particularly where . . . it comes from an interested protagonist, does not establish clear and convincing evidence of malice." *Coliniatis v. Dimas*, 965 F. Supp. 511, 518 (S.D.N.Y. 1997); *Contemporary Mission, Inc.*, 842 F.2d at 623-24.

In sum, when a defendant presents substantial, uncontested evidence that, irrespective of the truth of the complained-of statements, it believed the statements to be true when it published them and had no reason to doubt their truth, it has not as a matter of law acted with constitutional malice. *World Boxing Council v. Cosell*, 715 F. Supp. 1259, 1263 (S.D.N.Y. 1989).

---

[16] Due to the subjective nature of the constitutional malice standard, expert testimony is inadmissible on this issue. *See Khan v. New York Times Co.*, 269 A.D.2d 74, 76, 710 N.Y.S.2d 41, 43 (2000); *Tilton v. Capital Cities/ABC, Inc.*, 938 F. Supp. 751, 753-54 (N.D. Okla. 1995) (excluding expert testimony because "special knowledge is not necessary to determine Defendants' subjective state of mind"). *See also* Robert D. Sack, Sack on Defamation, Libel, Slander and Related Problems § 5.5.2 [D] (4th ed. 2010).

1.      HBO Did Not Doubt The Truth Of The Segment

Here, the evidence overwhelmingly shows that the employees at HBO believed the Segment was true.  There is no evidence – much less clear and convincing evidence – that HBO had a subjective awareness of the probable falsity of *any* statement about Mitre in the Segment. After taking the depositions of 14 HBO personnel, Mitre cannot point to a single piece of *evidence* or testimony other than mere conjecture that suggests anyone at HBO had serious doubts about the truth of anything in the Segment.  Evidence of the kind articulated in *St. Amant* – *i.e.*, proof that HBO employees fabricated the Segment or were provided with reliable evidence showing that something in the Segment was false – simply does not exist in the record in this case.  While Mitre may attempt to rely on its presentation of the YouTube Clip to HBO or its belief that independent contractors may, unbeknownst to HBO, have supplied HBO with inaccurate information, the law is clear that Mitre's burden under *Anderson* at this juncture is to produce clear and convincing evidence of actual knowledge of falsity *by HBO*.

Mitre has argued throughout this litigation that the scenes of children stitching Mitre-branded balls were fabricated and that those children had *never* stitched soccer balls before in their lives.  *See* Metcalf Dec. Ex. 1 at its Exs. C, D and F-I.[17]  Even if that were the case, however, it does not mean *HBO employees* had any doubts about the truth of the Segment. There is not a shred of evidence showing they were aware of any fabrication, and the uncontested testimony is that even today they still believe these children regularly stitched soccer balls, including Mitre-branded soccer balls.

---

[17] Mitre's claim is simply hard to believe.  Not only has Mitre failed to provide any credible evidence to support it, but a simple review of the outtake footage reveals that the children are skillful stitchers.  Perskie Dec., Exs. 74-76.  It defies credulity to believe that they never stitched before and were somehow induced to "act" like stitchers at the drop of a hat.

The law is clear that the existence of constitutional malice "must be proved with respect to each defendant." *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1446 (8th Cir. 1989) (author's reckless disregard could not be imputed onto book publisher because author was an independent contractor). "It cannot be imputed from one defendant to another absent an employer-employee relationship," let alone from a non-defendant to a defendant. *Seacord*, 747 F. Supp. at 787. Thus, for example, *Rolling Stone* magazine could not be held liable for an article it published even though the author of the article, Stephen Glass, later *admitted* the article was fabricated because Glass was an independent contractor – not an employee – of the magazine. *D.A.R.E. Am. v. Rolling Stone*, 101 F. Supp. 2d 1270, 1278-81 (C.D. Ca. 2000). *See also McNally v. Yarnall*, 764 F. Supp. 838, 851 (S.D.N.Y. 1991) (a museum cannot be held liable for the statements of its historian, who was not an employee); *McFarlane v. Esquire Magazine*, 74 F.3d 1296 (D.C. Cir. 1996) (finding that *Esquire* magazine is not vicariously liable for alleged fabrication by freelance author).

Similarly here, the footage of the children stitching Mitre-branded soccer balls that was included in the Segment was obtained by independent contractors – not employees of HBO. Thus, even assuming that Vijay or Manpreet – both individuals with journalistic experience who had been vetted by HBO – had induced children who do not ordinarily stitch soccer balls to do so, their actions cannot be imputed to HBO.[18]  Everyone involved in producing the Segment at HBO believed – and continues to believe – that the footage of the children stitching Mitre-branded soccer balls in the Segment is credible and accurate.

