UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
MITRE SPORTS INTERNATIONAL LIMITED,

        Plaintiff,

  -against-

HOME BOX OFFICE, INC.,

        Defendant.
------------------------------------------------------------------X

Case No.: 08 CIV 9117 (GBD)(HBP)

**DECLARATION OF BERNARD GOLDBERG**

I, BERNARD GOLDBERG, declare as follows:

1. I am a correspondent for the program *Real Sports with Bryant Gumbel* ("Real Sports"), which is an original production of Home Box Office, Inc. ("HBO"). This declaration is based on my personal knowledge and on documents kept by HBO in the ordinary course of business. If called as a witness, I could and would testify competently to these facts under oath.

2. The episode of Real Sports that premiered in September 2008 included a segment entitled "Children of Industry" (the "Segment"), which discussed the use of child labor to stitch soccer balls in India. I was the correspondent for the Segment.

**Professional Background**

3. I have been a professional journalist for over forty years, the vast majority of which I have spent working in television journalism.

4. Immediately after graduating from Rutgers University in 1967, I worked as a writer and editor for the Associated Press in New York. My work in television journalism began in 1969 in Miami, first as a producer and writer for WTVJ-TV and then as an investigative reporter for WPLG-TV, the ABC affiliate station in Miami.

5.      In 1972, I joined CBS News, where I worked for nearly thirty years as a producer, reporter, and correspondent for a broad range of programs, including the *CBS Evening News*, *Eye to Eye with Connie Chung*, *48 Hours*, *Public Eye with Bryant Gumbel*, *Street Stories*, and *Verdict*. In the course of my work at CBS News, I traveled throughout the United States, Latin America, Europe, China, Japan and the former Soviet Union, and contributed regular reports on a wide variety of issues and subjects. My work for CBS News earned me six Emmy Awards from the National Academy of Television Arts and Sciences.

6.      In my experience, for a news magazine program such as Real Sports, the producer is primarily responsible for the research and content of the segments that make up the program. The correspondent relies on the producer for background information, research, and identification of potential interviewees, and to ensure the overall accuracy of everything that is included. The correspondent is responsible for telling the story to the viewer, including conducting some interviews, narrating the segment, and working with the producer to tell a coherent story that will resonate with viewers. Some correspondents, including me, are actively involved in structuring the segment and writing the script; others leave the script writing to the producer. Regardless of the process followed, the producer is ultimately responsible for the content of the segment and I, like all correspondents, generally rely on the producer to make sure everything in the final script is accurate.

7.      Over my many years working for CBS News, I learned to rely heavily on producers to provide me with factual information for my reports. Because my reports often required travel around the world, I also learned to rely on the work of "stringers," or local independent contractors, to do scouting work, arrange taping and interviews, and gather factual information.

8. I first became a correspondent for Real Sports in 1999, and the first segment that I worked on was entitled "Crime and Punishment," which explored off-the-field violence in the NFL. Since that time, I have worked as a correspondent on nearly one hundred Real Sports segments, including reports exploring sports-related controversies, such as sexual harassment in women's sports, baseball recruiting practices in the Dominican Republic, improper conduct by coaches in high schools, athletes' addiction to prescription pain-killers, the slaughter of thoroughbred horses, and human rights violations in the world of camel racing. Other segments have included profiles of and interviews with famous sports figures such as gymnastics coach Bela Karolyi, sports agent Drew Rosenhaus, broadcaster Joe Buck, and NBA basketball player Ron Artest.

9. My role as a correspondent for Real Sports is consistent with my past experience. On each segment, my responsibilities include conducting interviews, writing and editing scripts, narrating scripts, and discussing segments with producers. In order to carry out these tasks, I have relied routinely on Real Sports producers to gather factual information and conduct research for Real Sports segments. My reliance on producers over the years working as a correspondent for Real Sports has been substantially similar to my reliance on producers for my work with CBS News.

10. Although the correspondent's role includes conducting on-camera interviews, it also is common for others such as the producer or associate producer to conduct off-camera and on-camera interviews. Such interviews can occur for many reasons, including that the interviewee speaks a foreign language or that the correspondent is not present when the interview is being conducted.

11. In addition, I know that in producing segments for Real Sports, producers often rely on "stringers," or local independent contractors in the same way as is done at CBS. This practice is not unusual in television journalism.

