**FILED UNDER SEAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
                                                      :
MITRE SPORTS INTERNATIONAL LIMITED,                   :
                                                      :
                  Plaintiff,                          :   Case No.: 08 CIV 9117 (GBD)(HBP)
                                                      :
            -against-                                 :
                                                      :
HOME BOX OFFICE, INC.,                                :
                                                      :
                  Defendant.                          :
                                                      :
---------------------------------------------------------------X

# MEMORANDUM OF LAW OF DEFENDANT HOME BOX OFFICE, INC. IN SUPPORT OF ITS MOTION IN LIMINE TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF LAURA B. STAMM

HOGAN LOVELLS US LLP
Slade R. Metcalf
R. Brian Black
Collin J. Peng-Sue
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100

Of Counsel:
Stephanie S. Abrutyn
Home Box Office, Inc.
1100 Avenue of the Americas
New York, NY 10036

*Attorneys for Defendant Home Box Office, Inc.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND.................................................................................... 2

ARGUMENT.......................................................................................................... 4

I.  THE COURT SHOULD STRIKE STAMM'S CALCULATION OF DAMAGES IN THE UNITED KINGDOM ........................................................ 5

    A.  HBO Is Not Liable for Unauthorized Republication of the Segment........................................................................................... 5

    B.  Stamm Fails to Establish the Reliability of Mitre's Budgeted Sales as a Basis for Calculating Alleged Damage in the United Kingdom........................................................................................ 7

    C.  Stamm Fails to Reliably Establish Causation................................. 8

    D.  Stamm Fails to Account for Significant Real World Events...................... 10

II.  THE COURT SHOULD STRIKE STAMM'S CALCULATION RELATED TO THE PURPORTED RATE CONCESSION TO REGENT ............................................................................................... 11

    A.  Mitre Failed to Disclose the Purported Royalty Rate Concession...................................................................................... 11

    B.  Stamm Relies on Incorrect "Facts" ............................................. 13

III.  THE COURT SHOULD STRIKE STAMM'S CALCULATION OF REGENT'S PURPORTED LOST SALES ............................................... 14

    A.  Stamm's Calculations Rely on Unauthorized Republication Evidence ...................................................................................... 14

    B.  Stamm Uses Unreliable Methodology and Facts for a Lost Profits Calculation...................................................................... 15

IV.  HBO WAS PREJUDICED BY MITRE'S FAILURE TO COMPLY WITH ITS DISCOVERY OBLIGATIONS........................................... 17

A.      Stamm's Report Failed to Disclose all "Facts or Data Considered" .......................................................................... 17

B.      Stamm Relies on Documents Not Disclosed in Discovery ......................... 19

V.     STAMM'S REPORT CONTAINS PREJUDICIAL, IRRELEVANT NON-OPINION STATEMENTS........................................................................... 22

CONCLUSION ............................................................................................................. 23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*24/7 Records, Inc. v. Sony Music Entm't, Inc.*,
   566 F. Supp. 2d 305 (S.D.N.Y. 2008) .............................................................. 12, 13

*Armenian Assembly of Am., Inc. v. Cafesjian*,
   Nos. 07-1259, 08-255, 08-1254 (CKK), 2010 WL 4258900 (D.D.C. Oct. 22, 2010)............. 13

*Boucher v. U.S. Suzuki Motor Corp.*,
   73 F.3d 18 (2d Cir. 1996) ......................................................................... 5, 8, 16

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) ..................................................................................... 5, 8

*Celebrity Cruises v. Essef Corp.*,
   434 F. Supp. 2d 169 (S.D.N.Y. 2006) ...................................................... 7, 8, 9, 10

*Cerasani v. Sony Corp.*,
   991 F. Supp 343 (S.D.N.Y. 1998) .......................................................................... 6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) ............................................................................... 1, 2, 4, 10

*Davidov v. Lousiville Ladder Group, LLC*,
   No. 02 Civ. 6652(LLS), 2005 WL 486734 (S.D.N.Y. Mar. 1, 2005),
   *aff'd* 169 Fed. Appx. 661 (2d Cir. 2006) .............................................................. 13

*Dayton Valley Investors, LLC v. Union Pacific R.R. Co.*,
   No. 2:08-cv-00127 (ECR) (RJJ), 2010 WL 3829219 (D. Nev. Sept. 24, 2010) ................. 13

*Design Strategy, Inc. v. Davis*,
   469 F.3d 284 (2d Cir. 2006) ............................................................................... 12

*Dupont Flooring Sys., Inc. v. Discovery Zone, Inc.*,
   No. 98 Civ. 5101(SHS), 2005 WL 22865 (S.D.N.Y. Jan. 5, 2005) ................................. 8

*East Hampton Dewitt Corp. v. State Farm Mut. Auto. Ins. Co.*,
   490 F.2d 1234 (2d Cir. 1973) ............................................................................. 12

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
   314 F.3d 48 (2d Cir. 2002) ...................................................................... 4, 6, 9, 15

*Frye v. Baker*,
   No. 1:06-CV-28, 2007 WL 1866882 (D. Vt. June 28, 2007)........................................ 19

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ........................................................................................ 5

*Geraci v. Probst*,
    15 N.Y.3d 336, 912 N.Y.S.2d 484 (2010) ......................................................... 6

*Giladi v. Strauch*,
    No. 94 Civ. 3976 (RMB)(HBP), 2001 WL 388052 (S.D.N.Y. Apr. 16, 2001) ....................... 19

*Hickman v. Taylor*,
    329 U.S. 495 (1947) ................................................................................... 20, 21

*Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*,
    No. 08-C-797, 2010 WL 1287058 (E.D. Wis. Mar. 30, 2010) ................................. 10

*Karaduman v. Newsday, Inc.*,
    51 N.Y.2d 531, 435 N.Y.S.2d 556 (1980) ....................................................... 5, 6

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ........................................................................................ 4

*McGuire v. Cirrus Design*,
    No. 1:07-CV-683, 2009 WL 383541 (E.D. Tex. Feb. 13, 2009) ............................. 19

*Mink Mart, Inc. v. Reliance Ins. Co.*,
    65 F. Supp. 2d 176 (S.D.N.Y. 1999),
    *aff'd*, 12 Fed. Appx. 23 (2d Cir. 2000) ....................................................... 5

*Point Prods. A.G. v. Sony Music Entm't, Inc.*,
    No. 93 Civ. 4001 (NRB), 2004 WL 345551 (S.D.N.Y. Feb. 23, 2004) ................... 10, 15

