FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x

MITRE SPORTS INTERNATIONAL LIMITED,  :

         :

         Plaintiff,      :

         :

         v.       :   **Case No. 08 CIV 9117 (GBD) (HBP)**

         :

HOME BOX OFFICE, INC.,      :

         :

         Defendant.    :

         :
-----------------------------------------------------------------x

## MITRE'S BRIEF IN OPPOSITION TO HBO'S MOTION IN LIMINE TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF LAURA B. STAMM

## FILED UNDER SEAL – CONTAINS HIGHLY CONFIDENTIAL INFORMATION UNDER PROTECTIVE ORDER

195985.1

# TABLE OF CONTENTS

INTRODUCTION .............................................................................................................. 1

ARGUMENT ..................................................................................................................... 1

I.   MITRE COMPLIED WITH ITS DISCOVERY OBLIGATIONS ........................ 1

II.  STAMM'S CALCULATION OF MITRE'S LOST ROYALTIES ON LOST
     SOCCER BALL SALES IN THE UNITED STATES IS ADMISSIBLE ............. 7

     A.   Stamm Relies on Wal-Mart's 30(b)(6) Testimony That It Returned the
          Cobra Balls Because of "the Potential That the Show Was True" ............. 7

     B.   Stamm's Calculation of Lost Royalties on Lost Soccer Ball Sales Is
          Reliable ....................................................................................................... 8

III. THE COURT SHOULD NOT STRIKE STAMM'S CALCULATION OF
     MITRE'S REGENT ROYALTY CONCESSION ................................................ 11

     A.   Mitre Disclosed the Damage to Its Ability to Earn Royalty Income
          from Its Licensees in the United States ..................................................... 11

     B.   Stamm Relies on Correct Facts ................................................................. 13

IV.  THE COURT SHOULD NOT STRIKE STAMM'S CALCULATION OF
     LOST SALES IN THE UNITED KINGDOM .................................................... 13

     A.   "Children of Industry" Was Posted on YouTube and Disseminated to
          Multiple Media Outlets with HBO's Approval and Participation,
          Making HBO Liable for Republication by Third Parties .......................... 13

     B.   There Is Sufficient Evidence That the Sudden, Unexplained Deviation
          in Mitre's U.K. Sales Was Caused by "Children of Industry" ................. 17

V.   THERE IS NOTHING PREJUDICIAL IN STAMM'S BASES FOR HER
     OPINION THAT HER DAMAGES CALCULATIONS ARE
     CONSERVATIVE ............................................................................................... 20

CONCLUSION ................................................................................................................. 21

195985.1

# TABLE OF AUTHORITIES

## Cases

*24/7 Records, Inc. v. Sony Music Entm't, Inc.*,
566 F. Supp. 2d 305 (S.D.N.Y. 2008) ..................................................................... 13

*Armenian Assembly of Am., Inc. v. Cafesjian*,
746 F. Supp. 2d 55 (D. D.C. 2010) ........................................................................ 13

*B.C.F. Oil Refining, Inc. v. Consol. Edison Co. of N.Y., Inc.*,
171 F.R.D. 57 (S.D.N.Y. 1997) ............................................................................... 6

*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2nd Cir. 1996) ..................................................................................... 19

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ................................................................................................ 19

*Celebrity Cruises Inc. v. Essef Corp.*,
434 F. Supp. 2d 169 (S.D.N.Y. 2006) ................................................................... 19

*Croy v. A.O. Fox Mem'l Hosp.*,
68 F. Supp. 2d 136 (N.D.N.Y. 1999) ..................................................................... 14

*Dayton Valley Investors, LLC v. Union Pac. R. Co.*,
2010 WL 3829219 (D. Nev. Sep. 24, 2010) .................................................... 11, 13

*Design Strategy, Inc. v. Davis*,
469 F.3d 284 (2d Cir. 2006) ................................................................................... 13

*Gen. Leaseways v. Nat'l Truck Leasing Ass'n*,
830 F.2d 716 (7th Cir. 1987) .................................................................................. 20

*Karaduman v. Newsday, Inc.*,
51 N.Y.2d 531 (1980) ............................................................................................. 14

*LePage's Inc. v. 3M*,
324 F.3d 141 (3d Cir. 2003) ................................................................................... 20

*Schonfeld v. Hilliard*,
218 F.3d 164 (2d Cir. 2000) ................................................................................... 10

*Toltec Fabrics, Inc. v. August Inc.*,
29 F.3d 778 (2nd Cir. 1994) ................................................................................... 19

195985.1

*Trademark Research Corp. v. Maxwell Online, Inc.*,
    995 F.2d 326 (2d Cir. 1993) ................................................................................................ 10

*U.S. Football League v. Nat'l Football League*,
    No. 84 CIVIL 7484 PKL, 1986 WL 10620 (S.D.N.Y. 1986) ........................................... 20, 21

## Rules

Federal Rule of Civil Procedure 26(a)(1) .................................................................................. 5

Federal Rule of Civil Procedure 26(a)(2) .................................................................................. 5

Federal Rule of Civil Procedure 26(b)(3) .................................................................................. 6

Federal Rule of Civil Procedure 26(b)(4) .................................................................................. 6

Federal Rule of Civil Procedure 26(b)(4)(D) ............................................................................. 2

Federal Rule of Civil Procedure 37(c)(1) .................................................................................. 5

## Other Authorities

8A Wright, Miller, and Marcus, *Federal Practice & Procedure* (2010 update) ........................ 2, 5

195985.1

## INTRODUCTION

Plaintiff Mitre Sports International Limited ("Mitre") respectfully submits this opposition to the motion in limine by Defendant Home Box Office, Inc. ("HBO") to exclude the expert report and testimony of Laura B. Stamm, Mitre's damages expert.

HBO offers a hodgepodge of claims challenging the factual accuracy of Stamm's opinions. As detailed below, each of these claims is meritless. Moreover, regardless of the merits of HBO's factual challenges, they are for the jury's resolution.

HBO also challenges Stamm's reliance on the republication of "Children of Industry" by third parties, which republication injured Mitre, claiming that defamation law flatly prohibits liability for republication by third parties. HBO's recitation of the law on this issue is incomplete and incorrect.

