UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MITRE SPORTS INTERNATIONAL LIMITED,

                    Plaintiff,

        v.

HOME BOX OFFICE, INC.,

                    Defendant.

MEMORANDUM
DECISION AND ORDER

08-CV-9117 (GBD)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GEORGE B. DANIELS, District Judge:

Plaintiff Mitre Sports International Limited ("Mitre") commenced this action against

Defendant Home Box Office, Inc. ("HBO"), alleging that Defendant's distribution of a portion of

"Real Sports With Bryan Gumbel Episode #138" entitled "Children of the Industry" ("COI") on

September 16, 2008 defamed Plaintiff by falsely portraying that Mitre employs child labor in the

manufacture of Mitre soccer balls in India. Plaintiff moved for summary judgment that HBO

defamed Mitre (ECF 244) and that Mitre is not a public figure (ECF 251). Defendant also

moved for summary judgment on these two issues (ECF 230). Plaintiff's motion for summary

judgment that it is not a public figure is GRANTED.[1] Plaintiff's motion for summary judgment

that Defendant defamed Plaintiff is DENIED.[2] Defendant's motion for summary judgment is

---

[1] Defendant's motions to strike the expert reports of Patricia A. Aufderheide and Scott Elder are
GRANTED on the basis that they are irrelevant and do not assist the Court in determining any
material issues in dispute.

[2] Defendant's motion to strike viewer emails relied upon by Mitre is GRANTED. The Plaintiff
has not demonstrated any foundation for the admissibility of anonymous emails or their
relevance to a summary judgment determination of liability.

DENIED.

## I.    BACKGROUND

The following facts are drawn from the parties' submissions in connection with the instant motions. The facts are undisputed unless otherwise noted.

### A.    The Parties

Mitre is a privately held sporting goods brand headquartered in the United Kingdom. (Compl. ¶ 2). Mitre is one of 15 sporting, fashion, and lifestyle brands owned by Pentland Group plc ("Pentland Group"). (Mitre 56.1 Public Figure Stmt. ¶1). Among other sporting goods products, Mitre, though its licensees, sells Mitre-branded soccer balls worldwide, including in the United States. *Id*. Mitre has no U.S. subsidiaries. *Id*.

HBO owns and operates a premium pay television network, which produces and distributes, among other things, the monthly news magazine program *Real Sports with Brian Gumbel* ("Real Sports"). (HBO 56.1 Stmt. ¶ 3). According to HBO, Real Sports "presents an inside look at the modern world of sports, highlighted by profiles on athletes and investigative pieces." (HBO 56.1 Stmt. ¶ 4).

### B.    The Segment

#### 1.    The Segment as Aired[3]

On September 16, 2008, HBO aired Episode #138 of Real Sports, which included a segment entitled "Children of the Industry" ("COI" or the "Segment") regarding the use of child labor to stitch soccer balls in India. (Compl. ¶¶ 7, 10). The Segment discusses two child labor issues in India: (i) the use of low-paid child labor in Jalandhar, India to stitch soccer balls and (ii) debt-bondage in Meerut India, where children allegedly stitch soccer balls to pay off their

---

[3] The facts described herein include the Court's viewing of the Segment, annexed as part of Ex. 1 to the Perskie Decl.

parents' debts.  Gumbel introduces the Segment by stating, "We start with a sobering look at a practice that is clearly illegal, and was supposedly done away with years ago, and that's child labor."  Gumbel goes on to state that governments, manufacturers and retailers "are all letting it happen."  Real Sports Correspondent Bernard Goldberg ("Goldberg") describes the situation: "In the slums of India, children as young as six spend their days crouched on dirt floors stitching soccer balls together."  Children's rights advocate Kailash Satyarthi ("Satyarthi") adds, "They have no childhood.  They have no freedom."

COI depicts the stories of several children in Jalandhar and Meerut, who allegedly stitch soccer balls for soccer companies, including Mitre.  First, the Segment shows a twelve-year-old orphan, Manjeet, from Jalandhar, who COI claims is "a full-time soccer ball stitcher."  Manjeet declares that she "ha[s] no choice but to work" and she can't go to school because her "grandparents are very old and [they] are very poor."  COI informs viewers that Manjeet earns "about a nickel an hour" and "this is precisely why some soccer ball makers in India like hiring children instead of their parents."  Furthermore, COI claims that "children are the cheapest source of labor.  They are physically and mentally vulnerable.  They cannot go on strike.  They cannot form unions.  So they are docile, easy."  COI then states that "Manjeet is making a ball for Mitre, one of the biggest soccer brands in the world, the preferred brand of the pros."  COI continues with the story of other children in Jalandhar stitching soccer balls, stating, "We met dozens of kids making Mitre balls in Jalandhar, like brothers Deepu and Aman.  And it's not just Mitre.  We found at least ten international brands being stitched by kids here."  No other soccer ball brands are mentioned in the Segment.  Satyarthi comments that he would call this practice "slavery."