---

[18] There is no dispute that Vijay Bedi and Manpreet Kaur, as well as the other stringers and researchers in India, were independent contractors and not employees of HBO. Mitre conceded this point during the February 17, 2010 conference with Judge Pitman. *See* Metcalf Dec. Ex. 7 at 20-21, 40; Ex. 5 at 11-12, 32; Ex. 6. It also is undisputed that there is no evidence that Vijay fabricated anything. He swears that all of the footage he taped "accurately reflects what I saw when I was filming the footage." Metcalf Dec. Ex. 30 ¶¶ 2-4. Nothing in the record contradicts that statement.

2.      HBO Did Not Intend to Imply Any Of Mitre's Unreasonable Interpretations of the Segment

Further, even if this Court were to credit *any* of Mitre's tortured interpretations of the Segment, Mitre cannot overcome summary judgment because it cannot carry its burden to prove, by clear and convincing evidence, that HBO *intended* to convey the allegedly defamatory implications that Mitre attributes to the Segment. *See* footnote 9, *supra*.    "Because the Constitution provides a sanctuary for truth, a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true." *Chapin v. Knight-Ridder*, 993 F.2d 1087, 1093 (4th Cir. 1993).  Accordingly, courts impose additional burdens on a plaintiff claiming that a news report is defamatory by implication.

In *Newton v. Nat'l Broad. Co.*, 930 F.2d 662 (9th Cir. 1991), for example, the Ninth Circuit Court of Appeals reversed a district court's approval of a jury finding that NBC "must have intended to convey" or "should have foreseen" the broadcast's defamatory implication. *Id.* at 680-82.  The Ninth Circuit rejected this reasoning, holding that it is not "permissible to uphold the jury's verdict [] because the defendants are trained journalists . . . or because the broadcast may be capable of supporting the impression Newton claims . . ." *Id.* at 681.  "[F]or such 'defamation by implication' claims, Plaintiffs typically have to show that Defendants affirmatively intended such implication." *Vinas v. Chubb Corp.*, 499 F. Supp. 2d 427, 437 (S.D.N.Y. 2007).  "[A]ll the courts of appeal that have considered cases involving defamation by implication have imposed a similar actual intent requirement." *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1063-64 (9th Cir. 1998).  *See also Compuware Corp. v. Moody's Investors Servs., Inc.*, 499 F.3d 520, 528-29 (6th Cir 2007); *Chapin*, 993 F.2d at 1093; *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990).

Because Mitre cannot meet its burden of proving, by clear and convincing evidence, that

HBO intended to imply *any* of the defamatory implications Mitre has ascribed to the Segment, Mitre cannot maintain a defamation claim based on these alleged implications and summary judgment should be granted to HBO.

## IV.
## IN THE ALTERNATIVE, HBO IS ENTITLED TO SUMMARY JUDGMENT BECAUSE HBO WAS NOT GROSSLY IRRESPONSIBLE

In the alternative, if this Court finds that Mitre is not a public figure, summary judgment still must be granted to HBO because the Segment involves a matter of public interest, and Mitre cannot demonstrate that HBO acted with gross irresponsibility.

The Supreme Court allows each state to set its own standard for libel plaintiffs who are not public officials or public figures, provided that the minimum standard set by each state is at least negligence. *Gertz*, 418 U.S. at 348. The New York Court of Appeals in *Chapadeau v. Utica Observer-Dispatch, Inc.*, 38 N.Y.2d 196, 379 N.Y.S.2d 61 (1975), took the opportunity to set the bar higher than mere negligence in actions brought by private figure plaintiffs:

> [W]here the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery he must establish, by a preponderance of the evidence, that the publisher acted in a *grossly irresponsible manner* without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

*Id.* at 199, 379 N.Y.S.2d at 64 (emphasis added).

Here, there can be no reasonable dispute that the subject matter of the Segment – the use of child labor in the soccer ball industry – is within the sphere of legitimate public concern. *See, e.g.*, *Sheridan v. Carter*, 48 A.D.3d 447, 448, 851 N.Y.S.2d 252, 253-54 (2d Dep't 2008) (treatment of domestic employee topic of public concern); *Tzougrakis v. Cyveillance, Inc.*, 145 F. Supp. 2d 325, 329 (S.D.N.Y. 2001) (allegation that goods were counterfeit matter of public concern). *See also* Metcalf Dec. Exs. 64 at its Ex. 1, 77 and at its Ex. 1, 88-8 – 88-26, 100-102.