**The Segment**

12. At the time I became the correspondent for the Segment, I spoke with Joe Perskie, the producer of the Segment, about the research that had been done up to that point. According to Mr. Perskie, the Segment was going to report on the use of child labor to stitch soccer balls in India, which was still a significant problem despite the soccer ball industry's attempt to address the problem in the 1990s. He told me that he already had footage of children stitching soccer balls in India and interviews with some of those children. He said that he planned for me to interview with Kailash Satyarthi, one of the foremost experts in the world on child labor in India, as well as a representative of the United States Department of Labor.

13. In July 2008, I traveled to London to tape the interview with Mr. Satyarthi. Mr. Perskie and Zehra Mamdani were also present. I prepared for the interview by talking to Mr. Perskie about the extensive research he and Ms. Mamdani had done on the use of child labor in the manufacture of soccer balls in India, as well as Mr. Satyarthi's background. During the interview, Mr. Satyarthi and I discussed a wide range of topics. For example, Mr. Satyarthi discussed how 15 years earlier, he and others had come "to know that a large number of children are engaged in stitching soccer balls and other sporting goods in India and Pakistan." He further stated that he "started working in both countries because they were the hub of soccer ball production" and that he and others "exposed [the practice] to the public and to the government." He noted that he and others "made the government and the industry and the international

4

institutions [agree] on certain treaties, certain memoranda [of] understandings to make sure that the children would not be working in soccer ball industry."

14. Mr. Satyarthi also told me that more recently, "[i]n some villages, one can find a few hundred kids working. Not at one place, not at one place. In different places, scattered" and that there were "thousands of children" stitching soccer balls. When I asked why the parents were not working, Mr. Satyarthi responded that "children are the cheapest source of labor. They are the cheapest labor. They are physically and mentally vulnerable. They cannot go on a strike, they cannot form the unions, they cannot knock the door of the court, they are not the one who are created problems to their employers" and that "parents are compelled to do it because parents can't find the jobs. So, they are compelled to send their children to work."

15. Mr. Satyarthi also talked about the companies whose balls were being made with child labor. He stated that "[t]he difficulty is that none of these companies own the responsibility. They say that it is the supply-chain problem" and that they "subcontract to some local people or local companies, and they further subcontract someone else so it becomes a long chain."

16. In light of Mr. Satyarthi's years of experience and prominent reputation as one of the foremost experts in the world on child labor in India, and because of the research that had been done and shared with me by Mr. Perskie, I had no reason to doubt the statements Mr. Satyarthi made during his interview.

17. In August 2008, I went to Washington, D.C. to interview Charlotte Ponticelli, a representative of the United States Department of Labor who was in charge of the Bureau of International Labor Affairs, the branch of the United States Department of Labor responsible for investigating the use of child labor in the manufacture of goods imported into the United States. Mr. Perskie and Ms. Mamdani were also present for the interview. At the time I sat down to

interview Ms. Ponticelli, I knew that she understood that I would be asking her questions about child labor in India with respect to the production of soccer balls. To prepare for my interview with Ms. Ponticelli, I once again spoke with Mr. Perskie, this time about the research that had been done into the policies of the United States government.

18. During my interview with Ms. Ponticelli I asked her for her thoughts on companies, like Mitre, which had policies against child labor but may not be aware of problems with child labor in their supply chains. Ms. Ponticelli told me that "Yes, that can often be -- the source of the problem is that -- the parent company, no matter how well intentioned, may not be doing due diligence in making sure that their subcontractors down the line are -- doing the best they can to make sure this exploitation is not occurring."

19. During August, Mr. Perskie began drafting a script for the Segment that incorporated narrative elements with the footage from India, the interviews with Charlotte Ponticelli and Kailash Satyarthi, and comments Mr. Perskie had received from Mitre. As part of the regular "give and take" of the script-writing process, I asked Mr. Perskie why the script named only Mitre, and not any other companies, as an example of the international brands being stitched by children in India. Mr. Perskie told me that while we did have footage of children stitching other brands, some of those brands were fairly small companies, and that none of those brands is particularly well known as a sporting goods company in the United States. He pointed out that although we had footage of a child stitching a Pepsi ball, for example, Pepsi is not known as a sporting goods company, and he had not been able to find anywhere in the United States where a Real Sports viewer could purchase Pepsi soccer balls.