*Polaroid Corp v. Casselman*,
    213 F. Supp. 379 (S.D.N.Y. 1962) ............................................................. 21, 22

*Schonfeld v. Hilliard*,
    218 F.3d 164 (2d Cir. 2000) ....................................................................... 7, 16

*Toltec Fabrics, Inc. v. August Inc.*,
    29 F.3d 778 (2d Cir. 1994) ............................................................................ 9

*Trademark Res. Corp. v. Maxwell Online, Inc.*,
    995 F.2d 326 (2d Cir. 1993) ........................................................................ 16

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007) .......................................................................... 5

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26 advisory committee notes (1983) ......................................................... 21

Fed. R. Civ. P. 26(a) .................................................................................................... 12, 18

Fed. R. Civ. P. 26(a)(1) advisory committee notes (1993) ............................................ 20

Fed. R. Civ. P. 26(a)(1)(A) ............................................................................ 11, 12, 13, 20

Fed. R. Civ. P. 26(a)(2) ................................................................................................... 17

Fed. R. Civ. P. 26(a)(2)(B) ......................................................................................... 17, 19

Fed. R. Civ. P. 26(a)(2)(B) advisory committee notes (1993) ................................... 18, 19

Fed. R. Civ. P. 26(a)(2)(B) advisory committee notes (2010) ...................................... 18

Fed. R. Civ. P. 34 ............................................................................................................ 20

Fed. R. Civ. P. 37(c)(1) ............................................................................................ 12, 18, 20

Fed. R. Evid. 401 ............................................................................................................... 4

Fed R. Evid. 702 ................................................................................................................ 4

Fed. R. Evid. 801(c) ........................................................................................................... 9

Defendant Home Box Office, Inc. ("HBO") submits this memorandum of law in support of its Motion In Limine to Exclude the Expert Report and Testimony of Laura B. Stamm, the expert for damages designated by plaintiff Mitre Sports International Limited ("Mitre") in this action. HBO respectfully requests that Stamm's expert report and any related testimony be excluded from consideration in this action.[1]

## PRELIMINARY STATEMENT

Mitre has proffered expert testimony that wholly fails to comply with the standards for relevance and reliability under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and the Federal Rules of Evidence. First, Mitre's expert opines that Mitre allegedly suffered damages in the United Kingdom solely based on unauthorized third-party republication of the HBO segment at issue in this litigation (the "Segment"). As a matter of well-established defamation jurisprudence, however, a defendant is not liable when an unauthorized third party republishes purported defamatory information. Thus, Stamm's calculation of U.K. damages is legally irrelevant to this case.

She then exacerbates that flaw by using a fundamentally unreliable methodology, comparing budget *predictions* to actual sales to calculate damages. Stamm also admittedly bases her opinions on speculative assumptions about whether HBO truly caused any injury in the United Kingdom when the Segment was never distributed there. She further ignores simple truths—such as the abysmal economy—in favor of a Mitre fantasy world in which Mitre's U.K. sales should have increased by 27.6% in 2009. Similar methodological and factual defects

---

[1] As discussed in HBO's memorandum of law in support of its motion for summary judgment, Mitre is limited to only nominal damages as a matter of law. Dkt. No. 192 at Mem. 45-48. If the Court grants HBO's summary judgment on damages, this motion to preclude Stamm's report and testimony is moot.

permeate her other damages calculations. Stamm's proffered opinions are at odds with the *Daubert* standards of reliability.

Moreover, Mitre facilitated Stamm's faulty report by concealing information during fact discovery. HBO expended substantial time and money taking discovery to refute the allegations of damages that Mitre made during fact discovery. Nevertheless, despite repeated demands by HBO for all damages information, Mitre withheld documents and financial information that its expert considered critical to the damages calculation. With her expert report, Stamm produced and extensively relied on more than 30 documents that had not been produced previously by Mitre; articulated new categories of damage not previously disclosed; and at the same time concealed additional facts and data that she had considered in forming her opinions, requiring HBO to waste more time and money addressing the disclosure flaws in her report rather than its substance. Mitre's failure to comply with discovery obligations alone warrants preclusion.

Finally, Stamm purports to offer observations on topics that she concedes are not relevant. She characterizes evidence and makes conclusory and unsupported assumptions for issues that she admits have no bearing on her calculation of Mitre's damages—an attempt to unfairly prejudice HBO that this Court must not admit.

## FACTUAL BACKGROUND

On January 18, 2011, Mitre sent HBO the Expert Report of Laura B. Stamm, calculating four categories of economic damages allegedly suffered by Mitre. (Decl. of R. Brian Black, dated April 21, 2011 ("Black Decl."), Ex. 1 (the "Stamm Rpt.").) Stamm opines that Mitre incurred damages as follows: (1) $3.0 million in lost sales in the United Kingdom (*id.* ¶¶ 48-52); (2) $516,688 in lost royalties based on a purported royalty rate concession that Mitre gave to Regent Sports Corp. ("Regent"), one of Mitre's U.S. licensees, effective January 2010 (*id.* ¶¶ 42-47); (3) $16,971 in royalties for lost sales of soccer balls to certain U.S. retailers (*id.* ¶¶ 36-41);

and (4) $39,615 in royalties for lost sales of soccer balls to Wal-Mart Stores, Inc. ("Wal-Mart") (*id.* ¶¶ 28-35).[2]

First, relying solely on purported third-party republication of the Segment on the Internet, Stamm calculates damages in the United Kingdom merely by comparing Mitre's forecasted budget to its actual net sales.  Because Mitre claims it predicted more U.K. sales than actually occurred, Mitre speculates that the unauthorized Internet republication of the Segment caused injury in the United Kingdom.  Simply accepting Mitre's conjecture that "the entire budget shortfall in Mitre's U.K. net sales in 2009 and 2010 resulted from the [Segment]," Stamm calculates that the lost profit in the United Kingdom "could be" approximately $3.0 million.  (*Id.* ¶ 52.)

Second, Stamm calculates lost royalties from a royalty rate concession that Mitre claims it made to Regent in its latest licensing agreement—purportedly keeping the rate flat, rather than increasing it by two percentage points.[3]  (*Id.* ¶¶ 45-46.)  She calculates the alleged damages for the contract period (2010-2014) at $516,688 in less royalties.