HBO also repeatedly states that Mitre "conceal[ed] information during fact discovery" and "withheld documents and financial information that its expert considered critical." HBO Mem. Stamm 2, 18. Far from meeting its obligation to put forth factual material to support its charges, HBO: (1) miscites Stamm's deposition testimony; (2) omits Stamm's deposition testimony showing that she provided the information HBO claims she did not; and (3) fails to inform the Court that HBO obtained the sales and financial data it claims to have lacked.

## ARGUMENT

## I.    MITRE COMPLIED WITH ITS DISCOVERY OBLIGATIONS

First, HBO asserts that Stamm did not identify, as materials she considered for her opinions, certain documents referenced at page 25 of her deposition. HBO Mem. Stamm 17. Stamm actually testified that members of her non-testifying support staff "may have" reviewed additional documents "and considered them not to be relevant," *i.e.*, not flagged them for Stamm to review. Stamm thus did *not* consider these documents and they did *not* inform her opinions.

Per Rule 26, only documents that the testifying expert herself considered, not that non-testifying support staff "may have" reviewed, need be identified.[1]  Counsel for HBO acknowledged this during Stamm's deposition.[2]  Counsel was not hindered in his examination of Stamm; he knew the documents Stamm had considered and those she had not, and was free to ask her why.

Second, HBO claims that Stamm failed to disclose her consideration of certain declarations obtained by HBO from non-parties (retailers in the U.S. and U.K.) and failed to disclose factual information received from Mitre.  HBO Mem. Stamm 17-18.  Testimony not provided to the Court by HBO shows that counsel examined Stamm about the declarations for approximately 22 minutes.  Kapoor Decl. ¶ 3 and Ex. 1 at 65 – 67, 136 – 148.  Concerning supposedly undisclosed factual information provided by Gary Hibbert of Mitre, Stamm testified that she "didn't learn anything new" in the previously unidentified conversation with Hibbert, beyond what she had learned from Hibbert's deposition.  *Id.* at 64.  Concerning supposedly undisclosed information received by Stamm's non-testifying support staff from interviews with Mitre and Regent Sports Corporation ("Regent") personnel,[3] HBO Mem. Stamm 18 (citing Stamm Dep. Tr. 30 – 33, 230 – 232, 235 – 236), HBO omits Stamm's testimony providing the information disclosed during these interviews and during Stamm's own interviews of these

---

[1] Fed. R. Civ. P. 26(b)(4)(D) (Dec. 1, 2010) ("Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial."); *accord* 8A Wright, Miller, and Marcus, *Fed. Prac. & Proc.*: Civil 3d § 2032 (2010 update).

[2] Kapoor Decl. Ex. 1 at 27:07 – 12 ("This is not just a question of what she relied on, it's a question of what she considered.  And what she considered is all documents that relate to facts in this case.").

[3] Regent is Mitre's licensee in the U.S. for the sale of Mitre-branded soccer balls and soccer accessories (not including footwear and fashion apparel).

194860.5

personnel confirming the information they had given her staff. Kapoor Decl. Ex. 1 at 230 – 239; *see also id.* at 30 – 34.[4]

The "prejudice" HBO asserts from its claimed lack of information is also baseless. HBO states: "HBO was clearly prejudiced. Because Mitre concealed this information from the Report, HBO was forced to waste time in a necessary fishing expedition just to find out what information Stamm considered in forming her opinions when it could have focused on substantive areas." HBO Mem. Stamm 18. To the contrary, HBO "substantively" examined Stamm as much as it desired; counsel for HBO stopped his direct examination after 6 hours 39 minutes of questioning, 21 minutes less than the allotted 7 hours. Kapoor Decl. ¶ 4.

HBO also states that it "still does not know all the facts and data that [Stamm] considered in forming her opinions." To the contrary, as counsel for HBO inquired:

> **Q.**     Having spent the day talking about these issues, are there any documents or conversations that you now recall that are not identified in Appendix C and have not -- and we have not discussed today that you reviewed in connection with forming your opinions in this case?
>
> **A.**     No.

Kapoor Decl. Ex. 1 at 269:14 – 22.

Third, HBO claims to have lacked sales and financial data during fact discovery, citing 33 documents produced as part of the supporting documents for Stamm's expert report. HBO Mem. Stamm 19-20. Of these 33 documents, 22 are spreadsheets containing transactional data for each sale of Mitre-branded products in the U.S. by Regent from January 2005 through

---

[4] HBO also claims Stamm improperly failed to identify, in her report, a conversation with counsel for Mitre. HBO Mem. Stamm 18 (citing Stamm Dep. Tr. 193 – 194). The conversation occurred after HBO's damages expert, Scott Phillips, submitted his rebuttal report and thus after Stamm had submitted her report. Stamm Dep. Tr. 193 – 194. Stamm testified fully about the conversation. Kapoor Decl. Ex. 1 at 191 – 194.

194860.5

September 2010. *E.g.*, Kapoor Decl. Ex. 2 (MIT00403092).[5] Counsel for Mitre obtained these data from Regent for purposes of expert discovery in this litigation in a format requested by Mitre's expert. Kapoor Decl. ¶ 5. HBO had *already* received these data, during fact discovery, for the period January 2003 – July 2009 in a different format directly from Regent pursuant to HBO's subpoena—a format that HBO had specified to Regent. HBO first received these data on September 11, *2009*. Kapoor Decl. Ex. 3 (production letter from counsel for Regent to counsel for HBO) and Exs. 4-5 (Grill Dep. Exs. 9 and 10); Kapoor Decl. Ex. 6 (April 15, 2010, production letter from counsel for Regent to counsel for HBO producing sales data as specified by HBO).[6] On July 14, 2010, Regent supplemented its production to include data through June 2010, and HBO deposed Regent's Vice President of Finance, Darren Grill, about these data on November 17, 2010. Kapoor Decl. Ex. 7 (Grill Dep. Tr.) 206:07 – 208:25; *id.* Ex. 8 (July 14, 2010, production email from counsel for Regent to counsel for HBO).