COI also portrays child labor in Meerut, "the second city of India's soccer ball industry." COI tells the story of ten-year-old Gurmeet Kumar, "an enslaved child stitcher [in Meerut] whose family 'sold his freedom' to a soccer ball manufacturer 'for less than a hundred dollars' to pay for medicine for his sick baby brother, who ultimately dies." COI then "informs viewers that Gurmeet was forced to quit school so he could pay off the loan from the 'soccer ball maker,' but that he will not be able to "because of the high interest rate demanded by the soccer ball maker." COI refers to this practice as "debt bondage," "slavery," "forced labor," and "indentured servitude," and states that "in Meerut, one of the most desperate places in India, it's as common as it is illegal." The hosts of COI then state that they "watched as other children in the village, children also in debt bondage to soccer ball makers, made their morning deliveries, bringing yesterday's finished balls to their masters, then leaving with that day's supply of raw materials."

COI describes Mitre as "the exclusive ball of the most prestigious league in the world, the English Premier League, as well as America's pro league, Major League Soccer." COI further comments that Mitre is "an industry leader off the field, too," and claims that "Mitre called a summit of the world's biggest soccer ball makers," in Atlanta and "they all pledged to stop using child labor." COI indicates that several companies, including Mitre, adopted a code of conduct requiring that child labor not be used by any of the suppliers that make soccer balls.

COI also includes an interview with Charlotte Ponticelli, then-Deputy Undersecretary for International Affairs at the U.S. Department of Labor. Ponticelli states that "[o]ne of the biggest hurdles you face addressing this problem is the fact that so much of it is hidden." Goldberg responds that "Real Sports was able to walk right into a stitching center in Jalandhar, where four kids not much older than ten were working for pennies a day. They were stitching Mitre Cobra model balls…" Goldberg then states that they "were able to buy several brands of balls that they

4

saw being made by children in India, and federal import records reveal scores of shipments of balls from India's soccer cities to America's ports." Later on in the Segment, Goldberg says, "And the one thing [the sporting good company, the U.S. government and the stores] have in common is they all say, 'we didn't know.'" COI depicts Ponticelli's response to be, "Look, it's our responsibility. All of us have a role to play. But, you know, you could go around and say 'how do you let this happen.' When you find out it's happening, you work to address it." Raw footage of this interview shows that Ponticelli's complete response to Goldberg included, "Look, policies—policies and law are not only good, they're essential…"

Toward the end of the Segment, Goldberg asks: "Are we supposed to believe that Mitre, for instance, which is just one of the many companies that, that are involved in this…is going to know what's happening on a side street in Jalandhar, India? It's hard. It's very hard." Gumbel responds, "I understand that, but when they say they investigated it, are they just lousy investigators or are they lying?" Goldberg concludes: "I don't believe they're lying…I honestly believe that Mitre and all the other companies would like this to be wiped out once and for all…But we found it. We found it…" Gumbel then asks, "How good can their investigations be? How hard can they be trying?" Goldberg responds, "I don't believe Mitre wants it to happen, but the subcontractors are a different story altogether. The subcontractors don't want to hire those kids' parents…They don't want to do that, because the kids are making a nickel an hour. The kids aren't yelling to organize…"

## 2. Research on and Filming of the Segment

Gul-e-Zehra Mamdani ("Mamdani"), an associate producer for the Segment and Joseph Perskie ("Perskie"), a coordinating producer at Real Sports, conducted research into the use of child labor in India from the summer of 2006 through the spring of 2007. (HBO 56.1 Stmt. ¶ 9).

Perskie and Mamdani's research included conversations and meetings with journalists, NGOs and soccer ball contractors in India. (HBO 56.1 Stmt. ¶¶ 12, 13, 25). Mamdani provided detailed notes of her research and interviews for the Segment. (Mamdani Decl. ¶¶ 10, 33, 40, 48, 79). Mamdani's notes indicate that Veena Sharma, one of the researchers in Jalandhar, told her that she saw several balls, including Mitre balls, being stitched by children under the age of fourteen and that she saw more than two dozen children under the age of fourteen stitching Mitre soccer balls. (Mamdani Decl. ¶49). The head of Mitre's parent company stated that "no one could say that there is no child labor in the production of [Mitre's] product" (Metcalf Decl. Ex. 34 at 41, 56-58; 186). Furthermore, the Sports Goods Foundation of India's ("SGFI") investigation revealed a number of children stitching Mitre-branded products in 2007-2008 (Metcalf Decl. Ex. 32; 33; 34).

On cross-examination, however, Sharma testified that she found "no children [under the age of 14] who could stitch footballs." (Mitre 56.1 Stmt. ¶ 35 (citing Sharma Tr. 181:06-10; 252:03-253:13)). Furthermore, Mamdani's notes from her conversations with Veena Sharma indicate that children in India were helping their parents, attending school, or doing only "very basic stitching." (Mitre 56.1 Stmt. ¶ 39).

A summary of the show indicates that HBO raised the question of whether the activities depicted in the Segment are "a product of Indian society, not necessarily an evil soccer ball company looking for balls on the cheap." (Mitre 56.1 Stmt. ¶ 44; Kapoor Decl. Ex. 20). Furthermore, Goldberg wrote to Perskie, "I think this is unfair to Wal Mart and Mitre. (Mitre 56.1 Stmt. ¶ 45; Kapoor Decl. Exs. 21 and 8). HBO disputes that these comments refer to anything contained in the document referenced. (HBO 56.1 Reply ¶ 45). Furthermore, Goldberg

6

testified that by the time the Segment was finalized, all of his questions had been addressed. (Goldberg Decl. ¶ 25).