The "standard of 'gross irresponsibility' demands no more than that a publisher utilize methods of verification that are reasonably calculated to produce accurate copy." *Karaduman v. Newsday, Inc.*, 51 N.Y.2d 531, 549, 435 N.Y.S.2d 556, 566 (1980).  New York courts have held that a reporter's reliance on a credible source, even if the information acquired from that source later turns out to be false, precludes a finding of gross irresponsibility.  *Naantaanbuu v. Abernathy*, 816 F. Supp. 218, 226-27 (S.D.N.Y. 1993) ("a publisher cannot be held liable upon an unrebutted showing that the publisher relied upon the integrity of a reputable author and had no substantial reason to question the accuracy of the information provided by such source.") (internal quotation omitted); *Gaeta v. New York News, Inc.*, 62 N.Y.2d 340, 347, 477 N.Y.S.2d 82, 84 (1984) (no gross irresponsibility because "[t]here was no reason to doubt the veracity of the information received from Sorrentino, and indeed good reason to believe it was accurate"); *Weiner v. Doubleday & Co.*, 74 N.Y.2d 586, 595, 550 N.Y.S.2d 251, 255 (1989); *Robare v. Plattsburg Publ'g Co.*, 257 A.D.2d 892, 685 N.Y.S.2d 129 (3d Dep't 1999); *Lee v. Rochester*, 254 A.D.2d 790, 677 N.Y.S.2d 848 (4th Dep't 1998).

In addition, neither a simple error nor a failure to investigate meets the gross irresponsibility standard.  *Sweeney v. Prisoners' Legal Services of New York, Inc.*, 84 N.Y.2d 786, 794, 622 N.Y.S.2d 896, 900 (1995); *Simonsen v. Malone Evening Telegram*, 98 A.D.2d 905, 905, 470 N.Y.S.2d 898, 900 (3d Dep't 1983), *leave to appeal denied*, 61 N.Y.2d 606, 474 N.Y.S.2d 1025 (1984); *Kuan Sing Enters., Inc. v. T.W. Wang, Inc.*, 86 A.D.2d 549, 550, 446 N.Y.S.2d 76, 77 (1st Dep't), *aff'd*, 58 N.Y.2d 708, 458 N.Y.S.2d 544 (1982).

Further, as with the constitutional malice standard, gross irresponsibility must be established as to each individual defendant.  *See Karaduman*, 51 N.Y.2d at 542, 435 N.Y.S.2d at 561-2.  "If there is to be liability at all on the part of the defendant . . . it must be because [he]

himself knowingly engaged or acquiesced in the type of misconduct which may lead to libel damages under the standard articulated in *Chapadeau*."  *Id.*  Therefore, as the Second Circuit explained, a corporation cannot be held liable for the actions of independent contractors:  "To hold that a publisher can be liable for the defamatory statements of an independent contractor without a showing of gross irresponsibility would defeat the purpose of requiring that showing." *Chaiken v. VV Pub. Corp.*, 119 F.3d 1018, 1034 (2d Cir. 1997).  *See also Nelson v. Globe Int'l, Inc.*, 626 F. Supp. 969 (S.D.N.Y. 1986) (finding that a magazine is not responsible for author's actions because he was an independent contractor); *Naantaanbuu*, 816 F. Supp. at 226-27 (book publisher cannot be held grossly irresponsible when it had no reason to doubt the veracity of author and "safeguards were provided in the editorial process"); *Ortiz v. Valdescastilla*, 102 A.D.2d 513, 478 N.Y.S.2d 895 (1st Dep't 1984).

The Second Circuit's decision in *Chaiken* is particularly instructive here.  In that case, the *Village Voice* published an article that was authored by an independent contractor about Jewish settlers in the West Bank.  119 F.3d at 1021.  The Second Circuit held the publisher had "no duty to take the extraordinary step of checking every source and verifying every quotation, which would have been particularly onerous in this case, as many of the subjects lived in Israel.  It is also clear that [the *Voice*] subjected the article to its normal editorial process, including verification of facts."  *Id.*  The Court then found that even if the author had acted in a grossly irresponsible manner, the author's actions could not be imputed to the newspaper because the author was an independent contractor and not an employee.  *Id.* at 1033.  *See also Naantaanbuu*, 816 F. Supp. at 227.

As in *Chaiken*, HBO followed its normal procedures for preparing a Real Sports segment. *See, e.g.,* Bernstein Dec. ¶ 9; Bradley Dec. ¶ 12; Goldberg Dec. ¶¶ 6, 9-10, 23-24; Perskie Dec.