20. Mitre, in contrast, is a large sporting goods company that I was already aware of. Mr. Perskie told me that Mitre had been the official soccer ball for Major League Soccer in the

United States and that it had also been the official soccer ball for the most prestigious soccer league in the world, the Premier League in England. Mr. Perskie informed me that Ms. Mamdani had personally seen children stitching Mitre-branded soccer balls in India, and that he had footage of children stitching Mitre-branded soccer balls in India. After hearing Mr. Perskie's explanation, I agreed with the decision to name Mitre in the Segment.

21. At some point during the editing process, Mr. Perskie incorporated a number of sound bites from my interview with Ms. Ponticelli into the draft script. He decided to juxtapose a statement I had made, "I don't want to read too much into this—but you look moved by that" with a statement Ms. Ponticelli had made several seconds later in the interview. Based on my experience as a journalist, the editing of this sound bite in this manner is appropriate and did not concern me because the substance of Ms. Ponticelli's statement was not changed. This edit conforms with my understanding of the standard practice, based on my years of experience in television journalism, of editing interviews to present a coherent statement from the interviewee on a particular subject, even if it was said in response to a different question or statement in a different part of the interview, so long as the response does not misrepresent the interviewee's point of view. I did not believe at the time and do not believe today that the edit misrepresented the point of view Ms. Ponticelli expressed in the interview.

22. As time passed, Mr. Perskie and I often discussed the script, and I provided him with feedback and revisions. For example, at one point, Mr. Perskie and I discussed contacting Mitre a second time, so that in the absence of a face-to-face interview, Mitre would have the chance to provide any bit of additional or relevant information about what we were planning on showing in the Segment.

\\\\NY - 033845/000001 - 2306070 v7

23. On at least one occasion, I also passed along comments to Mr. Perskie in written form by inserting those comments directly into one of the drafts I had reviewed. In that document, I questioned whether that part of the draft, as Mr. Perskie had sent it to me, was unfair to Wal-Mart and Mitre. (I was comfortable at the end of the process that the Segment was fair.) The questions I raised in that draft, and at other times, are part of the ordinary give and take of the writing process, and consistent with my interaction with Mr. Perskie on the many other Real Sports segments we have worked together on in the past and since.

24. Based on my lengthy experience in television journalism, news magazine programs rarely have persons working on the program who have the title of "fact checker." Traditionally, the producer and associate producer are responsible for ensuring the accuracy of facts contained in the program. They may do this by interviewing subjects, reviewing documents, and consulting prior news accounts. In connection with the Segment here, Mr. Perskie, as the producer, was responsible for ensuring the Segment was accurate, and I believe that he did so.

25. By the time the script was finalized, all of my questions had been addressed. The week before the Segment premiered, I received a rough cut of the Segment. A rough cut is a draft of a segment, in video form. I reviewed the rough cut and do not recall having any specific concerns or raising any additional questions with Mr. Perskie.

26. On September 15, 2008, Bryant Gumbel and I did our cross-talk exchange—the back and forth between the host and correspondent at the end of a Real Sports segment—which was taped at HBO's studios in New York. Mr. Gumbel and I did not speak about the Segment before taping began, although Mr. Perskie and I discussed some questions that Mr. Perskie thought Mr. Gumbel might ask me during the cross-talk. Included in our discussions was the point that Mitre might not be aware of the child labor involved in the manufacture of its balls

8

because of the difficulties in monitoring the supply chain. During the cross-talk, I stated, "are we supposed to believe that Mitre, for instance, which is just one of many companies that, that are involved in this – are we supposed to believe that Mitre, an international company based in London, is going to know what's happening on a side street in Jalandhar, India?" "I honestly believe – and I don't think I'm naïve – I honestly believe that Mitre and all the other companies would like this to be wiped out once and for all," and "I don't believe Mitre wants it to happen, but the subcontractors are a different story altogether."

27. At the time the Segment premiered, I believed that the information reported in the Segment was true, and I still believe so today. At no time before the Segment premiered, or ever, did any person or entity provide me with any information that led me to believe that any information in the Segment was false.

28. In light of my experience with Mr. Perskie, I had utmost confidence in the factual accuracy of the information he provided me and decided to include in the Segment, and in particular I believed that the information concerning the use of child labor in the manufacture of soccer balls in India was reliable and true. My belief in the accuracy of that information was further bolstered by the information provided to me by Kailash Satyarthi and Charlotte Ponticelli when I interviewed them.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This Declaration was executed on April 5, 2011.

_____
BERNARD GOLDBERG

\\\NY - 033845/000001 - 2306070 v7