Third, for her calculation of lost sales of soccer balls to certain U.S. retailers, Stamm claims that sales of Mitre-branded Cobra balls returned by Wal-Mart, and sold to those other retailers, offset potential sales of different Mitre-branded balls.  (*Id.* ¶ 40.)  According to Stamm, if Wal-Mart had kept the Cobra balls (and assuming Regent "neglected" marketing its non-Mitre brands (Black Decl. Ex. 3 ("Stamm Tr.") at 205-07)), then Regent would have purchased more Mitre-branded balls, resulting in $16,971 more royalties to Mitre.  (Stamm Rpt. ¶ 41.)

---

[2] On March 4, 2011, after reviewing HBO's responsive report, Stamm "corrected" the calculation concerning lost sales to Wal-Mart.  (Black Decl. Ex. 2.)

[3] Under its licensing agreements with Mitre, Regent pays royalties based on a percentage of the purchase price of Mitre-branded goods that Regent orders from manufacturers (FOB purchases), irrespective of whether Regent sells that product to a retailer.  (Black Decl. Ex. 10 at 11.)

Finally, Stamm calculates that Wal-Mart purchased fewer Mitre-branded *soccer balls* from Regent, ignoring that sales of all Mitre-branded products to Wal-Mart undisputedly increased after the Segment. (*Id.* ¶ 34.) Her purported damages calculation is premised on a change in purchasing for a new high-end soccer ball that Wal-Mart started selling for the first time shortly before the Segment premiered. (*Id.*) Stamm claims the damage in this category is $39,615. (*Id.*; Black Decl. Ex. 2).

## ARGUMENT

A district court has a special "gatekeeping" responsibility to ensure that all expert testimony is both relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). "The district court's 'gatekeeping' function in evaluating expert testimony requires that it look to Federal Rule of Evidence 401 to determine whether the testimony is relevant; *i.e.*, whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 60 (2d Cir. 2002) (internal marks omitted). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (internal marks omitted).

In addition, to demonstrate that an expert opinion is reliable, the offering party must show that: (1) the testimony "is based upon sufficient facts or data"; (2) the testimony "is the product of reliable principles and methods"; and (3) "the witness has applied the principles and methods reliably to the facts of the case." Fed R. Evid. 702; *Daubert*, 509 U.S. at 592-93 (the district court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue"). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the

*ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citation omitted).  "[E]xpert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (internal marks and citation omitted); *accord Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *Mink Mart, Inc. v. Reliance Ins. Co.*, 65 F. Supp. 2d 176, 181 (S.D.N.Y. 1999), (opinion unreliable because it was based on speculation), *aff'd*, 12 Fed. Appx. 23 (2d Cir. 2000).

The offering party—here, Mitre—must prove by a preponderance of the evidence that the proffered testimony meets the standards for admissibility.  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

## I.   THE COURT SHOULD STRIKE STAMM'S CALCULATION OF DAMAGES IN THE UNITED KINGDOM

The Court should preclude opinion testimony on Mitre's alleged damages in the United Kingdom because Mitre's expert: (1) relies exclusively on legally irrelevant facts; (2) fails to demonstrate that analysis of Mitre's budgets is a reliable method for calculating lost sales; (3) relies on nothing more than speculation as a basis for causation; and (4) fails to properly account for significant real world events.

### A.   HBO Is Not Liable for Unauthorized Republication of the Segment

Under long-standing New York legal precedent, evidence of an unauthorized third-party republication is irrelevant to an action for defamation because a defendant cannot be held liable for that republication.  In *Karaduman v. Newsday, Inc.*, the New York Court of Appeals held that the reporters who authored an allegedly defamatory series of articles could not be held liable for

the subsequent republication of a book based on those articles.  51 N.Y.2d 531, 435 N.Y.S.2d 556 (1980).  "Inasmuch as the record is barren of any concrete evidence of the reporters' involvement in the republication of the newspaper series, we conclude that the causes of action against them must be dismissed."  *Id.* at 540, 435 N.Y.S.2d at 561.  The New York Court of Appeals recently reaffirmed this principle in *Geraci v. Probst*:

> It is too well settled to be now questioned that one who utters a slander, or prints and publishes a libel, is not responsible for its voluntary and unjustifiable repetition, without his authority or request, by others over whom he has no control and who thereby make themselves liable to the person injured, and that such repetition cannot be considered in law a necessary, natural and probable consequence of the original slander or libel.

15 N.Y.3d 336, 342, 912 N.Y.S.2d 484, 488 (2010) (citation omitted); *accord Fashion Boutique*, 314 F.3d at 59 (defamation plaintiff cannot recover damages from a claim "arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication"); *Cerasani v. Sony Corp.*, 991 F. Supp 343, 351-52 (S.D.N.Y. 1998) ("a libel plaintiff must allege that the party had authority or control over, or somehow ratified or approved, the republication").  This principle is so well established that evidence of an unauthorized republication "is not admissible at trial, even to prove widespread dissemination of the defamatory statements." *Fashion Boutique*, 314 F.3d at 59.

HBO neither distributed the Segment in the United Kingdom nor authorized its distribution in any manner accessible there.  (Black Decl. Ex. 44 ¶¶ 11-13.)  The entirety of Mitre's claim for damages in the United Kingdom is premised on unauthorized republications— namely, the purported availability of the Segment on the Internet and the purported repetition of statements on various websites on the Internet.  (Stamm Rpt. ¶¶ 48-49; Black Decl. Ex. 11 at 43-44; Compl. (Black Decl. Ex. 4) ¶¶ 37-38 ("Some of the known re-publications of these defamatory statements are currently found at the following websites . . . .").)  Mitre has no

evidence that HBO authorized the distribution of allegedly defamatory material by these sources.[4]   (Stamm Tr. at 98-100, 104-09, 117, 133; Black Decl. Ex. 44 ¶¶ 11-13.)   Accordingly, Stamm should be precluded from referencing or relying on any unauthorized republications, including any reference to U.K. damages.

**B.      Stamm Fails to Establish the Reliability of Mitre's Budgeted Sales as a Basis for Calculating Alleged Damage in the United Kingdom**

Next, Stamm's testimony must be excluded because she fails to establish that comparing Mitre's forecasted sales budget with its actual net sales is a reliable methodology for calculating damages.   She offers no basis from which a jury could conclude that Mitre's *projected* sales accurately reflect its *actual* sales—not even a historical comparison of budgets and sales. (Stamm Tr. at 172-73 ("Q: What information do you have that Mitre's budgets reliably predict its actual sales? A: I don't.").)   In fact, Stamm received little documentation concerning Mitre's budgeting process and was informed that Mitre "didn't have documents that would reflect . . . any sort of global assumptions that went into the sales budget." (*Id.* at 168-69.)