With respect to Mitre financial data and budgets, HBO omits that it received the data it requested from Mitre. On November 5, 2010, less than six weeks before the close of fact discovery, HBO issued its sixth set of document requests to Mitre. Kapoor Decl. Ex. 9. Request Number 9 demanded Mitre "Financial Reports," which HBO defined as reports "substantially similar to the form of the document produced as MIT00398978 [Kapoor Decl. Ex. 10]," for 2006 and 2010 year-to-date. Kapoor Decl. Ex. 9 at 2, 4. Mitre had previously produced these data in this form for the years 2007 through April 2010. *Id.* Exs. 10-13 [MIT00374019 (2007 budget); MIT00371299 (2007 actual financial data, 2008 budget, and 2009 budget); MIT00360663 (2008

---

[5] To avoid burdening the Court with the voluminous data produced at MIT00403090 – MIT00403111, the Kapoor Declaration attaches only 2005 sales data as an example (MIT00403092).

[6] Again, to avoid burdening the Court with exhibits, only the 2004 – 2006 data provided by Regent are attached to the Kapoor Declaration.

actuals); MIT00398978 (2009 actuals, 2010 budget, and 2010 actuals through April 2010)].

Thus, HBO only demanded the 2006 and updated 2010 financial data. Mitre provided data

updated through November 2010 on December 14, 2010. *See* Kapoor Decl. Ex. 14

(MIT00402756). HBO then sought to compel Mitre to produce the 2006 financial data, Black

Decl. Ex. 39 at 4 & n.4, which Mitre no longer has and on which Stamm did not rely, Kapoor

Decl. Exs. 15-17 (2007 – 2010 financial data on which Stamm relies, collected in MIT00403079,

MIT00403080, and MIT00403082).[7]

HBO's possession of Regent and Mitre data during fact discovery belies its claim that

Stamm had access to these materials while HBO did not. *See* HBO Mem. Stamm 20 (citing

Stamm Dep. Tr. 16 – 17, 28 – 29, and 48 – 50). Further, as the testimony cited by HBO states,

Stamm requested and was given "all financial documents that had been produced in the

litigation" and the Regent sales histories that Regent had already produced to HBO.

HBO also claims that Federal Rule of Civil Procedure 37(c)(1) precludes Mitre's reliance

on Stamm's testimony because Mitre failed to provide these materials as part of its Rule 26(a)(1)

initial disclosures. HBO's argument is a non sequitur. The timing of Mitre's disclosure

obligations with respect to Stamm's expert damages testimony is governed by Rule 26(a)(2), not

Rule 26(a)(1). The initial disclosure requirements of Rule 26(a)(1) apply only to computation of

damages and supporting documents in existence at the time of Rule 26(a)(1) disclosures. *See* 8A

Wright, Miller, and Marcus, *Fed. Prac. & Proc.*: Civil 3d § 2053 (2010 update) ("This disclosure

provision applies only with respect to materials available to the party seeking monetary relief").

Moreover, at the time of initial disclosures in this case—February 2009—Mitre had just begun to

incur damages and no computation of damages existed.

---

[7] Stamm requested the 2007 – 2010 financial data in a form different from what HBO requested.

194860.5

Further, materials created specifically for expert discovery, that do not exist at the time of initial disclosures, need not and cannot be disclosed prior to expert discovery. *See B.C.F. Oil Refining, Inc. v. Consol. Edison Co. of N.Y., Inc.*, 171 F.R.D. 57, 67 (S.D.N.Y. 1997) ("It is only when plaintiff's attorney shows such a document [work product] to a testifying expert that the protections afforded under Rule 26(b)(3) give way to the disclosure requirements of Rule 26(b)(4) and the document becomes discoverable."). Preexisting documents on which the expert relies for her computation, and which are not demanded in fact discovery, also need not be disclosed until expert discovery. Only when the expert's computation is submitted and put forth in the litigation by the party seeking damages does the obligation to produce the supporting documents arise if the other party had not requested them previously in fact discovery.

Here, the information concerning Mitre's margins per retailer/customer, margins per market, and margins per product category—considered by Mitre for its damages for the first time during expert discovery—were not requested by HBO, which requested only overall margins. *Compare* Kapoor Decl. Ex. 9 at 2, 4 (Request No. 9 and definition of "Mitre Financials Reports" in HBO's sixth set of document requests requesting same in the form of MIT0000398978 (Kapoor Decl. Ex. 10)) *with id.* Ex. 18 (MIT00403081); *id.* Ex. 19 (MIT00403083); *and id.* Ex. 20 (MIT00403087). Nor did HBO request information concerning the terms of other license and distribution agreements. *See id.* Exs. 21-23 (MIT00403084, MIT00403085, and MIT00403086).

The U.K. sales data used by Stamm were also compiled by Mitre specifically for purposes of expert discovery in this litigation. Kapoor Decl. ¶ 27. These data were not requested by HBO during fact discovery in the form requested by Stamm. *Compare* Kapoor Decl. Ex. 9 at 2, 4 (Request No. 8 and definition of "Mitre Wholesale Sales Reports" in HBO's sixth set of document requests demanding reports in the form of MIT00028306 for "the United

194860.5

States and worldwide" and showing annual and quarterly sales for each region (Kapoor Decl. Ex. 24)) *with id.* Ex. 25 (MIT00403089, showing only U.K. sales but with greater detail). Mitre produced the data during fact discovery in the form specified by HBO. *See* Kapoor Decl. Exs. 26-28 (MIT00097679; MIT00197360; MIT00399045).

In sum, all the materials on which Stamm relied were provided to HBO with Stamm's report and virtually all the information had been provided to HBO during fact discovery, albeit in a different format—a format *HBO* had specified. HBO's claim of prejudice thus reduces to not having had, during fact discovery, the data in the format Stamm used, *i.e.*, HBO claims prejudice from Mitre's and Regent's complying with HBO's production specifications. Such a claim is nonsensical. In any event, HBO's expert had a month to analyze the data in the format Stamm used, and he testified that he was ***not "awaiting any other information to be made available to [him]*** . . . in order to supplement [his] opinions." Kapoor Decl. Ex. 29 at 216:21 – 24.