Sumit Khanna, an HBO stringer,[4] testified that a video he created for HBO contained footage of two girls not shown on COI, but who later testified that they are not soccer ball stitchers and were induced to pretend on camera that they stitch Mitre soccer balls. Mamdani purportedly rejected this video. Mamdani declares that she witnessed children stitching Mitre soccer balls when Khanna took her around Jalandhar (Mamdani Decl. ¶¶ 77-78) , but Khanna denied that he ever did this. Rather, Khanna testified that after Mamdani rejected the video footage he filmed, he did no other work for HBO. Rikkers Decl. Ex. 13 at 131:9-12, 133:16-134:08; 136:09-137:01;149:19-25.

Harinder Singh ("Singh"), a bureau chief for a Hindi news channel and an HBO stringer, testified that the scenes of purported children stitching Mitre-branded soccer balls shown in COI were "fabricated" or "dramatized." Kapoor Decl. Ex. 35 at 157:04-160:02; 171:3-23. Other witnesses also testified that the scenes depicted in COI and in HBO's raw footage did not show real stitching or real stitchers. Children identified as stitchers of Mitre soccer balls gave unrebutted testimony that they were induced to pretend to stitch Mitre balls on-camera and that those scenes were staged. Kapoor Decl. Ex. 6 at 33:21-34:03; 38:01-04; 37:05-38:10. There is also unrebutted testimony that the balls shown being stitched had already been stitched prior to being given to the children in the show. Finally, translated raw footage of Manjeet, Deepu and Aman stitching shows the cameraman and unidentified woman telling the children what to do and instructing them to say that they "make Mitre footballs." (Mitre 56.1 Stmt. ¶ 25).

---

4 A freelance contributor of reports, photos or videos to a news organization.

## C.    Mitre in the Media

### 1.    Mitre and the Child Labor Controversy

On November 3, 1995, the Sporting Goods Manufacturers Association ("SGMA") and

the World Federation of the Sporting Goods Industry ("WFSGI"), an international trade

association of sporting goods brands called for an international conference that brought together

NGO and industry leaders to discuss their concern over the use of child labor.  (Mitre Public

Figure 56.1 Stmt ¶ 15).  No Mitre employees or officials attended the meeting.  (*Id*. ¶ 15).  At the

time of the conference, the Chairman of Mitre's corporate parent, Pentland Group plc, was the

President of the WFSGI.  (HBO 56.1 Stmt. ¶ 129).

In November 1996, Pentland Group plc hosted and sponsored another conference which

brought together representatives from the soccer ball industry in Pakistan, major sporting brands,

British and American government representatives, the International Labor Organization and Save

the Children "to agree on the way forward."  (Mitre Public Figure 56.1 Stmt. ¶ 15; HBO 56.1

Stmt. ¶ 138).  This conference led to the 1997 Atlanta Agreement between the Sialkot Chamber

of Commerce, the International Labor Organization, the United Nations Children's Fund and

Save the Children "to remove children from the soccer ball industry, provide them with

educational opportunities and create internal and external monitoring systems."  (HBO 56.1

Stmt. ¶ 140-41).  The Atlanta Agreement called for a commitment to stop the practice of

stitching by children under 14.  Over 50 Pakistani soccer ball manufacturers and U.S. importers

signed the agreement.  (HBO 56.1 Stmt. ¶ 141).  Although Mitre "privately supported" the

Atlanta Agreement, it is not a signatory. (Mitre Public Figure 56.1 Stmt ¶ 13; 17).  The *New

York Times* reported that "companies taking part in the [Atlanta Agreement] include Adidas,

Reebok, Nike, Umbro, Mitre, Brine and 50 others." (HBO 56.1 Stmt. ¶ 143).  Other American

and international publications reported that Mitre was involved in the Atlanta Agreement. (HBO 56.1 Stmt. ¶ 150-56).

In May 1997, *Christian Aid*, an "agency of 41 British and Irish Churches," issued a report on the use of child labor in the manufacture of soccer balls in India. (HBO 56.1 Stmt. ¶ 158). The report discussed Mitre and its contractor in India and recounted the story of an eleven-year old girl who stitched Mitre footballs. (*Id.*). The *Christian Aid* report was featured in international and local media and was discussed in U.S. Department of Labor reports. (HBO 56.1 Stmt. ¶ 162; 164). Several publications subsequently discussed the *Christian Aid* report and Mitre's reaction and efforts to help address child labor. (HBO 56.1 Stmt. ¶ 165-69).

In 1998, Mitre's contractors in India joined other sporting goods manufacturers and agencies in forming the SGFI  whose purpose is to "identify and rehabilitate any child labor in the sporting goods industry." (HBO 56.1 Stmt. ¶ 170). Mitre has identified SGFI on its website as the body responsible for monitoring the use of child labor in the manufacture of Mitre-branded products in India since 2000. (HBO 56.1 Stmt. ¶ 173). Mitre further stated on its website that it has supported SGFI programs in the Jalandhar area for the past 11 years. (HBO 56.1 Stmt. ¶ 176). Mitre's "code of employment standards for suppliers" requires that child labor not be used. (HBO 56.1 Stmt. ¶  43). Finally, Mitre explained on its website in a document titled "Mitre Making a Difference:  Addressing Child Labor in India" that "[t]he stitching involved in making footballs (soccer balls) is often sub-contracted out to homeworkers…" and that "[c]hildren sometimes help out with this work in the home…." (HBO 56.1 Stmt. ¶  43; Metcalf Decl. Ex. 34.)