¶¶ 8-15; 16-85.   Thus, as the Second Circuit found in *Chaiken*, no reasonable jury could conclude that HBO acted in a grossly irresponsible manner.

**V.**
**IN THE ALTERNATIVE, HBO IS ENTITLED TO**
**SUMMARY JUDGMENT LIMITING RECOVERY TO NOMINAL DAMAGES**

One month after the close of fact discovery, Mitre for the first time provided a calculation of damages purportedly suffered as a result of the Segment.   Three of the four categories of damages identified by Mitre resulted from the independent actions of third parties—in two instances the conduct of Mitre's own licensee.   And Mitre never even hinted at the fourth category during fact discovery, much less calculated the related damages as required by Fed. R. Civ. P. 26(a).   HBO is entitled to summary judgment on such claims.

**A.**     **Mitre Is Not Entitled to Presumed Or Punitive Damages**

In *Gertz*, the Supreme Court held that in defamation cases involving a matter of public interest, "the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth [*i.e.*, "constitutional" malice]."   418 U.S. at 349.   Mitre cannot demonstrate that HBO acted with actual malice in the constitutional sense.   (*See* Part III(B))

**B.**     **Mitre Has No Evidence of Recoverable Economic Damages**

Mitre's 30(b)(6) representative testified that Mitre sustained damages from: (1) decreased U.K. sales, particularly to five "major" retailers (Black Dec. Ex. 6 at 36, 43-44, 74-75, 200-02); (2) an inability to secure U.K. sponsorships (*id.* at 13-17, 53); (3) lower royalties from Regent, a U.S. licensee, because Regent had excess inventory (*id.* at 8-9, 95-96, 105, 110-15, 130-31); (4) returned product from Modell's Sporting Goods to Mitre's U.S. licensees—Regent and Elan-Polo, Inc. (*id.* at 96-97, 137-38); and (5) a royalty rebate to Regent when Wal-Mart Stores, Inc. returned Mitre balls (*id.* at 99-100, 162-63).

All of this testimony was rank speculation and discovery now categorically refutes these damages claims.  The U.K. retailers and potential Mitre sponsors submitted declarations (one sponsor was deposed in the U.K.) that they were unaware of the Segment and it had no impact on their decisions concerning Mitre.  Black Dec. Exs. 13-36; Ex. 37 at 29-30, 42-43.  Documents and other declarations definitively proved that Regent's excess inventory and Modell's product return had no connection to the Segment.  *Id.* ¶ 4; Ex. 3; Ex. 43 ¶ 6; Ex. 42 ¶ 5.  And testimony of Regent's representatives wholly rejects the claim that Mitre gave Regent a royalty rebate for returned balls (as Mitre's own expert conceded).  *Id.* Ex. 5 at 222-23, 260-61; Ex. 7 at 99, 103; Ex. 45 ("Stamm Rpt.") ¶ 43.

After HBO's extensive discovery efforts revealed Mitre's 30(b)(6) testimony as purely speculative, Mitre largely abandoned those claims in exchange for an expert report submitted on January 18, 2011.[19]  The expert identifies Mitre's damages as:  (1) $3.0 million in lost U.K. sales (Stamm Rpt. ¶¶ 48-52); (2) $16,971 in royalties for lost sales to certain U.S. retailers (*id.* ¶¶ 36-41); (3) $39,615 in royalties for lost sales to Walmart (*id.* ¶¶ 28-35; Black Dec. Ex. 46); and (4) $516,688 in lost royalties for a purported rate concession to Regent effective January 2010 (Stamm Rpt. ¶¶ 42-47).  None of the alleged damages is recoverable against HBO.

It is undisputed that HBO *never* distributed, or authorized the distribution of, the Segment in the United Kingdom and that Mitre's U.K. damages claim is premised solely on unauthorized republication of the Segment on the Internet.  Rienecker Dec. ¶ 11-13; Stamm Rpt. ¶¶ 48-49; Black Dec. Ex. 6 at 43-44; Metcalf Dec. Ex. 1 ¶¶ 37-38.  Mitre cannot recover for unauthorized republication of the Segment.  *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d

---

[19]  HBO refers to the Report because it is Mitre's *only calculation* of damages in this case.  HBO reserves all rights to challenge the admissibility of the expert's testimony and does not intend to waive any such objections by referencing the Report here.