Stamm's failure to use a reliable methodology warrants the exclusion of her opinion.   In *Celebrity Cruises v. Essef Corp.*, two experts based their damages calculations on the plaintiff's "five-year plan"—profit projections for the relevant time period.   434 F. Supp. 2d 169, 183-87 (S.D.N.Y. 2006).   But "[t]he entrepreneur's 'cheerful prognostications' are not enough." *Id.* at 184 (citing *Schonfeld v. Hilliard*, 218 F.3d 164, 173 (2d Cir. 2000)) (internal marks omitted). The court found no reason to assume that the plaintiff would have met management expectations

---

[4] Mitre's 30(b)(6) witness attributed decreased U.K. sales to purported republication by Mitre's competitor, Molten Sports U.K. ("Molten"), in an e-mail to retailers.   (Black Decl. Ex. 11 at 43-44, 200-02.)   Even if HBO were liable for Molten's republication—which it is not—Stamm could not identify any evidence that the Molten e-mail, forwarding an Internet blog posting by one Brian Neller, derived from the Segment.     (Stamm Tr. at 117-29; Stamm Rpt. ¶ 49.) Moreover, Mitre already recovered for any such damage in a settlement with Molten.   (Black Decl. Ex. 8; Ex. 11 at 58-61.)

during the relevant period.  *Id.*; *see also Dupont Flooring Sys., Inc. v. Discovery Zone, Inc.*, No. 98 Civ. 5101(SHS), 2005 WL 22865, at *1 (S.D.N.Y. Jan. 5, 2005) (excluding an expert report that was based on "a mere subtraction of 1998 EBITDA [Earnings Before Interest, Taxes, Depreciation and Amortization] from 1997 EBITDA" because the expert had failed "to provide any support for the assumption in the report that those locations' respective EBITDA numbers for 1998 would have matched those of 1997 absent Dupont's alleged breach. The unfounded assumption underlying [the expert's] calculations render them unhelpful and unnecessarily confusing to the jury") (citations omitted).

Mitre's expert merely subtracted Mitre's actual sales from its budget projections (Mitre's own "cheerful prognostications").  There is no evidence that Mitre's budgets reliably correlate to actual sales.  Stamm's testimony on U.K. damages must be precluded.

**C.      Stamm Fails to Reliably Establish Causation**

Stamm also fails to reliably establish causation in calculating the U.K. damages.  Her Report simply states: "I understand that Mitre believes that its budget shortfalls in the U.K. in 2009 and 2010 resulted directly from damage inflicted by the HBO episode."  Without any analysis, she then "calculates" this damage to be $3.0 million by subtracting numbers provided by Mitre.  (Stamm Rpt. ¶¶ 51-52.)

Stamm's calculation of U.K. damages is premised entirely on rank speculation.  *See Brook Group*, 509 U.S. at 242; *Boucher*, 73 F.3d at 22.  She first assumes—contrary to the evidence—that HBO "allowed the [Segment] to be disseminated in part or in whole through numerous Internet-based outlets," relying on an allegation in Mitre's complaint that HBO denied

in its answer and that Mitre has never proven or even attempted to prove.[5]  (Stamm Rpt. ¶¶ 12, 48; Stamm Tr. at 105-08, 129.)  Stamm further assumes that hypothetical Internet viewers in the United Kingdom, having seen the Segment, decided to purchase fewer Mitre products because of the Segment—without evidence that anyone in the United Kingdom actually viewed the Segment (*Id.*)  Finally, Mitre's expert assumes that these hypothetical viewers purchasing fewer Mitre products account for Mitre's *entire* U.K. budget shortfall in 2009 and 2010.  When questioned, Stamm clarified that she simply assumed causation.  (Stamm Tr. at 101-03.)  Stamm applied no expert "methodology" at all.

Reliance on mere speculation is grounds for exclusion.  *Toltec Fabrics, Inc. v. August Inc.*, 29 F.3d 778, 784 (2d Cir. 1994) (vacating a damages award based on the absence of product orders due to the alleged wrongdoing, as entirely speculative and noting that "[n]o evidence was presented as to the reason for any company's failure to place recent orders" and that for certain customers, "it would be the height of conjecture to conclude that a failure to place later orders was causally linked" to the alleged wrongdoing); *see also Celebrity Cruises*, 434 F. Supp. 2d at 177 (precluding an expert's testimony and report on damages because the expert did not "present a compelling argument for causation").

Here, Stamm has offered no reliable basis for her causation assumption, failing to cite any evidence that the Segment was available in the United Kingdom, that anyone in the United Kingdom viewed it, that viewers decided not to purchase Mitre-branded products because it, or

---

[5] The only document offered on this point is an e-mail in which the purported author claims that the Segment was available on YouTube. That e-mail is classic hearsay and inadmissible in any event because HBO did not authorize distribution of the Segment on YouTube. *See* Fed. R. Evid. 801(c); *Fashion Boutique*, 314 F.3d at 59.

that there were no independent factors responsible for Mitre's budget shortfall.[6]  Her opinion is

thoroughly attenuated speculation that must be excluded.

**D.      Stamm Fails to Account for Significant Real World Events**

It is inconceivable that the global economic downturn had no impact on sales of Mitre-

branded goods.[7]  In her Report, however, Stamm calculates damages from reduced U.K. sales of

Mitre-branded goods without acknowledging the U.K. recession that started in late 2008.

(Stamm Rpt. ¶ 52.)   She conceded that she had not analyzed Mitre's U.K. sales for any

comparable period before 2008 that "would qualify as a recessionary period."   (Stamm Tr. at

151.)

The failure to address so significant a factor as the abysmal economy requires the

exclusion of expert testimony under *Daubert*.   Experts must properly account for "real world

facts and events."   *Point Prods. A.G. v. Sony Music Entm't, Inc.*, No. 93 Civ. 4001 (NRB), 2004

WL 345551, at *3 (S.D.N.Y. Feb. 23, 2004) (excluding an expert report as "irretrievably

unreliable and indefensible" because the expert report's "gaping omissions of real world events

that were highly material" to the damages claim and unrelated to the defendant's acts); *accord

Celebrity Cruises*, 434 F. Supp. 2d at 177 (precluding reliance on an expert's report and opinion

because "it is also possible that other factors overwhelmed the incident as the cause of dwindling

profits, and Mr. Fellman does not take account of any such factors").   Because Stamm wholly

---

[6] The only evidence obtained in discovery points to the *absence* of U.K. damages from the
Segment.  (Black Decl. Exs. 12-35, 36 at 29-30, 42-43.)