## II.   STAMM'S CALCULATION OF MITRE'S LOST ROYALTIES ON LOST SOCCER BALL SALES IN THE UNITED STATES IS ADMISSIBLE

HBO argues that Stamm's calculation of Mitre's lost royalties from lost soccer ball sales by Regent in the U.S.: (A) improperly relies on Regent's "unauthorized republication" of the libel to conclude that Wal-Mart returned its approximately 150,000 Mitre "Cobra" soccer balls because of "Children of Industry"; and (B) is unreliable. HBO Mem. Stamm 14-15. Both arguments are meritless.

### A.   Stamm Relies on Wal-Mart's 30(b)(6) Testimony That It Returned the Cobra Balls Because of "the Potential That the Show Was True"

As the 30(b)(6) testimony of David Breed of Wal-Mart, cited by HBO, states, Wal-Mart decided to return the Cobra balls to Regent because of "the potential that the show was true." Kapoor Decl. Ex. 30 at 74 – 75. The show was produced *by HBO*. Breed's belief in the potential that the show was true was based on the "screen shots" taken *by HBO* from its raw

7

footage, which *HBO* sent to Regent and Regent forwarded to him *after* he had already learned of the show's imminent telecast. *Id.* at 51:11 – 52:25, 74 – 75; Kapoor Decl. Ex. 31 (Pope 30(b)(6) Dep. Tr.) 229:06 – 25.

**B.     Stamm's Calculation of Lost Royalties on Lost Soccer Ball Sales Is Reliable**

HBO claims that Stamm's calculation of lost royalties on lost soccer ball sales is unreliable for a variety of reasons. None withstands scrutiny.

First, HBO claims that Stamm fails to account for general economic trends, *i.e.*, the recession in 2009 and 2010. HBO Mem. Stamm 15. To the contrary, Stamm does so by analyzing how sales of Mitre soccer accessories were affected during this period, and using that change as a benchmark for how soccer ball sales would have changed in the but-for world. *See* Kapoor Decl. Ex. 32 (Stamm Report) ¶¶ 32-33 at 11. Stamm concludes that Mitre soccer accessory sales stayed flat from 2008 to 2009, and therefore calculates damages for lost soccer ball sales based on soccer ball sales having remained flat in 2009 instead of what actually happened, a 24 percent decrease. *Id.* at ¶¶ 33-34 at 11-12. While it is likely that soccer accessory sales also were negatively impacted by "Children of Industry," *i.e.*, soccer accessory sales should have been higher in the but-for world, that fact results in Stamm's understating damages because the benchmark for soccer ball sales is lower than it should have been and because Stamm does not calculate any damages from lost accessory sales. *See id.* ¶ 33 at 11-12. The use of benchmarks to account for economic trends is an accepted methodology in damages calculation. HBO's damages expert acknowledged his use of such a methodology in his other work. Kapoor Decl. Ex. 29 (Phillips Dep. Tr.) at 87:21 – 89:19.

Stamm's benchmark is conservative for the additional reason that there is a factual basis to conclude that Mitre soccer ball sales also would have increased despite the recession. Stamm and HBO's damages expert agree that about 80 percent of Mitre sales in the U.S. are through

194860.5

Wal-Mart. Kapoor Decl. Ex. 32 (Stamm Report) ¶ 26 at 9; *id.* Ex. 29 (Phillips Dep. Tr.) at

166:22 – 167:02. It is well known that, during a recession, consumers become increasingly cost-

conscious and thus shop more at deep discount stores such as Wal-Mart. The result in this case

was that, despite the recession, Wal-Mart's net sales increased. In contrast, many other retailers'

net sales declined. Declaration of Laura B. Stamm (May 27, 2011) (Kapoor Decl. Ex. 48); *see*

Kapoor Decl. Ex. 29 (Phillips Dep. Tr.) at 167:03 – 16. In fact, Wal-Mart's sales in the soccer

category increased from between $27 million and $29 million in 2008 to between $33 million

and $34 million in 2009. Kapoor Decl. Ex. 30 (Wal-Mart 30(b)(6) Dep. Tr.) 166 – 167.[8] This

suggests that sales of Mitre soccer balls would have increased in 2009 notwithstanding the

recession. To be prudent and conservative, Stamm's damages calculation is premised on Mitre's

soccer ball sales at Wal-Mart remaining flat in 2009 from 2008. Kapoor Decl. Ex. 32 (Stamm

Report) ¶¶ 33-34 at 11-12. Stamm does not calculate damages for lost soccer ball sales in 2010.

Stamm's conservative calculation of damages for lost royalties on lost soccer ball sales to Wal-

Mart is $39,615, *id.* Ex. 2, hardly the wildly speculative damages HBO suggests.

  Second, HBO claims that 2008 is not a correct baseline for Mitre's soccer ball sales

because Stamm purportedly "admit[s] that 2008 was not a 'normal' year for Wal-Mart sales."

HBO Mem. Stamm 15 (citing Stamm Dep. Tr. 219). HBO misconstrues Stamm's testimony,

which is that 2008 was not "normal" "in the sense that . . . 2008 was the year that Wal-Mart

expanded their distribution of Mitre products" (before Wal-Mart learned of "Children of

Industry"). Stamm Dep. Tr. 219. Because Wal-Mart had expanded its distribution of Mitre

---

[8] HBO also cites, as reasons why Mitre's soccer *ball* sales should have decreased, a Consumer
Products Safety Commission recall of a soccer *goal* and Wal-Mart's alleged return of soccer
*goals* containing a higher lead content than Wal-Mart found acceptable. HBO Mem. Stamm 15
n.10. The recall concerned goals that had not been sold since 2007. Kapoor Decl. Exs. 34-35
(Hibbert 30(b)(6) Tr. 255:09 – 256:12 & Ex. 6). And Wal-Mart agreed to take back the other
goals once their lead content was fixed. Kapoor Decl. Ex. 33 (Pope Dep. Ex. 24).

194860.5

products, the years 2005 – 2007 would not make good baselines. *Id.* 2008 was the appropriate baseline year.