2.   **Mitre's Local Presence**

Mitre was described by *Forbes* magazine as "the leading maker of soccer shoes and balls in the U.S.," by *USA Today* as a "top supplier of soccer equipment," by the *Seattle Times* as one of "two giants in the soccer industry," and by the *Orlando Sentinel* as one of the "must-have brands." (HBO 56.1 Stmt. ¶ 1, 243, 246; Metcalf Decl. Ex. 36 at 167-68 and its Ex. 24; Ex. 88-6; Ex. 107). Mitre was one of the two initial sponsors of Major League Soccer and its sponsorship was covered in several United States newspapers (HBO 56.1 Stmt. ¶ 209-10). Mitre was listed as an MLS Corporate Partner in every program and media guide for every MLS team from 1996 through 1999 and MLS Official Ball was visible in promotional shots and advertisement in guides. (HBO 56.1 Stmt. ¶ 220). Millions of fans attended MLS games during the period of Mitre's MLS sponsorship and Mitre's sideline on-field advertising boards were visible to attendees. (HBO 56.1 Stmt. ¶ 221-22; 224). Mitre-branded goods are available at major retail outlets across the United States, including at Walmart, Modell's Sporting Goods and Big 5. (HBO 56.1 Stmt. ¶ 265).

Mitre does not currently sponsor any teams or leagues in the United States, and has not done so since 1999 (Mitre Public Figure 56.1 Stmt. ¶ 31). Mitre's licensees do minimal advertising in the United States (approximately $250,000 per year), where its focus has been on in-store promotions with retailers, not consumer promotions. (*Id.* at ¶ 32).

II.   **LEGAL STANDARD**

Summary judgment is appropriate where the evidence, viewed in the light most favorable to the non-moving party, shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Vacold, L.L.C. v. Cerami*, 545 F.3d 114, 121 (2d Cir. 2008). The moving party has the burden to

show that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is "material" only when it will affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For there to be a "genuine" issue about the fact, the evidence must be such that "a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether there is a genuine issue of material fact, the court is required to resolve all ambiguities and draw all inferences in favor of the non moving party. *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). Where there is no evidence in the record "from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact," summary judgment is proper." *Catlin v. Sobol*, 93 F.3d 1112, 1116 (2d Cir. 1996). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir. 1991). If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**III.    MITRE IS NOT A PUBLIC FIGURE**

A public figure is one who "ha[s] assumed [a] role[] of special prominence in the affairs of society." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974). Whether a plaintiff is a public figure is a question of law for the court. *Celle v. Filipino Reporter*, 209 F.3d 163, 176 (2d Cir. 2000); *see also Hotchner v. Castillo-Puche,* 404 F.Supp. 1041, 1045 (S.D.N.Y. 1975).

"If the plaintiff is a public official or public figure suing a media defendant, the First Amendment requires actual malice." *Celle v. Filipino Reporter*, 209 F.3d 163, 176 (2d Cir. 2000). Actual malice is the publication of a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S.

11

254, 280 (1964). Actual malice must be proven by clear and convincing evidence. *Id.* Plaintiff satisfies the burden of establishing actual malice by showing that "defendant in fact entertained serious doubts as to the truth of his publication." *Freeman v. Johnston*, 614 N.Y.S.2d 377, 380 (1994). Mere negligence and failure to investigate do not establish actual malice. *Sullivan*, 376 U.S. at 283 n.24; *Freeman*, 614 N.Y.S.2d at 379.

### A. Mitre is Not a General Purpose Public Figure

A general purpose public figure must have "general fame or notoriety in the community and pervasive involvement in ordering the affairs of society." *Gertz*, 418 U.S. at 324. As the Supreme Court observed in *Gertz*, "those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Id*. at 345. In finding that Gertz was not a public figure, the Court reasoned that "[h]e plainly did not thrust himself into the vortex of this public issue, nor did he engage the public's attention in an attempt to influence its outcome." *Id.* at 352.

Furthermore, the Court in *Gertz* emphasized that it "would not lightly assume that a citizen's participation in community and professional affairs rendered him a public figure for all purposes." *Id*. Thus, although Gertz was well known in some circles, the Court did not deem him a general purpose public figure because "he had not achieved general fame or notoriety in the community." *Id.* In so finding, the *Gertz* Court noted that none of the prospective jurors called at the trial had ever heard of Gertz prior to the litigation.

HBO argues that "Mitre, simply by virtue of being one of the largest sporting goods companies in the world and one of the leading soccer ball brands in the United States….is a public figure." (HBO Brief at 35-36). To support its claim, HBO points to Mitre's status as a sports brand, including Mitre's statements in the media that it is "synonymous with soccer" and

is the "number one manufacturer of [soccer balls] in the world"; descriptions of Mitre in magazines as "the leading maker of soccer shoes and balls in the U.S.", a "top supplier of soccer equipment" and as one of "two giants in the soccer industry"; and the wide availability of Mitre-branded goods at major retail outlets across the United States.   (HBO Brief at 36).