48, 59 (2d Cir. 2002); *Geraci v. Probst*, 15 N.Y.3d 336, 342, 912 N.Y.S.2d 484, 488 (2010). Moreover, Mitre's claim for U.K. damages is based on the mere *assumption* that there was injury in the United Kingdom and that the Segment caused *all* of it. Black Dec. Ex. 47 at 101-08, 129, 146-48. Such rank speculation, without actual evidence of causation, is insufficient to sustain a claim for damages. *Toltec Fabrics, Inc. v. August Inc.*, 29 F.3d 778, 784 (2d Cir. 1994) ("it would be the height of conjecture to conclude that a failure to place later orders was causally linked" to the alleged wrongdoing); *Suckenik v. Levitt*, 177 A.D.2d 416, 416, 576 N.Y.S.2d 258, 259 (1st Dep't 1991).

Two categories of damage calculated by Mitre's expert are premised on the fact that Walmart returned more than 100,000 Cobra balls to Regent. Stamm Rpt. ¶¶ 34, 40; Black Dec. Ex. 47 at 221-22. Mitre cannot sustain either claim because Walmart's representative testified that Walmart returned the Cobra balls—a decision made *before* the Segment premiered— because of an e-mail from Regent (an unauthorized republication that included material that was not part of the final Segment), not any action by HBO. Black Dec. Ex. 4 at 74-75. *Fashion Boutique*, 314 F.3d at 59.

Similarly, Mitre did not disclose during fact discovery its purported royalty rate concession to Regent and therefore it is not entitled to rely on it. Black Dec. Ex. 1 at 12; Ex. 2 at 13; Ex. 6 at 110-15, 198-200. *See* Fed. R. Civ. P. 26(a)(1)(A), 37(c)(1); *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 295 (2d Cir. 2006); *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 566 F. Supp. 2d 305, 317-18 (S.D.N.Y. 2008).

## C.   Mitre Is Not Entitled to Non-Economic Damages

For-profit corporations such as Mitre do not have injuries that cannot be economically quantified. *Wolf St. Supermarkets, Inc. v. McPartland*, 108 A.D.2d 25, 32, 487 N.Y.S.2d 442, 448 (4th Dep't 1985) ("A corporation cannot suffer personal humiliation or mental anguish.");

accord *Synygy, Inc. v. Scott-Levin, Inc.*, 51 F. Supp. 2d 570, 581 n.9 (E.D. Pa. 1999) ("A corporation's analogue to humiliation would be damage to reputation—an injury that should translate into a pecuniary loss."), *aff'd*, 229 F.3d 1139 (3d Cir. 2000) (table).[20]   Moreover, reputational injury requires "*direct testimony from persons in the community* that the statements were understood by them to impeach the plaintiff's integrity or business methods causing them to shop elsewhere."   *Wolf Street Supermarkets*, 108 A.D.2d at 33, 487 N.Y.S.2d at 449 (emphasis added).  Mitre has no such evidence.

### D.   <u>Mitre Did Not Comply With its Discovery Obligations</u>

Mitre provided *no computation* of damages during fact discovery.  *See Design Strategy*, 469 F.3d at 295.  Mitre's first computation of economic damages was an expert report one month after fact discovery closed, and it has made no calculation of non-economic damages, if any. Fed. R. Civ. P. 37(c)(1).

---

[20]  *See also MVM Inc. v. Rodriguez*, 568 F. Supp. 2d 158, 170 (D.P.R. 2008) ("As a corporation, [plaintiff] is not eligible for damages related to emotional or mental suffering"); *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1084 (W.D. Ky. 1995) ("If a business is damaged, the damage is usually reflected in the loss of revenues or profits."); *cf. F.C.C. v. AT&T Inc.*, 131 S. Ct. 1177, 1183 (2011) ("When it comes to the word 'personal,' there is little support for the notion that it denotes corporations, even in the legal context.").

## CONCLUSION

Accordingly, HBO respectfully requests that this Court grant HBO's motion for summary judgment and dismiss the Complaint with prejudice in its entirety and grant HBO such other and further relief as this Court deems appropriate.  In the alternative, HBO respectfully requests that if this Court determines that Mitre has presented sufficient evidence to create a material issue of fact for trial on liability, that Mitre's recovery in this action be limited as a matter of law to nominal damages.

Dated: April 15, 2011

Respectfully submitted,

By: _Slade R. Metcalf_

Slade R. Metcalf
Katherine M. Bolger
R. Brian Black
Rachel F. Strom
Collin Peng-Sue
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
Tel: (212) 918-3000

Of Counsel:
Stephanie S. Abrutyn
Home Box Office, Inc.
1100 Avenue of the Americas
New York, NY 10036

*Attorneys for Defendant Home Box Office, Inc.*