[7] This Court may take judicial notice of the recession.  *E.g.*, *Iron Workers Local No. 25 Pension
Fund v. Oshkosh Corp.*, No. 08-C-797, 2010 WL 1287058, at *11 (E.D. Wis. Mar. 30, 2010)
(taking judicial notice that "drops [in the Dow Jones Industrial Average] foreshadowed further
plummets into the six-thousands and the recession that occurred in late 2008 and 2009"); *cf.*
BBC News, *UK in Recession as Economy Slides*, Jan. 23, 2009, *available at*
http://news.bbc.co.uk/2/hi/business/7846266.stm ("The UK is now in recession for the first time
since 1991, official government figures have confirmed.").

fails to account for the effect of larger economic trends on sales of Mitre-branded products, her calculation of U.K. damages should be disregarded.

## II.   THE COURT SHOULD STRIKE STAMM'S CALCULATION RELATED TO THE PURPORTED RATE CONCESSION TO REGENT

### A.   Mitre Failed to Disclose the Purported Royalty Rate Concession

Mitre did not disclose during fact discovery its purported royalty rate concession to Regent that accounts for more than $500,000 in claimed damages. But before Stamm's Report, Mitre never mentioned this category of damage as required by the Federal Rules of Civil Procedure, despite ample opportunity to do so.

On February 13, 2009, in its initial disclosure of damages under Fed. R. Civ. P. 26(a)(1)(A), Mitre simply stated that the "total amount of damages has yet to be quantified, but is believed to be, at a minimum, tens of millions of dollars." (Black Decl. Ex. 5 at 12.) When HBO requested that Mitre set forth the damages it claimed to have suffered as a result of the distribution of the Segment, Mitre's March 6, 2009, interrogatory response only stated that "Mitre will provide this information once it has determined more completely its damages." (Black Decl. Ex. 6 at 13.)

Nor did Gary Hibbert, Mitre's 30(b)(6) witness on damages, mention that Mitre was seeking damages from a purported rate concession. (*See generally* Black Decl. Ex. 11.) Asked how Regent's royalty payments to Mitre had been damaged as a result of the Segment, Mr. Hibbert explained that Regent had purchased fewer Mitre balls. (*Id.* at 110-115.) Later, asked about any discussions with Regent concerning damage that the Segment caused, he only identified discussions about Wal-Mart's return of the Cobra balls. (*Id.* at 198-200.) Not once did Mr. Hibbert refer to any sort of royalty rate concession made to Regent—a category of "damage" that is now one of Mitre's most significant points.

Mitre disclosed the concession as a source of damages for the first time on January 18, 2011, with its expert's report—more than a month after the close of fact discovery. (Stamm Rpt. ¶¶ 42-47.) Mitre must be precluded from seeking this undisclosed category of damages.

"[A] party must, *without awaiting a discovery request*, provide to the other parties . . . a computation of each category of damages claimed by the disclosing party . . . ." Fed. R. Civ. P. 26(a)(1)(A) (emphasis added). "By its very terms Rule 26(a) requires more than providing—without any explanation—undifferentiated financial statements; it requires a 'computation,' supported by documents." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 295 (2d Cir. 2006). A party that fails to comply with its obligations under Rule 26(a)(1)(A) "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Mitre's failure to disclose this category of damage is unjustified and prejudicial to HBO. Mitre had ample opportunity to inform HBO of the purported rate concession, but did not do so. HBO obtained no fact discovery on this category of alleged damage. Had Mitre identified this category of alleged damage earlier, however, HBO not only would have questioned Mitre's and Regent's witnesses about the concession, but also would have inquired whether Mitre took reasonable steps to mitigate such alleged damage.[8] Instead, Mitre held back identification of this category of "damage" until after fact discovery closed, resulting in clear prejudice to HBO.

Mitre's behavior merits preclusion under Fed. R. Civ. P. 37(c)(1). In *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, Judge Cedarbaum precluded the plaintiff from seeking categories of

---

[8] It would be relevant, for example, whether Mitre pursued other potential licensees to replace Regent instead of conceding the lower royalty rate. *E.g.*, *East Hampton Dewitt Corp. v. State Farm Mut. Auto. Ins. Co.*, 490 F.2d 1234, 1239 (2d Cir. 1973). According to Stamm, Mitre did not undertake any efforts to find such a licensee (Stamm Tr. at 244), but HBO should have had an opportunity to conduct fact discovery on that and other issues.

damage that were not identified in initial disclosures, noting that plaintiff's failures "depriv[ed] defendants of a meaningful opportunity to conduct discovery as to this damages theory" and that plaintiff's failure to disclose "was neither substantially justified nor harmless."  566 F. Supp. 2d 305, 317-18 (S.D.N.Y. 2008); *accord Armenian Assembly of Am., Inc. v. Cafesjian*, Nos. 07-1259, 08-255, 08-1254 (CKK), 2010 WL 4258900, at *13 (D.D.C. Oct. 22, 2010) ("Defendants cannot be faulted for failing to compel Plaintiffs during the discovery period to produce more specific evidence about a type of damages that was not explained to them in Plaintiff's initial disclosures, in Plaintiff's responses to their interrogatories, or in Plaintiff's answers to Defendant's questions at their depositions."); *Dayton Valley Investors, LLC v. Union Pacific R.R. Co.*, No. 2:08-cv-00127 (ECR) (RJJ), 2010 WL 3829219, at *4-6 (D. Nev. Sept. 24, 2010) (precluding categories of damage disclosed 21 months after the initial disclosure deadline for plaintiff's failure to comply with Rule 26(a)(1)(A) discovery obligations).  Here, Mitre can offer no justification for its failure to disclose the royalty rate concession as a category of damage, and the harm to HBO is clear.

**B.     Stamm Relies on Incorrect "Facts"**

Stamm's opinion regarding the royalty rate concession is inconsistent with the undisputed facts.  "[A]n expert's opinion which is not based on the evidence in the case is little more than speculation and it cannot be the basis of a verdict in conflict with the uncontradicted evidence in the case."  *Davidov v. Lousiville Ladder Group, LLC*, No. 02 Civ. 6652(LLS), 2005 WL 486734, at * 2 (S.D.N.Y. Mar. 1, 2005), *aff'd* 169 Fed. Appx. 661 (2d Cir. 2006).  Contrary to Stamm's assertions, Mitre's effective royalty rate for Regent did increase, by two percentage points.

In 2008, Mitre agreed that Regent would pay an 8% royalty on products purchased for sale to Wal-Mart, a decrease from the 10-12% royalty in Regent's existing licensing agreement.