HBO also takes issue with the fact that, in 2008, Mitre started selling a higher-priced "Premier" ball in addition to its lower-priced offering. HBO Mem. Stamm 15-16. But as Stamm testified, one would reasonably expect Wal-Mart to maximize its profits and maintain or grow its revenues in 2009 and 2010 by changing its product mix during a recession to sell relatively more of the less expensive ball to reflect greater expected demand for the lower-priced ball and lower expected demand for the higher-priced ball. Kapoor Decl. Ex. 1 at 224:08 – 225:24. Further, it is reasonable for Stamm to have calculated damages on the basis that dollar sales of Mitre soccer balls would have stayed the same from 2008 to 2009, in light of the fact that soccer sales at Wal-Mart increased by several million dollars during that time.[9]

Third, HBO claims that Stamm has no basis for her statement that "Wal-Mart's attitude towards purchasing Mitre-branded soccer balls" changed because of "Children of Industry." HBO Mem. Stamm 16. To the contrary, as Wal-Mart's 30(b)(6) witness, David Breed, testified, he returned 150,000 Mitre "Cobra" balls because of the potential the show was true. Kapoor Decl. Ex. 30 at 74 – 75. His testimony that Wal-Mart sees "value in the brand"—given after Wal-Mart determined "that there was no child labor involved," Kapoor Decl. Ex. 30 (Wal-Mart 30(b)(6) Dep. Tr.) 163:22 – 164:07—does not undermine his earlier testimony that he returned

---

[9] The cases HBO cites for the proposition that Stamm's calculations are subject to enhanced scrutiny, because they involve a "new product" or "new business venture," are inapposite. *See Schonfeld v. Hilliard*, 218 F.3d 164, 168 (2d Cir. 2000) (damages from the failure to launch a new cable news channel in the U.S.); *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 333 (2d Cir. 1993) (damages from the early introduction of CD-ROM technology). The "Premier" soccer ball is not a "new product" or "new business venture" in this sense.

194860.5

the Cobra balls because of the potential that the show was true and it does not change the fact

that Wal-Mart purchased fewer Mitre products in 2009 in the wake of "Children of Industry."[10]

Finally, concerning Stamm's calculation of lost royalties from lost soccer ball sales due

to Regent's having to sell the returned Cobra balls to other retailers instead of selling other

similarly priced Mitre balls to these retailers, Kapoor Decl. Ex. 32 (Stamm Report) ¶ 41 at 14-15,

HBO claims that Stamm's calculation is unreliable because the Cobra balls "could have

displaced sales of MacGregor," another soccer brand sold by Regent.  HBO Mem. Stamm. 17.

HBO offers no factual support for this counterintuitive assertion.  If a retailer purchased a Mitre

Cobra ball, it would have been more likely to purchase another similarly priced Mitre ball than

the ball of a different brand.

## III.   THE COURT SHOULD NOT STRIKE STAMM'S CALCULATION OF MITRE'S REGENT ROYALTY CONCESSION

### A.   Mitre Disclosed the Damage to Its Ability to Earn Royalty Income from Its Licensees in the United States

HBO makes the illogical claim that Mitre should have disclosed, as part of Mitre's initial

disclosures in February 2009, the damage to Mitre's ability to raise Regent's royalty—before the

harm was incurred in the new Regent license effective January 1, 2010.  Under Rule 26, Mitre's

obligation to disclose this computation of damages arose only when Mitre's accounting expert

computed it.  See Dayton Valley Investors, LLC v. Union Pac. R. Co., 2010 WL 3829219, at *3

(D. Nev. Sep. 24, 2010) (cited in HBO Mem. Stamm 13) ("Timing is better gauged in relation to

---

[10] Stamm Report, at Ex. 1 (Kapoor Decl. Ex. 32).  HBO mistakenly cites Stamm's testimony for the proposition that sales of Mitre soccer balls to all U.S. retailers increased.  HBO Mem. Stamm 16 n.11.  Her testimony is that she "disagree[s] with the statement that the quantity of Mitre soccer balls increased from 2008 to 2009." Kapoor Decl. Ex. 1 at 78:05 – 11; Stamm Report, at Ex. 1.  Mitre soccer ball sales to retailers other than Wal-Mart increased, but not by nearly as much as sales to Wal-Mart decreased, resulting in a net decrease because 80% of Mitre sales in the U.S. are through Wal-Mart.  Id.

194860.5

the availability of the supplemental information."). Per Rule 26, Mitre disclosed the computation

and supporting materials at the time set by this Court's scheduling order for expert disclosures.

HBO also claims that Mitre's 30(b)(6) witness on damages, Gary Hibbert, failed to

identify this category of damages. To the contrary, Hibbert testified:

> **Q.** What is the clear evidence that it has been reduced?
>
> MR. KAPOOR: Object to form.
>
> **A.** As I outlined earlier on, *a significant reduction in our royalty income through our licensing partners in the U.S.*; our inability to secure ongoing and new sponsorship agreements; a 20-percent reduction in our sales in the United Kingdom. Those are the key elements.
>
> **Q.** I'm going to table for a second the discussion of royalty income. . . .

Kapoor Decl. Ex. 34 at 13:06 – 17 (emphasis added). While counsel for HBO did return to the

topic of royalty income during Hibbert's deposition, counsel did so only with respect to 2009

sales—not royalty income from 2010 onwards. *Id.* at 106:11 – 112:09 (discussing Hibbert

30(b)(6) Dep. Ex. 3). HBO also claims that Hibbert identified only discussions with Regent

about the Cobra ball return concerning damage caused by "Children of Industry." HBO Mem.

Stamm 11 (citing Hibbert 30(b)(6) Dep. Tr. 198 – 200). HBO omits Hibbert's earlier testimony:

> **Q.** What conversations has Mitre had with Regent about damages that the segment has done to Mitre's -- the Mitre brand?
>
> **A.** Outside of the sales issues *and royalty revenue*, we've had no further conversations in terms of a level of damages.

Kapoor Decl. Ex. 34 at 195:25 – 196:06 (emphasis added). HBO failed to follow-up on

Hibbert's answer. HBO also failed to examine Hibbert concerning Mitre's negotiations with

Regent for the 2010 license beyond establishing the simple fact of the amounts of the royalty

rates stated in that license. *See id.* at 217:04 – 218:20.