HBO has failed to offer clear evidence that Mitre has the general fame and pervasive influence required by *Gertz*.  Rather, the evidence shows that Mitre does not approach the status of being a household name or a celebrity in the community.  First, Mitre has not sponsored any teams or leagues in the United States since 1999.  Furthermore, Mitre's sale and advertising of sports equipment is insufficient to make it a general purpose public figure.  Courts have held that even well-known corporations that sell and advertise common products are not general purpose public figures. *See e.g., Computer Aid, Inc. v. Hewlett-Packard Co.*, 56 F. Supp. 526, 535-36 (E.D. Pa. 1999) ("we do not believe that Hewlett-Packard has such pervasive fame or notoriety to be deemed a general purpose public figure," despite its status as "one of the largest and most influential corporations in the world with one of the most actively traded stocks on the New York Stock Exchange").  New York courts have repeatedly rejected the notion that advertising alone makes a business a public figure.  *Lee v.City of Rochester*, 663 N.Y.S.2d 738, 745-46 (N.Y. Sup. Ct. 1997) ("If that was the only criterion, any business that advertised would, merely by the fact of advertising, become a public figure, a proposition rejected in the cases."); *Behr v. Weber*, No. 16047/89,1990 WL 270993, at *2 (N.Y. Sup. Ct. Jan. 5, 1990) ("a business does not 'thrust itself into a public controversy by merely advertising its services") (citation and internal quotations omitted); *El Meson Espanol v. NYM Corp.*, 389 F. Supp. 357, 359 (S.D.N.Y. 1974) ("a corporation. . . holding itself out to the public as operating a safe and proper place to go, is not a public figure").  Finally, Mitre's status as a privately held corporation further supports the

13

conclusion that it is not a general purpose public figure. *Lake Havasu Estates, Inc. v. Reader's Digest Ass'n, Inc.*, 441 F. Supp. 489, 492 (S.D.N.Y. 1977) (plaintiff land sales company not a public figure because, among other reasons, it was not a "publicly held company about to offer stock").

## B. Mitre is Not a Limited Purpose Public Figure

The Supreme Court held in Gertz that "[p]arties who are not public figures for all purposes may still be public figures with respect to a particular controversy." *Gertz,* 418 U.S. at 352. In *Gertz,* the Court determined that the plaintiff, a lawyer tangentially involved in the prosecution of a policeman, was not a limited purpose public figure in connection with the controversy surrounding the prosecution because he had not "thrust himself into the vortex of [a] public issue, nor did he engage the public's attention in an attempt to influence its outcome." 418 U.S. at 352. As articulated by the Second Circuit, a limited purpose public figure is someone who has: (i) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of the litigation' (ii) voluntarily injected himself into a public controversy related to the subject of the litigation; (iii) assumed a position of prominence in the public controversy; and (iv) maintained regular and continuing access to the media. *Contemporary Mission, Inc. v. New York Times Co.,* 842 F.2d 612, 617 (2d Cir.1988), *citing Lerman v. Flynt Distrib. Co., Inc.,* 745 F.2d 123, 136–37 (2d Cir.1984). In addition, in determining whether a plaintiff is a public figure, New York courts examine whether plaintiff had taken affirmative steps to attract personal attention or had strived to achieve a measure of public acclaim. *James v. Gannett Co.*, 40 N.Y. 2d 415, 422 (N.Y. 1976). Voluntary attention-seeking, or voluntary participation in a particular controversy is a key factor in determining limited public figure status. *See James*, 40 N.Y. 2d at 423-24.

14

The passage of time will not necessarily change an individual's status as a public figure. *Contemporary Mission, Inc. v. New York Times Co.*, 842 F.2d 612, 619 (2d Cir. 1988). For example, the Second Circuit held in *Sidis v. F–R Publishing Corp.*, 113 F.2d 806, 809 (2d Cir. 1940) that a child prodigy who was once a public figure remained a public figure years later even after he had "cloaked himself in obscurity," because "his subsequent history, containing as it did the answer to the question of whether or not he had fulfilled his early promise, was still a matter of public concern." On the other hand, the Second Circuit has held that continuous access to the media to seek public attention with respect to the controversy makes an individual more likely to be a limited purpose public figure. *Compare Contemporary Mission*, 842 F. 2d at 620 (plaintiffs continuously used the media during the four year hiatus to seek public attention with respect to the business activities that were the subject of the earlier controversy) *with Lerman*, 745 F. 2d at 137 (plaintiff was not a limited purpose public figure because "he did not thrust himself or his views into the public eye to influence others, nor did he invite public attention or have regular and continuing access to the media").

HBO relies on three main categories of facts to allege that Mitre is a limited purpose public figure with respect to child labor in the manufacture of soccer balls: (i) news reports regarding child labor in the manufacture of soccer balls generally; (ii) news reports about soccer ball manufacturers' use of child labor that specifically name Mitre; and (iii) Mitre's stance on child labor. First, general news reports[5] regarding public controversy over the use of child labor

---

[5] For example, HBO cites a February 1997 industry *News Bulletin* report that the soccer industry exploits workers in developing countries in order to provide consumer products at low cost; a 1997 United States Department of Labor report that lays out the history of the public controversy over the use of child labor in the soccer ball industry; and a 1996 *Los Angeles Times* report that the United States government became involved in the international effort "to halt the production of soccer balls by Pakistani children."

in the soccer ball industry and efforts to address the problem, without more, are insufficient to deem Mitre a public figure with respect to the issue.