(Black Decl. Ex. 11 at 120-21; Black Decl. Ex. 7.)  And as Mitre's expert admitted, "By 2008, Regent sales of Mitre-branded products to Walmart represented approximately 84% of total Regent sales of Mitre-branded products."   (Stamm Rpt. ¶ 26.)   In the recent licensing negotiations, Regent agreed to pay a 10-12% royalty for products purchased for sale to Wal-Mart, instead of the flat 8% rate.  (Black Decl. Ex. 10 at 8-9, 13-14; Stamm Rpt. ¶ 45.)  Thus, Mitre secured an *increased* royalty rate on most of the Mitre-branded products that Regent sells—at least 10%, rather than 8%.

Similarly, while not a single Mitre witness testified to any royalty rate concession, the only fact discovery concerning negotiations of the Regent agreement contradicts Mitre's claim. For example, Regent's Executive Vice President, Ingram Pope, testified that Regent made a royalty rate concession to Mitre, not the other way around.  (Black Decl. Ex. 10 at 8-9, 13-14.) Stamm's opinion is in conflict with this uncontradicted evidence and must be excluded.

## III.   THE COURT SHOULD STRIKE STAMM'S CALCULATION OF REGENT'S PURPORTED LOST SALES

### A.   Stamm's Calculations Rely on Unauthorized Republication Evidence

Mitre's two damages claims based on Regent's purported lost sales rely on evidence of unauthorized republication.  Stamm assumes that Wal-Mart returned the Cobra balls because of the Segment.  (Stamm Rpt. ¶¶ 34, 40-41; Stamm Tr. at 253.)  Wal-Mart's representative David Breed, however, testified that he personally made the decision to recall the Cobra balls.  (Black Decl. Ex. 9 at 74.)  He removed the balls because he received an e-mail from Regent no later than September 12, 2008—four days before the Segment premiered.  (*Id.* at 74-75.)  There is no evidence that HBO authorized, directed, or ratified Regent's decision to forward the e-mail to Wal-Mart.  Because Mitre's purported lost sales depend on Wal-Mart's decision to return the

Cobra balls—*i.e.*, inadmissible evidence of republication—HBO is not liable to Mitre for these categories of damage. *Fashion Boutique*, 314 F.3d at 59.[9]

**B.     Stamm Uses Unreliable Methodology and Facts for a Lost Profits Calculation**

Stamm's calculation of reduced royalties from Regent's alleged lost sales of soccer balls should be precluded for other reasons.  First, as with the purported U.K. damages, Stamm failed to account for other factors that affected the sale of goods, such as the abysmal state of the overall economy.  (Stamm Rpt. ¶¶ 34, 41.)   Although she attempted to explain why purported sales to Wal-Mart should increase in an economic downturn, she offered no explanation regarding sales to other U.S. retailers.  (Stamm Tr. at 80-81 ("[Wal-Mart] is the exception to the trend.").)  Failure to consider real world events is a basis for preclusion. *Point Prods.*, 2004 WL 345551 at *7.[10]

Stamm's methodology also is faulty because she treats 2008 as a baseline for Regent's sales to Wal-Mart while admitting that 2008 was not a "normal" year for Wal-Mart sales. (Stamm Tr. at 219).  In 2008, Wal-Mart made the decision to switch from Mitre's "Cobra" ball to the "Cup Final" ball—to replace the Cobra ball—and a new, higher-priced "Premier" ball. (Black Decl. Ex. 10 at 55-56; Stamm Tr. at 220-21.)   Regent's 2008 sales to Wal-Mart therefore were higher than normal because Wal-Mart stocked its shelves with a new and more expensive product.  An analysis that uses 2008 as a baseline thus is unreliable because it ignores the unique

---

[9] Moreover, even if Mitre could prove—which it cannot—that authorized distribution the Segment caused some of Regent's lost sales to Wal-Mart, Stamm conceded that she could not differentiate damages to Mitre caused by the authorized distribution of the Segment from the damages caused by the unauthorized republications, for which HBO is not liable.  (Stamm Tr. at 98-99.)

[10] Stamm also failed to consider other real world events beyond the general state of the economy. For example, on the day that the Segment premiered, the Consumer Products Safety Commission recalled a Mitre-branded soccer goal because a child had been strangled to death.  (Black Ex. 10 at 107-09.)  Mitre goods also were returned in late 2008 because they tested positive for lead. (*Id.* at 123-24.)

nature of Wal-Mart's orders in 2008. Stamm's applies an "apples and oranges comparison" that compels exclusion of her opinion.[11]  *See Boucher*, 73 F.3d at 21.

Moreover, Stamm admitted that reduced sales in the entirely new and untested Premier balls from 2008 to 2009 accounted for most of Mitre's purported lost sales to Wal-Mart. (Stamm Tr. at 226-27). Stamm offered no basis for lost royalties based on a new product like the Premier ball. *See Schonfeld*, 218 F.3d at 172 ("[A] plaintiff is entitled to recover lost profits only if he can establish both the existence and amount of such damages with reasonable certainty . . . evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate."); *Trademark Res. Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 333 (2d Cir. 1993) (striking plaintiff's expert's calculation of lost profits based on the sale of certain CD-ROMs, noting that the CD-ROMs were "a new product and therefore subject to the stricter evidentiary standard for lost profits" and that plaintiff "could offer neither a historical basis nor a competitor's experience in support of its lost profits projection").

Also, Stamm's opinion is unreliable because it is contradicted by the undisputed evidence. To explain the alleged decrease in sales to Wal-Mart—which does not exist—Stamm speculates that Wal-Mart's attitude toward Mitre changed negatively. (Stamm Rpt. ¶ 30.) In contrast, Wal-Mart's representative, David Breed, testified that since November 2007, Wal-Mart has bought an increasing number of Mitre-branded products because it sees "value in the brand"; that Mitre is Wal-Mart's brand for "better quality soccer balls"; that Wal-Mart anticipated selling 5-10% more Mitre-branded goods in 2010 than in 2009; and that Wal-Mart "still believed in the Mitre brand" after the distribution of the Segment. (Black Decl. Ex. 9 at 11-13, 129, 141.)

---

[11] Regent's overall sales of Mitre-branded soccer balls to all U.S. retailers in 2009 *increased* from their levels in 2008—a fact Stamm ignored in her flawed analysis, but admitted at her deposition. (Stamm Tr. at 78.)

Stamm's characterization of reduced sales of Mitre-branded goods "amplified by a change in Walmart's attitude" is contrary to the facts of the case and should be precluded.