12

194860.5

The cases on which HBO relies are inapposite.  In *Design Strategy, Inc. v. Davis*, the plaintiff had *never* disclosed its computation of damages and supporting documents, neither in its Rule 26(a)(1) initial disclosures nor in its Rule 26(a)(2) expert disclosures. 469 F.3d 284, 293 (2d Cir. 2006).  Instead, the plaintiff disclosed its damages expert for the first time "shortly before trial" "in a proposed pretrial order." *Id.*  The same was the case in *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 566 F. Supp. 2d 305, 317-18 (S.D.N.Y. 2008); *Armenian Assembly of Am., Inc. v. Cafesjian*, 746 F. Supp. 2d 55, 69-71, 2010 WL 4258900, at \*\*12-13 (D. D.C. 2010); and *Dayton Valley Investors*, 2010 WL 3829219, at \*2 (computation and supporting documents disclosed 18 months after close of all discovery, both fact and expert).

### B.    Stamm Relies on Correct Facts

HBO claims that Stamm is incorrect that Mitre was unable to increase its royalty from Regent because that royalty allegedly increased from 8 percent to 10 percent.  HBO Mem. Stamm 13-14.  The 8 percent royalty to which HBO refers was not the royalty in the Mitre/Regent license, but a royalty for a one-time program with Wal-Mart.  Kapoor Decl. Ex. 36 (REG-00011524 – 532, at 525:  royalty reduction would be for a program in the fall of 2008); Black Decl. Ex. 7.  The royalties in the old Regent license were unchanged in the new Regent license. *Compare* Kapoor Decl. Ex. 37 at MIT00370001 *with id.* Ex. 38 at MIT00399159.

## IV.   THE COURT SHOULD NOT STRIKE STAMM'S CALCULATION OF LOST SALES IN THE UNITED KINGDOM

### A.    "Children of Industry" Was Posted on YouTube and Disseminated to Multiple Media Outlets with HBO's Approval and Participation, Making HBO Liable for Republication by Third Parties

"Under New York law, the original publisher of a defamatory statement is not *automatically* liable for subsequent republication of the statement by others." *Croy v. A.O. Fox Mem'l Hosp.*, 68 F. Supp. 2d 136, 144 (N.D.N.Y. 1999) (emphasis added; citing, *inter alia*,

13

194860.5

*Karaduman v. Newsday, Inc.*, 51 N.Y.2d 531, 540 (1980)). "The original author of a document may not be held personally liable for injuries arising from its subsequent republication absent a showing that the original author approved or participated in some other manner in the activities of the third-party republisher." *Id.* As *Karaduman* held, the original publisher is responsible for the republication where a defamation plaintiff demonstrates that the original publisher knew or had a reasonable expectation that republication was likely. 51 N.Y.2d at 541 n.2.

HBO's argument that it is not liable for "Children of Industry"'s ("COI") republication by third parties glosses over the applicable legal standard and ignores HBO's approval of, and active participation in, COI's dissemination by third parties and on the internet.

The International Labor Rights Forum ("ILRF") is an organization that assisted HBO in the production and dissemination of COI, including by posting a YouTube link to the show on ILRF's internet blog. ILRF began working with HBO to produce what ultimately became COI in early 2007. Kapoor Decl. Ex. 39 (Tocco Dep. Tr.) 168:7 – 169:21. To support HBO's production of COI, ILRF introduced HBO to Kailash Satyarthi, conducted field work in Meerut with HBO's stringer Yatish Yadav, supplied HBO with information regarding import records of soccer products from India to the United States, and provided HBO a draft copy of ILRF's 2008 report on soccer ball production in Meerut. *Id.* 64:18 – 104:6. ILRF worked with HBO to coordinate the release of its 2008 report with the first telecast of COI. *See id.* 178:20 – 179:5; Kapoor Decl. Ex. 40 (ILRF 032).

After COI's initial telecast, ILRF worked with HBO to disseminate the program. In an email to HBO's Zehra Mamdani, dated September 24, 2008, eight days after COI's initial telecast, ILRF's Trina Tocco wrote:

> So now we want to spread this footage as far as possible as quickly as possible. I know you mentioned its not on the internet but its

14

194860.5

> really essential to have it available over the web so we can make
> sure lots and lots of folks see the footage.  Is there anything we can
> do to help make this happen ASAP.

Kapoor Decl. Ex. 41 (ILRF 164).  In the same email Tocco asked Mamdani to send ILRF 20 –

30 DVD copies of the show.  Aware that ILRF sought to republish COI "as far as possible as

quickly as possible" and on the internet, HBO provided ILRF with the requested DVDs.  *See*

Kapoor Decl. Ex. 39 (Tocco Dep. Tr.) 138:07-22.

On October 6, 2008, ILRF posted a blog referencing COI and including a link allowing

people to view the show on YouTube.  *See* Kapoor Decl. Ex. 42 (Tocco Dep. Ex. 7); Kapoor

Decl. Ex. 39 (Tocco Dep. Tr.) 153:03-17.  On October 16th, after Mitre sent HBO a cease-and-

desist letter dated October 1st, HBO counsel Stephanie Abrutyn contacted Tocco and indicated

that HBO no longer wanted ILRF to make reference to "the segment on Youtube."  *See* Kapoor

Decl. Ex. 43 (ILRF 181); *id.* Ex. 39 (Tocco Dep. Tr.) 163:21 – 164:17.  That same day, ILRF

complied with HBO's request.  *Id.* 165:04 – 15.

HBO is liable for the distribution of COI over the internet because HBO actively took

steps to enable ILRF, one of HBO's partners in producing COI, to republish the program and, as

ILRF told HBO it would do, "spread this footage as far as possible as quickly as possible,"

including by posting it on the internet.  HBO then provided ILRF with 20 – 30 DVD copies of

COI to enable this dissemination.  ILRF also described to HBO with great clarity how "essential"

it was to "have it [COI] available over the web."  In such circumstances, HBO had a reasonable

expectation that ILRF would republish COI, including via the internet.  Demonstrating HBO's

influence over the republication of COI, ILRF removed the YouTube link from its blog post only

after HBO demanded that ILRF do so.