Aside from the fact that the majority of these reports date back to the late 1990s, they fail to suggest that Mitre took affirmative steps to attract personal attention or had strived to achieve a measure of public acclaim as required by *James*. Neither do these reports show that Mitre "thrust[ed] [itself] into the vortex of [a] public issue" or "engage[d] the public's attention in an attempt to influence its outcome" as required by *Gertz*. Second, even the news reports that mention Mitre specifically, including: a June 1996 *Life* magazine article recounting the danger to children from being forced to stitch soccer balls in Sialkot and mentioning Mitre by name as one of the "multinational companies . . . operating in Pakistan"; a 1995 *USA Today* report that "[v]irtually all of the USA's top suppliers of soccer equipment –including Adidas, Umbro and Mitre – import balls from Pakistan," where child labor and bonded labor are rampant; a 1995 *Sunday Times* of London article on the use of child labor in Pakistan stating that balls made for Mitre are being stitched together by children in Pakistan—fall short of meeting the requirements for a limited purpose public figure under *Gertz* and the line of cases that consistently require "affirmative steps," "purposeful activity," "voluntary" injection, or "invit[ing] public attention." *See James*, 40 N.Y. 2d at 423; *Lerman*, 745 F.2d at 136-37; *Contemporary Mission*, 842 F. 2d at 617; *Bruno*, 633 F. 2d at 588-89. Finally, Mitre's purported role in the international effort to eliminate child labor in the manufacture of soccer balls similarly lack the level of involvement required by *Gertz*, *James*, and their progeny. Specifically, the role of Mitre's corporate parent in sponsoring a conference that brought together representatives from the soccer ball industry in Pakistan in 1996, the creation of a hotline for American consumers to learn which brands had committed to the Atlanta Agreement, Mitre's corporate policy denouncing child labor on its

website and press releases indicating that Mitre had committed to the Atlanta Agreement do not show that Mitre itself took an affirmative stance on child labor in a manner that aimed to influence the public's views on the controversy.

## IV.   MATERIAL FACTS REMAIN IN DISPUTE AS TO WHETHER HBO DEFAMED MITRE

Defamatory statements made during a television broadcast are by definition libel. Black's Law Dictionary 427 (3d Pocket Ed. 2006).  Under New York law, a plaintiff must establish five elements to prove libel for a non-public figure: (1) a written defamatory statement of fact concerning the plaintiff; (2) publication to a third party; (3) fault (gross irresponsibility); (4) falsity of the defamatory statement; and (5) special damages or per se actionability (defamatory on its face). *See Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 176 (2d Cir. 2000).

### A.   Material Facts Remain in Dispute as to Whether COI is Susceptible to a Defamatory Meaning

Whether a particular statement is defamatory is a matter of law to be determined by the court in the first instance. *Id*. The New York Court of Appeals has defined "defamatory" as a statement that threatens to expose an individual to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or ... induce[s] an evil opinion of one in the minds of right-thinking persons, and ... deprives one of ... confidence and friendly intercourse in society." *Id*. at 177 (citing to *Kimmerle v. New York Evening Journal*, 262 N.Y. 99, 186 N.E. 217, 218 (1933).  Summary judgment is appropriate if the words are susceptible to only a defamatory meaning.  *Id*.  However, if the words are susceptible to multiple meanings, some of which are not defamatory, then it is for the trier of fact to determine how the words are to be understood. *See Karedes v. Ackerley Group, Inc.*, 423 F.3d 107, 113 (2d Cir. 2005).  In determining whether a particular writing or television program is defamatory, the

court is to examine the statements in "the context of the publication as a whole." *Id.* (citing

*Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 625 N.Y.S.2d 477, 649 N.E.2d 825,829

(1995)). Furthermore, "it is the meaning reasonably attributable to the intended reader that

controls." *Id.* On a motion for summary judgment, the issue for the court to consider is not

whether the language is libelous, but whether it is "reasonably susceptible of such a

construction." *Jewell v. NYP Holdings, Inc.*, 23 F.Supp.2d 348, 360 (S.D.N.Y. 1998). Thus,

while it is the duty of the courts to determine whether "the statement alleged to have caused

plaintiff an injury is *reasonably susceptible* to the defamatory meaning imputed to it," it is for

the jury to determine whether a plaintiff has in fact been defamed. *Id.* (emphasis in original)

(citations omitted).

Here, the record is in dispute as to what statement in the Segment is allegedly

defamatory. In its Motion for Partial Summary Judgment that HBO Defamed Mitre ("Mitre

Defamation PSJ Br.") (ECF 244), Mitre claims that HBO defamed it by "falsely portraying that

Mitre employs child labor in the manufacture of Mitre soccer balls in Jalandhar, India."[6] (Mitre

Defamation PSJ Br. at 1). In its opposition to HBO's summary judgment motion ("Mitre Opp.