In addition, for the claim of reduced sales to other U.S. retailers, Stamm assumes that Regent would have sold those retailers Mitre-branded soccer balls if Regent had not had the returned Cobra balls in inventory.   That analysis ignores the fact that Regent also sells MacGregor-branded soccer balls.[12]   Regent's sale of returned Cobra balls could have displaced sales of MacGregor, not Mitre, balls.   Stamm's failure to consider that fact undermines the reliability of her opinion.

Because Stamm's opinions related to Regent's alleged lost sales are based on unreliable methodology and facts in direct conflict with evidence in this case, her testimony on those claims should be excluded.

## IV.   HBO WAS PREJUDICED BY MITRE'S FAILURE TO COMPLY WITH ITS DISCOVERY OBLIGATIONS

### A.   Stamm's Report Failed to Disclose all "Facts or Data Considered"

Mitre did not comply with the expert disclosure requirements of Fed. R. Civ. P. 26(a)(2). An expert witness must disclose in an expert report before deposition "the facts or data considered by the witness in forming" his or her opinions.  Fed. R. Civ. P. 26(a)(2)(B)(ii).  At her deposition, Stamm revealed for the first time that Mitre provided documents that Stamm's team reviewed and considered, but did not list in Appendix C ("Materials Relied Upon") of the Report because her team deemed the documents not relevant. (Stamm Tr. at 25.)  She further testified that she had reviewed clearly relevant declarations that were not listed in Appendix C and that

---

[12] *E.g.*,  http://www.regent-halex.com/displayproduct.html?tablename=soccer&itemnum=97107. When asked whether Regent sold any other brand of soccer ball besides Mitre, Stamm first stated that she "wasn't aware that Regent sold other soccer brands," then said that "maybe" she was aware. (Stamm Tr. at 208-09.)

she received factual information from Mitre in conversations that were not disclosed in Appendix C.[13]  (*Id.* at 60-64, 193-194.)  Finally, Stamm testified that members of her team had other conversations, not listed in Appendix C, with representatives from Regent and Mitre that may have informed her understanding of information relied on in the Report.  (*Id.* at 30-33, 230-32, 235-36.)  Asked why she had not disclosed one conversation, she stated only that she "[d]idn't realize it would be necessary."  (*Id.* at 62.)

> The Advisory Committee Notes for Rule 26 clarify:
>
> [T]he intention is that "facts or data" be interpreted broadly to require disclosure of *any material considered by the expert, from whatever source, that contains factual ingredients*.  The disclosure obligation extends to any facts or data 'considered' by the expert in forming the opinions to be expressed, *not only those relied upon by the expert*.

Fed. R. Civ. P. 26(a)(2)(B) advisory committee notes (2010) (emphases added).  The Rule thus *requires* disclosure of the facts and data concealed by Mitre's expert.   *See* Fed. R. Civ. P. 37(c)(1).

HBO was clearly prejudiced.  Because Mitre concealed this information from the Report, HBO was forced to waste time in a necessary fishing expedition just to find out what information Stamm considered in forming her opinions when it could have focused on substantive areas. And because Stamm was unclear on the details at her deposition, HBO still does not know all the facts and data that she considered in forming her opinions.  (*E.g.*, Stamm Tr. at 64 ("I did have a conversation with Mr. Hibbert.  It's not listed on Appendix C.  I didn't learn anything new.  I don't think I learned anything new beyond what I had learned from his deposition.  But possibly I did.").)  This type of ambiguity is precisely what the disclosure requirements Fed. R. Civ. P. 26(a) were designed to avoid.  *See* Fed. R. Civ. P. 26(a)(2)(B) advisory committee notes (1993)

---

[13] One conversation with Mitre's counsel took place after Stamm issued her Report, but Mitre did not timely amend Appendix C.  (Black Decl. ¶ 26.)

(disclosures under Fed. R. Civ. P. 26(a)(2)(B) are to avoid receiving information that is "so sketchy and vague that it . . . was even of little help in preparing for the deposition of the witness").

In *Giladi v. Strauch*, No. 94 Civ. 3976 (RMB)(HBP), 2001 WL 388052 (S.D.N.Y. Apr. 16, 2001) (Pitman, J.), plaintiff failed to fully identify the cases in which its expert had testified as an expert within the preceding four years. In precluding expert testimony, this Court noted that defendant had been prejudiced because it was unable to investigate the prior testimony had been consistent with the proffered testimony. *Id.* at *6; *see also McGuire v. Cirrus Design*, No. 1:07-CV-683, 2009 WL 383541, at *1 (E.D. Tex. Feb. 13, 2009) (expert "failed to satisfy the simple and straightforward requirement of Rule 26 that he provide a list of the data or other information he considered . . . . The purpose of Rule 26(a)(2)(B) is to eliminate unfair surprise to the other party, and that goal is not achieved when experts fail to provide key information in or along with their reports."); *Frye v. Baker*, No. 1:06-CV-28, 2007 WL 1866882, at *1 (D. Vt. June 28, 2007) ("[E]xperts should not be offering their services in federal court if they cannot (or will not) comply with the Federal Rules and attorneys should not be retaining such experts."). An expert's failure to comply with disclosure requirements "frustrates the spirit and purpose of Rule 26 expert discovery and threatens to turn the trial into a game of blindman's bluff." *Id.* Stamm's testimony should be precluded.

## B.     Stamm Relies on Documents Not Disclosed in Discovery

On December 15, 2010, fact discovery in this case ended. (Black Decl. ¶ 18.) Because HBO believed Mitre's document production on damages (among other topics) remained incomplete, on January 14, 2011, HBO requested a conference with the Court to discuss Mitre's

discovery deficiencies.[14]   (*Id.* Ex. 39.)   On January 18, 2011, Mitre sent HBO the Report, accompanied by 33 documents that Mitre had not produced in fact discovery, but that Stamm had considered extensively in drafting the Report.  (*Id.* ¶ 20, Ex. 40; Stamm Rpt. at Exs. 1-13.)   On January 27, Mitre sent HBO a letter conceding that the documents had been "provided to HBO for the first time on January 18."  (*Id.* Ex. 42.)[15]  Stamm had access to at least some of the new documents before the close of fact discovery.  (Stamm Tr. at 16-17, 28-29, 48-50.)  Moreover, Mitre clearly provided its expert access to Mitre's databases without providing HBO an equal opportunity to access that information.  (*Id.* at 260-63.)  After Stamm's March 8, 2011 deposition, Mitre also produced eight pages of notes from Stamm's conversations with Mitre and Regent representatives that had not previously been produced.[16]  (Black Decl. Ex. 43.)