Further, Ross Greenburg, the President of HBO Sports, testified about HBO's public

relations ("PR") campaign "to strengthen the public's awareness of Children of Industry."

194860.5

Kapoor Decl. Ex. 44 at 264:18 – 24. The purpose of this PR campaign was "to increase the viewership of Children of Industry" and "get articles written about the story for Real Sports and HBO." *Id.* at 264:25 – 265:11. To do so, HBO's PR department sent press releases about "Children of Industry" to various media outlets, including *The New York Times*, *The Los Angeles Times*, National Public Radio, and all "soccer contacts" on HBO's PR list. *Id.* at 265:22 – 271:04 & Kapoor Decl. Ex. 45 (Greenburg Dep. Exs. 15 – 17.)[11]

Under these circumstances, it is appropriate to hold HBO responsible for the republication of "Children of Industry" and reports of its contents via the internet. HBO participated in this republication, actively encouraged it "to strengthen the public's awareness" of the show and "get articles written" about it, disseminated multiple copies of the show to ILRF, and allowed the show to be posted on YouTube. Therefore, HBO's argument that Stamm should be precluded from referencing or relying on COI's republication on the internet for purposes of calculating U.K. damages, is without merit.

## B. There Is Sufficient Evidence That the Sudden, Unexplained Deviation in Mitre's U.K. Sales Was Caused by "Children of Industry"

Stamm calculates Mitre's damages from lost sales in the United Kingdom premised on Mitre management's conclusion that Mitre's lost sales were entirely due to COI because there was no other factor that would have accounted for such a drastic shortfall during the time leading

---

[11] HBO was proud of its "investigative" work, to the point of even discussing how HBO would win awards for it. Kapoor Decl. Exs. 46-47 (HBO009936; HBO004329). HBO Sports President Ross Greenburg described "Children of Industry" as "a beautiful, heart-wrenching spectacularly told drama that keeps you riveted to the screen during the entire piece. Frankly, I don't even know how long it is or care. Play it as it is and don't change a thing. Masterful work by the best storytellers/journalists in the business. Congrats to all. This will make a difference, you'll see. Ray and Kris, please get the word out for the kids in this piece. It is important." Kapoor Decl. Ex. 44 at 221:22 – 224:23. By "get[ting] the word out for the kids," Greenburg meant "spreading the word" on "Children of Industry" through HBO's public relations team for the benefit of the children purported to be child laborers. *Id.*

194860.5

up to the FIFA 2010 World Cup, when soccer sales increase—as they did for Mitre's competitors Nike and Adidas. Kapoor Decl. Ex. 34 (Mitre 30(b)(6) Dep. Tr.) at 8:15 – 9:16 ("From a U.K. perspective, our sales are significantly down, approaching 20 percent down in a World Cup year, which in the 21 years I've been with the brand, has never happened before."); *id.* Ex. 1 (Stamm Dep. Tr.) at 101:16 – 104:16; *id.* at 152:06 – 153:02 (economic measures showed recovery in 2010 which would not explain a 20 percent drop in sales in 2010); Kapoor Decl. Ex. 32 (Stamm Report) ¶ 51 at 19 (soccer sales increased for Nike and Adidas).

Stamm properly relies on Mitre's 30(b)(6) testimony because Mitre management's conclusion is supported in the record. As described above, COI was distributed outside the United States via YouTube. Also, the issue of child labor in soccer ball production gains increased prominence leading up to the FIFA World Cup. Kapoor Decl. Ex. 32 ¶ 49 at 18. Exhibit 10 to Stamm's report indicates that, "from 2005 through 2008 sales of Mitre products increased on average by more than 10 percent annually." *Id.* ¶ 50 at 19. In 2009, Mitre's U.K. sales were flat. *Id.* In 2010, Mitre's U.K. sales "dropped in excess of 18 percent" to their lowest point in five years. *Id.* ¶ 51 at 19. This 18 percent drop was the first drop in U.K. sales experienced by Mitre in a World Cup year in the 21 years that Gary Hibbert, Managing Director of Mitre, has been with the company. Kapoor Decl. Ex. 34 at 40:08 – 24. Notwithstanding the global economic downturn, "sales of soccer products of Mitre competitors Nike and Adidas both *increased*" in 2010. Stamm Report ¶ 51 at 19 (Kapoor Decl. Ex. 32) (emphasis added).

HBO argues that Stamm's calculation of damages for lost U.K. sales is unreliable because it derives from the deviation in Mitre's actual U.K. sales from Mitre's budgeted sales. HBO Mem. Stamm 7-8. HBO's argument is without merit. As Stamm testified, she understands the budgets to be realistic and created through a formal process within Mitre in the ordinary

17

194860.5

course of business by the individuals most knowledgeable and experienced in the business. They comprise Mitre management's best estimates in the ordinary course of business and are not the "cheerful prognostications" HBO argues. Kapoor Decl. Ex. 1 at 163:13 – 25.

Further, Stamm did not rely on management's estimates without question. She asked "whether anything had changed," such as expenses or merchandising strategy, "in the course of the year that differed from what would have been budgeted" and that could therefore account for the sudden shortfall in Mitre's sales. *Id.* at 167:14 – 25. Nothing had. *Id.*[12]

HBO also claims that Stamm unwarrantedly assumes causation because she does not account for the effect of the economic downturn from 2009 – 2010. HBO Mem. Stamm 8-10 ("It is inconceivable that the global economic downturn had no impact on sales of Mitre-branded goods."). To the contrary, as Stamm testified, she did consider economic data—the very data on which HBO's expert relies—and concluded that, "[h]istorically, the Mitre U.K. sales were not, not correlated well with the economic indices." Kapoor Decl. Ex. 1 at 149:15 – 150:02, 151:12 – 24. From 2006 through 2009, "Mitre's sales grew at a substantially higher rate than the economy." *Id.* "[F]rom 2009 to 2010, the economy grew," which supports the conclusion that Mitre's 2010 U.K. sales—its lowest in five years and an 18 percent drop during a World Cup year—were negatively impacted by "Children of Industry" rather than general economic conditions. Notably, HBO's expert testified that "general industry and economic conditions in 2009 and in 2010" were *not* one of his "principal objection[s]" to Stamm's calculations. Kapoor Decl. Ex. 29 at 160:02 – 16.