Br."), Mitre argues that the "two 'major,' 'separate' meanings conveyed by [COI] and

understood by viewers were that (1) Mitre hires and exploits children as a source of labor in

Jalandhar, India, because they are cheap, cannot strike, and cannot unionize, and that (2) Mitre

employs child slave labor in Meerut, India, and itself enslaves children there including Gurmeet

Kumar." (Mitre Opp. Br. at 23). As framed by Mitre during oral argument, "It's not the issues

of whether or not children stitched soccer balls in India [ . . . ] The issue is whether Mitre hires

---

[6] On October 6, 2009, Mitre moved for partial summary judgment that COI "defamed Mitre by falsely portraying that Mitre and its manufacturers in India engage in the monstrous practice of employing child slave labor in the manufacture of Mitre soccer balls in the city of Meerut, India." That motion was denied (ECF 179).

children, whether Mitre wants this to happen, whether Mitre lets it happen…" (12/6/2011 Hr'g Tr. at 93: 2-3: 10-12).

On the other hand, HBO argues that they are entitled to summary judgment that HBO did not defame Mitre because the "gist or thrust of the Segment as it pertains to Mitre—that children in India are involved in the manufacture of soccer balls, including Mitre-branded balls—is substantially true. (HBO Br. at 23). HBO further points out that Mitre could not identify a defamatory statement of fact in the Segment (HBO Opp. Br. at 3-4). Specifically, HBO argues that while Mitre's 30(b)(6) witness stated that "the images of the children" stitching Mitre-branded soccer balls are the part of the Segment that 'cause[d] the greatest damage," nowhere in the Segment were the words "Mitre *employs* children directly to stitch soccer balls" said. (HBO Opp. Br. at 4). Thus, HBO argues, at best, Mitre can only state a claim for defamation by implication. *Id*. "Defamation by implication is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements." *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 380-81 (1995); *accord Krepps v. Reiner*, 588 F. Supp. 2d 471, 483 (S.D.N.Y. 2008). HBO argues that even a defamation by implication claim fails because "the purported implication that Mitre itself hires children to stitch balls is nowhere in [ . . . ] the Segment." (HBO Opp. Br. at 5). Furthermore, HBO argues that this implication is "directly contradicted by the Segment itself," given Goldberg's statement that he "honestly believe[s] that Mitre and all other companies would like this to be wiped out once and for all" and that he "[doesn't] believe Mitre wants it to happen, but the subcontractors are a different story altogether." (HBO Opp. Br. at 5-6). Finally, HBO argues that a reasonable interpretation of the Segment is that Mitre "could have done more but they decided not to." (12/6/2011 Hr'g Tr. at 39:22-40:1).

Because there are no undisputed facts in the record that establish what statements, if any, are defamatory, this Court cannot make any determinations on this issue as a matter of law. Rather, it is for the jury to determine first what the gist of the Segment is, and second, whether any statements therein are defamatory.

**B.    Questions of Fact Remain as to Whether COI is Substantially True**

Neither can this Court grant summary judgment for either side on whether COI is substantially true.  Under New York law, "'substantial truth' suffices to defeat a charge of libel." *Guccione v. Hustler Magazine, Inc.,* 800 F.2d 298, 302 (2d Cir.1986).  Thus, libel requires only that the gist or substance of the allegedly defamatory statements is true. *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 458 (S.D.N.Y. 2012); *Printers II, Inc. v. Professionals Publishing, Inc.,* 784 F.2d 141, 146 (2d Cir. 1986); *see also Korkala v. W.W. Norton & Co.,* 618 F.Supp. 152, 155 (S.D.N.Y. 1985) ("Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance.") (internal quotation marks and citation omitted); *Sharon v. Time, Inc.,* 609 F.Supp. 1291, 1294 (S.D.N.Y. 1984) ("Defendant is permitted to prove the substantial truth of this statement by establishing any other proposition that has the same 'gist' or 'sting' as the original libel, that is, the same effect on the mind of the reader.").  A statement is substantially true and "not actionable if the published statement could have produced no worse an effect on the mind of a reader than the truth pertinent to the allegation." *Guccione, 800 F.2d at 302; see Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 146 (2d Cir. 2001).

HBO argues that Mitre cannot prevail because the gist or thrust of the Segment—that "children in India are involved in the manufacture of soccer balls, including Mitre-branded soccer balls"—is substantially true.  (HBO Br. at 33).  HBO also argues that Mitre cannot establish that the Segment is materially false given the following undisputed facts:  (i) the head

20

of Mitre's parent company stated that "no one could say that there is no child labor in the

production of [Mitre's] product" (HBO Br. at 24); (ii) the SGFI found a number of children

stitching Mitre-branded products in 2007-2008 (HBO Br. at 25); and (iii) Mamdani personally

witnessed children stitching Mitre-branded balls in India (HBO Br. at 25).

Mitre claims, on the other hand, that COI is substantially untrue because an Indian

journalist, on whom the documentary's producer relied, informed HBO that there is no direct

contact between Mitre or its contractors and children, but rather that the parents give their

children balls to stitch. (Mitre Defamation PSJ Br. at 11). Mitre further claims that HBO's

researcher did not find any children stitching Mitre soccer balls in the Jalandhar area, (Mitre

Defamation PSJ Br. at 12), and that Mitre does not hire and employ children there (Mitre Opp.