"A party claiming damages or other monetary relief must, in addition to disclosing the calculation of such damages, make available the supporting documents for inspection and copying as if a request for such material had been made under Rule 34."  Fed. R. Civ. P. 26(a)(1) advisory committee notes (1993).  A party that fails to comply with its obligations under Rule 26(a)(1)(A) "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  "Mutual knowledge of all the relevant facts gathered by both parties is essential to

---

[14] The Court has not yet scheduled a conference to discuss Mitre's deficiencies.

[15] The newly produced documents included: (1) documents concerning Mitre's budgets (MIT00403079, MIT00403080, MIT00403081); (2)  Mitre financial statements (MIT00403082, MIT00403083); and (3) documents containing information regarding Mitre's license and distribution agreements (MIT00403084, MIT00403085, MIT00403086), Mitre's sales margins (MIT00403087), Mitre's retail customers (MIT00403088), Mitre's U.K. sales (MIT00403089), and U.S. sales of Mitre-branded balls and accessories (MIT00403090-MIT00403111). Mitre had previously produced only four of these documents in a different form.  (Black Decl. ¶¶ 23-24.)

[16] At her deposition, Stamm admitted that Mitre's counsel had never even asked her about notes of her conversations with fact witnesses.  (Stamm Tr. at 228-29.)

proper litigation." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947); *accord* Fed. R. Civ. P. 26 advisory committee notes (1983) ("Thus the spirit of the rules is violated when advocates attempt to use discovery tools as tactical weapons rather than to expose the facts and illuminate the issues by . . . unnecessary use of defensive weapons or evasive responses.").

Mitre's production of key financial documents well after the close of fact discovery resulted in clear prejudice to HBO.[17]  In its initial disclosures, Mitre stated that its "total amount of damages has yet to be quantified, but is believed to be, at a minimum, tens of millions of dollars."  (Black Decl. Ex. 5 at 12.)  HBO repeatedly requested access to Mitre's financial information concerning its alleged damages.  As late as January 13, 2011—five days before it produced the new documents with its expert report—Mitre represented to HBO that it had already produced the financial information HBO requested.  (Black Decl. Ex. 41 at 4 ("As Mitre explained to Rachel Strom, counsel for HBO, on January 13, 2011, the financial information sought by HBO has either already been produced to HBO or Mitre does not have it.").)  Nevertheless, Mitre had been collecting documents, culling information from its databases, and taking data from its licensees for its expert to use in calculating alleged damages.  Although Mitre had that information before the close of fact discovery—and in some cases already provided the data to its expert—Mitre did not produce the information to HBO.  Mitre's expert relied extensively on those documents in calculating Mitre's damages.  (*Compare* Black Decl. Ex. 42 at its Ex. A *with* Stamm Rpt., Exs. 1-13.)  "A law suit is not a game but a search for truth. The ends of justice are served, not by giving one side a vested right to exhaust the other, but by affording both an equal opportunity to a full and fair adjudication on the merits." *Polaroid Corp*

---

[17] For example, as reflected in Stamm's notes (produced after her deposition) Mitre's expert spoke with one John Godden—an individual at Mitre whom Mitre has never identified as a potential witness or person with knowledge of any relevant information—about Mitre's budget projections.  (Black Decl. Ex. 43 at MIT00403141.)

*v. Casselman*, 213 F. Supp. 379, 381 (S.D.N.Y. 1962).   Mitre should not be rewarded for thwarting HBO's investigation during fact discovery by being permitted now to rely on previously unproduced documents.   Accordingly, HBO respectfully requests that Stamm's opinion be precluded.

## V.   STAMM'S REPORT CONTAINS PREJUDICIAL, IRRELEVANT NON-OPINION STATEMENTS

At a minimum, this Court should strike Stamm's testimony to the extent she offers both opinions that are prejudicial and irrelevant.   Stamm conceded that the Report references allegations that have no relevance to her calculation of damages.   The Report claims that Modell's Sporting Goods, Inc. ("Modell's") "returned Mitre-branded products as a consequence of the episode" (Stamm Rpt. ¶¶ 17, 29), but Mitre's expert offers no calculation of purported damage because she had "insufficient data to quantify any such damage" (*Id.* ¶ 29; Stamm Tr. at 56-57).[18]   The Report also claims that "Mitre has had less success securing important sponsorship arrangements" (Stamm Rpt. ¶ 18), but Stamm is offering no calculation of such damages (*Id.* at 6 n.21; Stamm Tr. at 175).[19]   The Report further states that "Mitre likely has suffered from damages in multiple countries," but Mitre's expert will not be offering an opinion on damages outside of the United States and the United Kingdom.   (Stamm Rpt. ¶¶ 2, 19, 54; Stamm Tr. at 24.)   Finally, the Report alludes to "lingering effects" of the Segment and recites that "Mitre believes that its sales continue to suffer . . . as a result of the HBO episode," but Stamm's damages calculations are limited expressly to the period through December 31, 2009

---

[18] Her reluctance to opine on this subject is understandable because both Modell's and Elan-Polo, Inc., another of Mitre's U.S. licensees, declared that no Mitre-branded product was returned because of the Segment.  (Black Decl. Exs. 37-38).

[19] Similarly, the companies with which Mitre had a sponsorship arrangement or potential sponsorship arrangement submitted declarations stating that the Segment has had no effect on their relationship with Mitre. (Black Decl. Exs. 12-29.)

for the United States and through December 31, 2010 for the United Kingdom.  (Stamm Rpt.

¶¶ 19, 35; Stamm Tr. at 70, 72.)  Mitre's expert thus offers unverifiable rhetoric and other non-

opinion testimony that is prejudicial to HBO; irrelevant to the legitimate scope of her testimony,

if any; and inadmissible under Fed. R. Evid. 401, 402, 403 and 702.   Accordingly, those

statements must be precluded.

**<u>CONCLUSION</u>**

For the foregoing reasons, HBO respectfully requests that the Court exclude the expert

report and testimony of Laura B. Stamm.

Dated:  April 22, 2011                                 Respectfully submitted,

By: _____

Of Counsel:                                                    Slade R. Metcalf
Stephanie S. Abrutyn                                     R. Brian Black
Home Box Office, Inc.                                   Collin J. Peng-Sue
1100 Avenue of the Americas                        HOGAN LOVELLS US LLP
New York, New York 10036                          875 Third Avenue
                                                                        New York, New York 10022
                                                                        Tel: (212) 918-3000

*Attorneys for Defendant Home Box Office, Inc.*