---

[12] HBO's reliance on Stamm's testimony, that she had no information that Mitre's budgets "predict" what Mitre's actual sales will be, proves only the unremarkable fact that one cannot predict the future. As Exhibit 11 to Stamm's Report shows, Mitre's budgets were much closer to the mark in 2007 and 2008 than they were in 2009 and 2010.

194860.5

HBO's cases do not support its arguments. *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.* 509 U.S. 209, 242 (1993), and *Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 22 (2nd Cir. 1996), involved opinions un-tethered to objective data. *See Brooke Group,* 509 U.S. at 232 ("No inference of recoupment is sustainable on this record, because no evidence suggests that Brown & Williamson . . . was likely to obtain the power to raise the prices for generic cigarettes above a competitive level."); *Boucher* 73 F.3d at 22 (Boucher's expert estimated Boucher's lost earnings based on assumptions inconsistent with Boucher's past employment record). Stamm's calculation of Mitre's U.K. damages is based on historical financial data, industry data, and general economic data. *Celebrity Cruises Inc. v. Essef Corp.* actually endorses one aspect of Stamm's analysis—her reference to the fact that Mitre's competitors' sales increased during the recession. "While calculation of Celebrity's losses is the ultimate goal, damage to the cruise industry could be important in determining how to view the profits of comparable companies in order to ascertain the extent to which Celebrity may have deviated from the 'norm' as a result of the incident." 434 F. Supp. 2d 169, 177 (S.D.N.Y. 2006).[13]

Finally, HBO claims that Stamm's calculation of U.K. damages is unreliable because Stamm engages in "mere speculation" in assuming for purposes of her calculation that the entirety of Mitre's sales' shortfall is attributable to "Children of Industry." HBO Mem. Stamm 9. To the contrary, Stamm testified that Mitre's conclusion was supported by (1) the marked reversal in Mitre's historical sales performance coincident with "Children of Industry" and internet activity about the show; and (2) the absence of evidence of other reasons for Mitre's

---

[13] *Toltec Fabrics, Inc. v. August Inc.,* 29 F.3d 778 (2nd Cir. 1994), is inapposite because it concerns damages for loss of goodwill or future profits. *See id.* at 781. According to *Toltec Fabrics,* courts impose more stringent requirements of proof when parties seek recovery of future profits. *See id.* at 782. Here, Mitre is only seeking to recover damages already incurred for U.K. sales, not damages likely to incur at some future point in time.

194860.5

reversal in performance. Kapoor Decl. Ex. 1 at 103:08 – 23. Where an assumption is grounded in fact, as here, the credibility of that assumption is a question for the jury. *LePage's Inc. v. 3M*, 324 F.3d 141, 165-66 (3d Cir. 2003) *(en banc)* (affirming jury verdict for plaintiff); *see also Gen. Leaseways v. Nat'l Truck Leasing Ass'n*, 830 F.2d 716, 726 (7th Cir. 1987) (affirming jury instruction that "You have heard conflicting testimony concerning these and other major assumptions of General Leaseways' study. As to each of these assumptions, it is General Leaseways' burden to establish to your satisfaction that the assumption is reasonable, that it is consistent with your understanding of what would have occurred . . . ."); *U.S. Football League v. Nat'l Football League*, No. 84 CIVIL 7484 PKL, 1986 WL 10620 (S.D.N.Y. 1986) (giving jury instruction: "Both plaintiffs and defendants are allowed to base their damages theory on assumptions, so long as the assumptions are reasonable in light of the evidence in the record. It is for you the jury to decide the reasonableness of the assumptions underlying plaintiffs' theory of damages, based on the evidence in the record and your own common sense. If you find that an assumption made [by the experts] was not reasonable, then you should take the unreasonableness of that assumption into account in your estimation of plaintiffs' damages.").

## V.   THERE IS NOTHING PREJUDICIAL IN STAMM'S BASES FOR HER OPINION THAT HER DAMAGES CALCULATIONS ARE CONSERVATIVE

HBO argues that several statements in Stamm's report are "prejudicial and irrelevant." HBO Mem. Stamm 22-23. These include Stamm's statements that: Modell's Sporting Goods returned several Mitre products immediately after "Children of Industry" was first shown on HBO; "Mitre has had less success securing important sponsorship arrangements" in the United Kingdom; and it is probable that Mitre continues to suffer lost sales in 2011. Kapoor Decl. Ex.

194860.5

32 ¶¶ 17, 18, 29 at 6, 10.  These statements have factual bases in the record.  *Id.*[14]  And they are

not prejudicial to HBO.  As Stamm states in her report, she does not calculate damages from the

Modell's return nor from Mitre's injured ability to secure sponsorships in the U.K. nor from

2011 because she did not have sufficient data with which to quantify the likely damages.  *Id.* ¶ 19

at 6-7.  The fact that she did not include these losses in her damages calculations does not make

her statements prejudicial; rather, it makes her analysis conservative.  *Id.*

## CONCLUSION

For the foregoing reasons, Mitre respectfully requests the Court to deny HBO's Motion in

Limine to Exclude the Expert Report and Testimony of Laura B. Stamm.

Dated: May 27, 2011

Respectfully submitted,

**CONSTANTINE CANNON LLP**

By: _____
Lloyd Constantine
Ankur Kapoor
Jean Kim
Sam Rikkers
335 Madison Avenue
9th Floor
New York, N.Y. 10017
(212) 350-2700
(212) 350-2701 (fax)

Jason Enzler
Mitchell L. Stoltz
One Franklin Square
1301 K Street, N.W.
Suite 1050 East
Washington, D.C. 20005
(202) 204-3500
(202) 204-3501 (fax)

---

[14] HBO's damages expert testified as to the continuing internet presence in 2011 of HBO's allegations made in "Children of Industry."  Kapoor Decl. Ex. 29 at 186:06 – 188:05.

194860.5