Br. at 27-28). Additionally, Mitre claims that HBO fabricated instances of children stitching

Mitre soccer balls in India. (Mitre Support Br. at 21-24). Finally, Mitre claims that HBO knew

that Mitre, its manufacturers and its subcontractors were not hiring children in Jalandhar. (Mitre

Reply Br. at 8-11).

Because determining whether COI is substantially true would require this court to decide

disputed facts, including whether children in Meerut and Jalandhar stitch soccer balls and the

circumstances under which they do, summary judgment is not appropriate.

## C. Questions of Fact Remain as to Whether HBO Was Grossly Irresponsible

Because Mitre is not a public figure, it must show that HBO acted in a grossly

irresponsible manner without due consideration for the standards of information gathering and

dissemination ordinarily followed by responsible parties. *Chapadeau v. Utica Observer-*

*Dispatch*, 38 N.Y.2d 196, 199 (1975). Mitre claims that HBO was grossly irresponsible because

"far from extensive fact checking—HBO published knowingly false statements in COI,

21

fabricated information, and manipulated and edited footage to misrepresent facts." (Mitre Defamation PSJ Br. at 30).

Beyond gross irresponsibility, Mitre argues that HBO knew that COI was false at the time it broadcasted the Segment. Mitre claims that HBO knew that child stitching occurred because parents that Mitre hired gave balls to their children to stitch for additional income. (Mitre Defamation PSJ Br. at 11). Furthermore, Sharma "found no children [under the age of 14] who could stitch footballs" and reported these findings to Mamdani, whose notes indicate that children were helping their parents stitch but were attending school and doing only minimal stitching. (*Id.* at 12). Mitre also points to evidence that HBO internally questioned the accuracy of the show—including a statement by Goldberg that "this is unfair to Wal Mart and Mitre"— and claims that HBO fabricated reasons why Mitre liked to hire children. (*Id.* at 14). Furthermore, Mitre cites evidence that HBO knew that Mitre worked to stop child labor. (*Id.* at 17-20). Mitre also argues that HBO edited the Ponticelli interview to hide the fact that Ponticelli actually refuted Goldberg's statement that "they all say, 'we didn't know'" by informing him of the importance of company and governmental policies in combating child labor." (*Id.* at 20).

Finally, Mitre claims that HBO did not actually find children stitching Mitre soccer balls in India, but fabricated those scenes in COI. Mitre claims that the children shown stitching soccer balls in the Segment were paid to do so and that in reality, those children attend school. (Mitre Defamation PSJ Br. at 21-22). Mitre further claims that HBO knew that these scenes were staged and that HBO instructed the children to say that they stitch Mitre balls even though the children informed HBO that they do not stitch. (*Id.* at 23-24). Mitre points to evidence that from its earliest research in 2006, HBO knew that neither the brands nor the manufacturers hired children and that parents make children in the household stitch soccer balls. (*Id.* at 26). Mitre

alleges that HBO failed to convey that the children's parents gave them soccer balls to stitch because the core message that Mitre likes to hire children because they are the cheapest source of labor would have been destroyed had HBO indicated that soccer ball makers hire adult stitchers and some of them give their children soccer balls to stitch at home. (*Id*. at 27).

HBO argues that Mitre cannot prevail even under the "grossly irresponsible" standard because the Segment involves a matter of public interest and Mitre has not demonstrated as a matter of law that HBO acted in a grossly irresponsible manner. Specifically, HBO argues that "the only 'fabrication' Mitre claims happened would only have been done by independent contractors—not by HBO [and] [i]t cannot therefore constitute evidence that *HBO* acted grossly irresponsibly." (HBO Opp. Br. to Defamation PSJ at 18). Furthermore, HBO argues, none of its editing of certain interview footage that did not mention Mitre changed the meaning of the content of the Segment in a way that is a gross departure from the standard of care. *Id*.

Because questions of fact remain as to whether HBO was grossly irresponsible in producing the Segment, summary judgment is not appropriate. In particular, facts regarding whether and the circumstances under which children in India stitch soccer balls for Mitre, whether anyone working on the Segment saw any children in India stitching Mitre soccer balls, what HBO knew about the circumstances (if any) under which children in India stitch Mitre soccer balls, and what information HBO decided to include in the Segment in light of these facts remain in dispute. Therefore, determining a level of fault, including HBO's fact-gathering, editing and distribution of the Segment, requires an evaluation of the factual evidence and an assessment of witness credibility that is appropriate only for a jury.

## CONCLUSION

Mitre's motion for summary judgment that Mitre is not a public figure is GRANTED.

Mitre's motion for partial summary judgment that HBO defamed Mitre is DENIED.  HBO's

motion for summary judgment is DENIED.

The Clerk of the Court is ORDERED to close the motions at ECF 229, 243, 248, 252,

253,[7] 254 and 255.

Dated: May 16, 2014
      New York, New York

                        SO ORDERED.

                        GEORGE B. DANIELS
                        UNITED STATES DISTRICT JUDGE

---

[7] Defendant's motions to strike the expert report of Laura B. Stamm is DENIED without prejudice to renew prior to trial.